**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**MICHAEL T. BENSON,**                          :

            Plaintiff                          :

      **v.**                          :                          **CIVIL NO. MJG-02-CV-3626**

                       :

**TOMMY G. THOMPSON, SECRETARY
U.S. DEPT. OF HEALTH & HUMAN SERV:**

            Defendant                          :

                       **...oOo...**

**MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

Defendant Tommy G. Thompson, Secretary of the United States Department of Health and Human Services ("HHS" or "the Agency"), by Thomas M. DiBiagio, United States Attorney for the District of Maryland, and Larry D. Adams, Assistant United States Attorney for said District, hereby submits this Memorandum in Support of his Motion to Dismiss or for Summary Judgment.

## I.    INTRODUCTION

After having twice failed to successfully argue his claims before the Equal Employment Opportunity Commission ("EEOC"), Plaintiff Michael Benson has brought his claims of discrimination to this Court.  Plaintiff first claims that the Food and Drug Administration's ("FDA") refusal to allow him to work from home two days each week as a reasonable accommodation for his post-polio syndrome violated the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. (hereinafter "Rehabilitation Act").  Plaintiff further claims that FDA officials twice retaliated against him for pursuing his Rehabilitation Act complaint.

As we will show, Plaintiff's challenge of the FDA's decision to remove him from the Flexible Workplace Arrangements Program ("FWAP") in 1996 was not timely filed. Moreover, his eleventh hour characterization of his request for reinstatement in FWAP as a reasonable accommodation for his physical handicap is not supported by the record evidence, and Plaintiff's challenge of the FDA's initial refusal to provide him with that accommodation also was not timely. Further, the reasonable action taken by Plaintiff's supervisor to correct his performance deficiencies ultimately was not adopted by the agency and therefore did not rise to the level of an adverse employment action. In addition, Plaintiff's two-day suspension from duty was not causally related to his prior protected EEO activity. Finally, Plaintiff cannot show that he is a qualified individual with handicaps, and even if he can make that showing, the accommodation demanded by him is neither effective nor necessary to enable him to perform the essential functions of his job. For these reasons, this Court should dismiss Plaintiff's Complaint and enter Judgment for Defendant.

## II.   FACTS

Plaintiff is a GS-14 Regulatory Review Pharmacist employed by the Food and Drug Administration's Office of Drug Evaluation, Division of Over-the-Counter Drugs ("DOTCDP"), located in Rockville, Maryland. Plaintiff has been diagnosed with post-polio syndrome of the respiratory muscles and scoliosis secondary to poliomyelitis of the abdominal muscles. See Report of Investigation ("ROI"), Exhibit 9, at 2-4; the ROI is attached to this Motion as Exhibit A. From March 1995 until April 16, 1996, Plaintiff was participating in FWAP, under which he was permitted to work at home two days each week. Id. at Ex. 6. The FWAP agreement

Plaintiff signed on February 24, 1995, specifically permitted the agency to terminate his participation in FWAP "if the employee's performance decline[d]." Id. at Ex.7, p. 3.

**A.    Plaintiff's Initial Termination from FWAP.**

On April 16, 1996, Plaintiff was notified by his immediate supervisor that he would not be permitted to continue working at home until further notice. Id. at Ex. 6. Plaintiff was informed that his participation in FWAP was being suspended because several incidents of poor performance had shown that he was unable to work independently as a GS-14 Regulatory Review Pharmacist. Id. at Ex. 10; see also Ex. B. Specifically, Plaintiff made a major error on a citizen petition, and his team leader reported that the work he had done on several Federal Register documents had required significant supervision due to lack of timeliness and the need for revisions. Id.

On May 6, 1996, at 7:42 p.m., Plaintiff sent an e-mail to his immediate supervisor requesting authorization to work at his home in Baltimore, Maryland, the following day. Id. On May 7, 1996, despite being told three weeks earlier that he could no longer work from home, Plaintiff did not report to work and stayed home awaiting his supervisor's reply to his e-mail message of the previous evening. Id. After being told by his supervisor to report to the office, Plaintiff arrived at 11:09 a.m. and was charged with absence without leave from 9:30 a.m. to 11:09 a.m. on May 7, 1996. Id. Plaintiff was thereafter issued an official reprimand stemming from the same incident. Id.

**B.     The Agency's Refusal to Allow Plaintiff to Work at Home Two Days Each Week as a Reasonable Accommodation for his Physical Handicap.**

On May 20, 1996, Plaintiff once again requested immediate restoration to FWAP, but for the first time, his request was styled as a "right of accommodation" for his physical disability. See Ex. A at Ex. 9.  In his request to his supervisor, Plaintiff stated that he "did not bring the medical matter up to you before, because it is personal." Id.  Plaintiff further stated that he "had given serious thought to taking disability retirement because of the stress to me of travel to work in the morning, but could not afford to live on the income offered. . . . Amazingly enough since my surgery, I haven't noticed the same types of problems when driving home." Id.  In order to properly evaluate what Plaintiff for the first time styled as a reasonable accommodation request, the agency requested that he submit medical documentation to support his claim that his physical disability required that he work from home two days each week.

After receiving Plaintiff's medical documentation, the agency referred his request to James Vorosmarti, Jr., M.D., a contract consultant in occupational medicine assigned to the agency's office of human resources.  By memorandum dated May 31, 1996, Dr. Vorosmarti noted that the medical documentation provided by Plaintiff did not "list any work accommodations that must be made for Mr. Benson, but lists only the equipment and therapy required by him." Id. Ex. 15 at p.10.  Thus, Dr. Vorosmarti concluded that Plaintiff's medical documentation did not support his requested accommodation of working from home two days a week while at the same time reporting to the workplace the rest of the week.  Id.  Following several exchanges of medical information between Plaintiff and Dr. Vorosmarti during the

-4-

Summer of 1996, Plaintiff's supervisor denied his request to be restored to FWAP on October 9, 1996.  See Ex. B.

Plaintiff did not contact an EEO counselor regarding his official reprimand nor his termination from FWAP until September 2, 1997, more than fourteen months after his official reprimand and eleven months after his request for reinstatement in FWAP was denied by his supervisor following her receipt of Dr. Vorosmarti's report.  After efforts to informally resolve his complaint proved unsuccessful, Plaintiff filed a formal complaint of discrimination on November 12, 1997.  See Ex. A at Ex. 3; Complaint at 10.

Although Plaintiff has requested permission to work at home as a reasonable accommodation since May 20, 1996, he has never requested any adaptive equipment to aid his breathing at work.  Indeed, it was not until October 1998—while a subsequent formal grievance challenging his second termination from FWAP was being processed—that Plaintiff brought a rented pulse oximeter to his office and made a point of showing it to his immediate supervisor. See Ex. C.  However, Plaintiff's then-supervisor had never seen him actually use this equipment at the office.  See Ex. D.  Although Plaintiff also rents a portable oxygen system, see Ex. E, there is no evidence that he has used this portable system while commuting.

When Plaintiff's request to work at home as a reasonable accommodation was denied by his supervisor on October 9, 1996, he was informed that he could request and secure approval for sick leave whenever he was unable to drive to work for medical reasons.  See Ex. B.  In the three years that followed, however, Plaintiff missed only four days of work due to his alleged inability to drive to work because of his medical condition.  See Complainant's Response No. 12 to

-5-

Agency's Interrogatories, attached hereto as Ex. F.  Plaintiff took sick leave on each of those

days.  Further, Plaintiff is a member of a carpool and does not have to drive to work the four days

of each week that he is assigned to his office in Rockville.  Id., Response No. 3.

     In support of his request to work from home as a reasonable accommodation, Plaintiff has

submitted reports by three physicians and a rehabilitation therapist documenting his physical

condition.  See, e.g., Ex. A at Ex. 9.  None of these reports addresses Plaintiff's contention that

he does not experience any difficulty breathing while driving home after work.  See

Complainant's Response to Agency's Request for Admissions, No. 1, attached hereto as Ex. G.

Nor do they address Plaintiff's contention that although his physical condition requires that he

work at home two days a week it does not interfere with his ability to report to the office on the

remaining days of each week.  None of the reports submitted by Plaintiff's physicians expressly

requires that he work at home in order to accommodate his physical disability.  See, e.g., Ex. A at

Ex. 9.

     In September 1998 one of Plaintiff's physicians opined that "sitting in an automobile with

a low seat for an extended period of time leads to difficulty breathing by hampering lung

expansion.  Since this can worsen hypoxia and $CO_2$ retention and cause tachycardia and distress,

it is recommended that Mr. Benson be permitted to work at home as much as possible."  See Ex.

H.  In a report predating Plaintiff's request for reasonable accommodation, however, this same

physician made no mention of working at home and instead recommended certain equipment and

therapy for Plaintiff.  See Ex. A at Ex. 9, p.2.

     Although Plaintiff is renting the adaptive equipment recommended by his physician, see

Ex. E, he has never requested that the agency provide his workplace with the equipment he uses

at home, nor has he asked the agency to provide him with adaptive equipment for his car to

address his breathing difficulties while seated in a low car seat. Rather, the sole accommodation

requested by Plaintiff is that of being allowed to work from home. See Ex. A at Ex. 6.

Additional medical documentation submitted by Plaintiff states that he is a "healthy

gentlemen in no acute distress" and that he has been "stable until the last month or two when he

has noted markedly increased exertional dyspnea." See Ex. I. However, there is no evidence

linking Plaintiff's exertional dyspnea to being seated in a car.

On October 30, 1998, the agency's consulting physician noted that one of Plaintiff's

physicians conceded that although his pulmonary dysfunction was linked to physical exertion, his

respiratory rate was normal and did not indicate any respiratory deficiency on September 15,

1998. See Ex. D. Dr. Vorosmarti also pointed out that Plaintiff's oxygen saturation which was

measured at 75-80 mm Hg. by his pulse oximeter was not consistent with hypoxia, which is

indicated by an arterial oxygen tension of 60 mm Hg. or less. Id. Although Plaintiff requires

mechanical ventilation while asleep due to a decrease in lung function when lying down, there is

no medical evidence that he requires oxygen supplementation when awake and upright, or while

driving. Id.

On May 25, 1999, an EEOC administrative judge granted the agency's motion for

decision without a hearing on the AWOL charge and Plaintiff's first termination from FWAP on

the ground that these claims were not timely filed.  <u>See</u> Ex. J at 29-31.[1]  The administrative judge

reached the merits of Plaintiff's reasonable accommodation claim based on the theory that the

agency had a continuing obligation to provide such an accommodation if needed, but ultimately

found that the agency was not required to allow Plaintiff to work from home two days each week

as a reasonable accommodation.  <u>Id.</u> at 57-61.  Following Plaintiff's appeal from the

administrative judge's decision, the EEOC's Office of Federal Operations affirmed the judgment

in favor of the agency on August 7, 2002.  <u>See</u> Ex. K.

**C.      The Issuance of a "Performance Memo" to Plaintiff.**

Independent of his pending formal complaint and without regard to his characterization of

FWAP as a reasonable accommodation for his physical disability, the agency restored Plaintiff to

FWAP in February 1998.  Ex. A at Ex. 18.  On the same day that his participation in FWAP

became effective, Plaintiff violated the terms of the FWAP agreement by failing to attend a

meeting that he was to chair on February 24, 1998.  <u>Id.</u>  Thus, Plaintiff's participation in the

FWAP was terminated for the second time and he was given a three-day suspension for failure to

follow his supervisor's instructions.  <u>Id.</u>

In August 1998, while the administrative precursor of this complaint was pending before

the EEOC, Plaintiff filed a formal grievance pursuant to a collective bargaining agreement that

permits allegations of discrimination to be raised in a negotiated grievance procedure.  <u>See</u> Ex. L.

---

[1]      Exhibit J consists of a cover letter dated September 28, 1999 and a bench decision recorded
in the last ten pages of the transcript of the hearing on the agency's dispositive motion before the EEOC
administrative judge.  Because the administrative judge addressed the timeliness issue in pages 28 through
31 of that transcript, those pages are included as well.

In his grievance, Plaintiff challenged his three day suspension and the agency's refusal to allow him to work from home as a reasonable accommodation for his physical disability, but did not allege that these actions were taken against him in retaliation for his having filed an EEO complaint in 1997.  Id.  Although Plaintiff's grievance was denied at Step 1, see Ex. M, his suspension was reduced from three days to two at Step 2, but he was not restored to FWAP.  See Ex. N.  On February 18, 1999, the National Treasury Employees Union ("NTEU") invoked arbitration on behalf of Plaintiff regarding this grievance.  See Ex. O.  However, Plaintiff never exhausted his remedies under the agency's negotiated grievance procedure, and on October 17, 2002, NTEU withdrew the request for arbitration that it had filed on behalf of Plaintiff.  See Ex. P.

**D.    Plaintiff's 1999 Performance Rating.**

Independent of his pending formal complaint and grievance and without regard to Plaintiff's characterization of FWAP as a reasonable accommodation for his physical disability, the agency again reinstated Plaintiff in FWAP on February 22, 1999 for one day each week for four months.  See Declaration of Linda M. Katz, M.D., at ¶ 11, attached as Ex. Q.  On May 27, 1999, Plaintiff's FWAP privileges were extended to two days each week for four months.  Id. at ¶ 12.  Two months later, however, Dr. Katz met with Plaintiff for his mid-year performance review and pointed out areas he needed to improve in order to meet all performance measures.  Id. at ¶ 13.

On November 24, 1999, Plaintiff again requested FWAP as a reasonable accommodation for his physical disability, but on that occasion requested that his work-at-home privileges be

expanded from two days to three.  See Ex. R.  On December 28, 1999, however, Plaintiff's

request was approved for only two days each week.  Id.; Declaration of Charles J. Ganley, M.D.,

at ¶ 2, attached as Ex. S.

Plaintiff's continued participation in FWAP was contingent upon his meeting

performance standards.  See Ex. Q at 12, Attachment 2.  Although Plaintiff met performance

standards in calendar year 1998, on February 1, 2000, he was given his 1999 Performance

Evaluation Plan ("PEP") which gave him a rating of "fails to meet performance measures."  See

Ex. T.  Because Plaintiff's new rating of record did not meet performance measures, he was no

longer eligible for FWAP, and he was terminated from the program for the third time.  See Ex. Q

at 12, Attachment 2.  Once again, Plaintiff filed a grievance pursuant to the FDA's collective

bargaining agreement.  Plaintiff's grievance sought a change in his performance rating to "meets

performance measures" and reinstatement to FWAP two days each week.  See Ex. U.  Plaintiff

did not allege that the performance rating had been given to him in retaliation for his having filed

an EEO complaint in 1997.  Id.  Although Plaintiff's grievance was denied at Step 1, see Ex. V,

he won a partial victory at Step 2 when the deciding official found that the adverse performance

rating was invalid because it was based on some performance measures that should not have been

applied to Plaintiff.  See Ex. W.  However, Plaintiff's renewed request for reinstatement to

FWAP was denied.  Id.  Plaintiff did not seek further review of the Step 2 decision by Dr. Robert

DeLap.

-10-

### III.   LEGAL STANDARDS

**A.     Motion to Dismiss.**

A motion to dismiss under Rule 12(b)(6) for failure to state a claim serves to test the legal

sufficiency of the complaint. See, e.g., District 28, United Mine Workers of America, Inc. v.

Wellmore Coal Corp., 609 F.2d 1083, 1085-86 (4th Cir. 1979); United States v. Azrael, 765 F.

Supp. 1239, 1242 (D. Md. 1991) (Nickerson, J.).  According to EEOC regulations, aggrieved

federal employees who believe they have been discriminated against on the basis of their

handicap must initiate contact with an EEO counselor within 45 days of the effective date of the

action.  See 29 C.F.R. § 1614.105(a)(1).  Court actions based on untimely administrative

complaints also must be dismissed.  Young v. National Center for Health Services Research, 828

F.2d 235, 237 (4th Cir. 1987).

**B.     Summary Judgment.**

A party is entitled to summary judgment if the evidence in the record "show[s] that there

is no genuine issue as to any material fact and the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The Supreme Court has emphasized that the "summary

judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an

integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and

inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

Trial courts should enter summary judgment "against any party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Where the

plaintiff fails to meet this burden, "a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial". Hayes v. Hambruch, 841 F. Supp. 706, 708 (D. Md. 1994) aff'd 64 F.3d 657 (4th Cir. 1995). The Fourth Circuit has emphasized that trial judges have an "affirmative obligation. . .to prevent factually unsupported claims and defenses from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F. 2d. 1126, 1128 (4th Cir. 1987).

The statutory purpose of summary judgment applies no less to discrimination cases than to commercial or other areas of litigation. Meiri v. Dacon, 759 F.2d 989, 998 (2nd Cir. 1985), cert. denied, 474 U.S. 829. If the opponent of a summary judgment does not have a reasonable prospect of prevailing the parties should not be subjected to the time and expense of trial. Palucki v. Sears, Roebuck & Co., 879 F. 2d 1568, 1572 (7th Cir. 1989).

## IV.    ARGUMENT

### A.    Plaintiff's Claims in Count I are Time-Barred.

Plaintiff alleges that he was removed from FWAP on April 16, 1996, that he was unlawfully placed on "absent without leave" ("AWOL") status on May 7, 1996, and that on June 17, 1996, he was given an official reprimand for his absence on May 7, 1996. Complaint at pp. 4 and 7. Plaintiff's request that he be restored to FWAP was denied by his supervisor on October 9, 1996. See Ex. B. However, Plaintiff did not contact an EEO counselor regarding his official reprimand nor his termination from FWAP until September 2, 1997, more than 14 months after his  official reprimand and removal from FWAP, and 11 months after his request for reinstatement in FWAP was denied by his then-supervisor following her receipt of a medical

report that did not support Plaintiff's requested accommodation. <u>See</u> Ex. A at Ex. 1, p. 1.

As an aggrieved federal employee who believed he had been discriminated against on the basis of his handicap, Plaintiff was required to contact an EEO counselor at the agency within 45 days of the effective date of the action. 29 C.F.R. § 1614.105(a)(1). Applying 29 C.F.R. § 1614.105(a)(4) to Plaintiff's administrative claim, the EEOC administrative judge who heard his case rejected the issues noted in the foregoing paragraph as untimely. <u>See</u> Ex. J at 29-31. The administrative judge's decision was affirmed by the EEOC's Office of Federal Operations on appeal. <u>See</u> Ex. K.

The 45-day time limit that proved fatal to two of Plaintiff's administrative claims applies with equal force to administrative complaints that reach the courts. <u>Young v. National Center for Health Services Research</u>, 828 F.2d 235, 237 (4th Cir. 1987); <u>Zorgrafov v. Veterans Administration Medical Center</u>, 779 F.2d 967, 969-70 (4th Cir. 1985); <u>Woodward v. Lehman</u>, 717 F.2d 909, 914-16 (4th Cir. 1983). Accordingly, Plaintiff's claims that his 1996 removal from FWAP and his AWOL were discriminatory and should be dismissed as untimely.

Although Plaintiff clearly did not timely challenge the agency's October 1996 refusal to reinstate him in FWAP as a reasonable accommodation, the EEOC administrative judge nonetheless reached the merits of this claim based on the theory that the agency had a continuing obligation to reasonably accommodate Plaintiff's handicap. Ex. J at 30-32. Since the EEOC affirmed the administrative judge's summary judgment in favor of the agency, however, the Supreme Court has rejected the so-called "continuing violation" theory in all but a limited class of hostile work environment cases and made clear that a party raising claims of discrete

-13-

discriminatory or retaliatory acts must file his charges within the applicable time limits or lose

the ability to recover for them. <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101

(2002). In <u>Morgan</u>, the Court held:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal
> to hire are easy to identify. Each incident of discrimination and each retaliatory
> adverse employment decision constitutes a separate actionable "unlawful
> employment practice." [Plaintiff] can only file a charge to cover discrete acts that
> "occurred" within the appropriate time period. . . . All prior discrete
> discriminatory acts are untimely filed and no longer actionable.

122 S.Ct. 2061, 2073.

Applying <u>Morgan</u> to the undisputed facts of this case, Plaintiff was notified on October 9,

1996 that his May 1996 request to be reinstated in FWAP as a reasonable accommodation was

denied. Yet, Plaintiff did not initiate EEO counseling until September 2, 1997, nearly 11 months

after this notification. In light of <u>Morgan</u>, Plaintiff cannot seriously contend that his September

1997 challenge of the agency's October 1996 denial of his reasonable accommodation request

was timely under a "continuing violation" theory. <u>Lurie v. Meserve</u>, 214 F. Supp.2d 546, 550 (D.

Md. 2002)(plaintiff's claims that denial of performance awards from 1988 through 1999

constituted a continuing violation under the ADEA were not timely). Accordingly, Count I of

Plaintiff's complaint fails to state a claim and should be dismissed.

**B.      Plaintiff Cannot Establish a Prima Facie Case under the Rehabilitation Act.**

In order to establish a prima facie case of disability discrimination under the

Rehabilitation Act, a plaintiff alleging unlawful failure to accommodate must show "'(1) that he

was an individual who had a disability within the meaning of the statute; (2) that the [employer]

-14-

had notice of his disability; (3) that with reasonable accommodation he could perform the

essential functions of the position . . .; and (4) that the employer refused to make such

accommodation.'" Rhoads v. Federal Deposit Insurance Corp., 257 F.3d 373, 387 n. 11 (4th Cir.

2001), cert. denied 535 U.S. 933 (2002)(quoting Mitchell v. Washingtonville Cent. Sch. Dist.,

190 F.3d 1, 6 (2nd Cir. 1999)).[2]  Plaintiff must initially establish that he is a "qualified individual

with handicap(s)." 29 C.F.R. § 1614.203.[3]  An "individual with a handicap" is defined as a

person who "1) has a physical or mental impairment which substantially limits one or more of

such person's major life activities, 2) has a record of such an impairment, or 3) is regarded as

having such an impairment." 29 C.F.R. § 1614.203(a)(1).  Major life activities are "such

functions as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking,

breathing, learning and working." 29 C.F.R. § 1614.203(a)(3).

     Although the administrative judge who heard Plaintiff's case before the EEOC found that

Plaintiff had established that he is an individual with a handicap within the meaning of the Act,

since that decision was rendered in May 1999, the Supreme Court has provided additional

guidance on who qualifies as disabled.  Interpreting similar language found in the ADA, the

---

[2]     Rhoads involved a claim under the Americans with Disabilities Act, 42 U.S.C. § 12101-
12117, 12203 ("ADA"), the relevant provisions of which parallel those of the Rehabilitation Act.  Thus, the
standards for determining liability under the ADA and the Rehabilitation Act are the same.  29 U.S.C.
§ 794(d); Myers v. Hose, 50 F.3d 278, 281 (4th Cir. 1995).

[3]     No Federal Agency shall discriminate against a qualified individual with physical or mental
handicaps.  29 C.F.R. § 1614.203(b).  A qualified individual with a handicap is "an individual with
disabilities who, with or without reasonable accommodation, can perform the essential functions of the
position in question without endangering the health and safety of the individual or others." 29 C.F.R.
§ 1614.203(a)(6).

Supreme Court stated that "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." Toyota Motor Manuf., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002). Further, the question of who is a handicapped person under the Act is determined on a case-by-case basis. Sutton v. United Air Lines, Inc. 527 U.S. 471, 483 (1999)(ADA case); Forrisi v. Bowen, 794 F.2d 931, 933 (4th Cir. 1986) (citations omitted); Jasany v. U.S. Postal Service, 755 F.2d 1244, 1249 (6th Cir. 1985).

Defendant does not dispute that Plaintiff has been diagnosed with post-polio syndrome of the respiratory muscles and scoliosis secondary to poliomyelitis of the abdominal muscles. Ex. A at Ex. 9, pp. 2-4. Rather, the issue is whether one or both of these physical impairments substantially limit one or more of his major life activities. Heilweil v. Mount Sinai Hospital, 32 F.3d 718 (2nd Cir. 1994), cert. denied, 513 U.S. 1147 (1995)(holding that although Plaintiff's asthma constituted a "physical impairment," the evidence did not show that it substantially limited plaintiff's major life activities of breathing or working).

Plaintiff alleges that his diagnosed medical conditions "substantially impair [his] major life activities by significantly compromising [his] pulmonary function (breathing ability)." Complaint at 2. However, this contention is belied by his own testimony:

> My walking rate is slowed because I deoxygenate on slight exertion. I use a handicap permit to minimize walking distances from where I park my car. I notice a rapid heart beat when sitting in a car after a prolonged time in the morning. I am unable to immediately begin work upon arrival at the office in the morning and need to rest to 'reoxygenate' before beginning work. Sometimes I feel as if I am deoxygenating while sitting at work. At times like those, I would normally use my rented volume ventilator to bring my oxygen levels to normal. My ability to inhale air in normal quantities is reduced. Consequently, I inhale shallow amounts of air, which contain a proportionately lower amount of oxygen,

which leads to a rapid heart beat and respiratory distress.  I usually stop and wait
before sitting down in my car, otherwise, I have a tendency to deoxygenate briefly.

See Ex. F, answer # 10.  In Sutton, the Court held that "disability under the [ADA] is to be

determined with reference to corrective measures . . . ."  527 U.S. at 488.  In his complaint,

Plaintiff admits: "I eventually figured out how to more effectively cope with my symptoms while

driving to work; I began to use and continue to use a volume ventilator to increase my oxygen

saturation levels and monitor those levels with a pulse oximeter before leaving for work."

Complaint at 5-6.  Plaintiff also concedes that his breathing difficulties while driving to work in

the morning were adequately addressed by taking amantadine 100 mg. BID.  See Ex. A at Ex. 9,

p. 8.  And, of course, Plaintiff encounters no difficulty on the drive home.  While Plaintiff's use

of these corrective measures "does not, by itself, relieve [his] disability," Sutton, 527 U.S. at 488,

he cannot be considered a qualified individual with handicaps unless, "notwithstanding the use of

a corrective device, [he] is substantially limited in a major life activity."  Id.

       Plaintiff's diagnosis of post-polio syndrome of the respiratory muscles does not

substantially limit any of his major life activities.  Even viewing the evidence in the light most

favorable to Plaintiff, the most that can be said is that – prior to using the corrective measures

described above – his disability occasionally impaired his major life activity of breathing while

driving to work in the morning, and that his walking rate was slowed.  See Ex. L at 2.  As the

Court reasoned in Toyota Motor, "The word 'substantial' thus clearly precludes impairments that

interfere in only a minor way with the performance of manual tasks from qualifying as

disabilities."  534 U.S. at 197.  Although Plaintiff asserts that he needs adaptive equipment to

-17-

help him breathe while lying down, his impairment prevented him from driving to his desk job

on only four occasions over the course of four years.  Ex. F, answer # 1; Ex. A at Ex. 9.  Because

Plaintiff's physical impairment does not <u>substantially</u> limit one or more of his major life

activities, he cannot establish that he is a qualified individual with handicaps, and he cannot

establish a prima facie case under the Rehabilitation Act.

**C.     The Accommodation Demanded by Plaintiff is Neither Effective nor Necessary to Enable Him to Perform the Essential Functions of His Job.**

Although the EEOC administrative judge found that Plaintiff was a qualified individual

with handicaps, he also found that Plaintiff did not require participation in FWAP as a form of

reasonable accommodation.  <u>See</u> Ex. I at 61.  Even assuming for the sake of argument that

Plaintiff is a qualified individual with a disability, the most he can prove is that he can perform

the essential functions of his position <u>without</u> reasonable accommodation, and this does nothing

to further his case.  29 C.F.R. § 1614.203(a)(b) .

When Plaintiff was first placed on FWAP in 1995, he never mentioned that he was

physically disabled, let alone that he was unable to drive to work in the mornings on the two days

of each week when he was allowed to work from home.  Only after he was terminated from

FWAP did Plaintiff submit letters by two physicians documenting his physical condition.  <u>See,</u>

<u>e.g.,</u> Ex. A at Ex. 9.  None of these letters addressed Plaintiff's facially inconsistent contention

that he does not experience any difficulty breathing while driving home <u>after</u> work.  <u>See</u>

Complainant's Response to Agency's Request for Admissions, No. 1, attached as Ex. G.  Nor did

they address Plaintiff's illogical and inconsistent contention that his physical condition requires

that he work from home two days a week while not interfering with his ability to report to work and perform the essential functions of his job on the remaining days of each week.  Moreover, none of the reports submitted by Plaintiff's physicians unequivocally states that he must be permitted to work at home in order to accommodate his physical disability.  See, e.g., Ex. A at Ex. 9.

Similarly, as noted above, on October 30, 1998, the agency's consulting physician noted the report of one of Plaintiff's physicians that although his pulmonary dysfunction was linked to physical exertion, his respiratory rate was normal and did not indicate any respiratory deficiency on September 15, 1998.  See id., Ex. D.  Dr. Vorosmarti also pointed out that Plaintiff's oxygen saturation—which was measured at 75-80 mm Hg. by his pulse oximeter—was not consistent with hypoxia, which is indicated by an arterial oxygen tension of 60 mm Hg. or less.  Id.  Although Plaintiff requires mechanical ventilation while asleep due to a decrease in lung function when lying down, Plaintiff has proffered no evidence that he requires oxygen supplementation when awake and upright, or while seated at a desk.  Id.

Plaintiff admits that his alleged difficulties in driving to work in the morning were adequately addressed by taking amantadine 100 mg. BID in the past.  See Ex. A at Ex. 9, p. 8. Plaintiff reported that with his "first use of the drug, [he] was able to sit in [his] car without reclining the seat part way to relieve pressure on the diaphragm."  Id.  Although Plaintiff stopped taking this drug one week before receiving a flu shot, he apparently never resumed taking it long after the flu season was over.  Additionally, in his complaint Plaintiff alleges: "I eventually figured out how to more effectively cope with my symptoms while driving to work; I began to

-19-

use and continue to use a volume ventilator to increase my oxygen saturation levels and monitor those levels with a pulse oximeter before leaving for work.  See Complaint at 5-6.

Although Plaintiff has requested permission to work from home as a reasonable accommodation since May 20, 1996, he has never requested any adaptive equipment to aid his breathing at work.  Indeed, it was not until October 1998—while his first grievance was being processed—that Plaintiff brought a rented pulse oximeter to his office and made a point of showing it to his immediate supervisor.  See Ex. C.  However, Plaintiff's then-supervisor never saw him actually use this equipment at the office.  See Ex. D.  Although Plaintiff also rents a portable oxygen system, see Ex. E, there is no evidence that he has used this portable system while commuting.

When Plaintiff's request to work at home as a reasonable accommodation was denied by his supervisor on October 9, 1996, he was informed that he could request and secure approval for sick leave whenever he was unable to drive to work for medical reasons.  See Ex. B.  Over a period of three years following his termination from FWAP, however, Plaintiff claims to have missed only four days of work due to his alleged inability to drive to work because of his medical condition.  See Complainant's Response No. 12 to Agency's Interrogatories, attached as Ex. F. Plaintiff used sick leave on each of those days.

It is little wonder that Plaintiff's request to work from home two days each week while commuting the remaining days of the week did not survive medical scrutiny.  Plaintiff apparently recognized the problem this inconsistency raised for his reasonable accommodation claim, because when he renewed his request in connection with his first formal grievance, he requested

that he be permitted to work from home four days a week.  <u>See</u> Ex. C.  In support of this request,

Plaintiff relied in part on a letter from his physician stating, <u>inter alia</u>, that "[h]e will use his LP6

<u>at work</u> for maximal insufflations at 2000 ml frequently during the day and continue to use high

span BiPAP overnight."  <u>See</u> Ex. H (emphasis supplied).  Far from recommending that Plaintiff

be permitted to work at home every day, Dr. Bach clearly contemplates that Plaintiff will be

spending some time at work—where he already has equipment to help him with his

breathing—and merely recommends that Plaintiff "be permitted to work at home as much as

possible."  <u>Id.</u>  Dr. Bach's 1998 letter is the closest that any expert has come to recommending

that Plaintiff be permitted to work from home; it falls far short of opining that Plaintiff must be

permitted to work at home in order to accommodate his physical disability.  Moreover, while

Plaintiff's main complaint is the problems he experiences while driving to work in the morning,

he participates in a carpool and does not have to drive every time he reports to his office in

Rockville.  <u>See</u> Ex. F, Complainant's Response to Interrogatory no. 3.

        Plaintiff bears the burden of proving not only that he is a qualified individual with a

disability, but also that the accommodation he requests is reasonable.  <u>Tyndall v. National</u>

<u>Education Centers, Inc. of California</u>, 31 F.3d 209, 213 (4th Cir. 1994).  To determine whether a

requested accommodation is reasonable, the court should consider whether the accommodation

"(1) would be 'effective,' i.e., would it address the job-related difficulties presented by the

employee's disability; and (2) would it allow the employee to attain an 'equal' level of

achievement, opportunity and participation that a non-disabled individual in the same position

would be able to achieve."  <u>Bryant v. Better Business Bureau of Greater Maryland, Inc.</u>, 923 F.

Supp. 720, 736 (D. Md. 1996)(citations omitted).

Even if Plaintiff could show that he is a qualified individual with a handicap, allowing him to work from home would be effective only to the extent that it would save him the trouble of commuting to work. The record demonstrates that working from home certainly would not be effective in getting Plaintiff to an equal level of achievement because he is not functioning as independently as he should be and he apparently does not understand when he needs to show up for meetings. If anything, allowing Plaintiff to work from home has <u>impaired</u> his ability to do the job. In February 1999, Plaintiff was restored to FWAP one day a week, and in June 1999, he was allowed to work from home two days each week. <u>See</u> Ex. Q at ¶¶ 11-12. Far from proving effective in allowing Plaintiff to attain an equal level of achievement, Plaintiff failed to meet performance measures in 1999. <u>Id.</u> at ¶¶ 13-14.

Inasmuch as the record demonstrates that Plaintiff is able to perform the essential functions of his job <u>without</u> reasonable accommodation,[4] it would defy both reason and the plain meaning of the Rehabilitation Act to provide an "accommodation" to an employee who does not need one in the first place. Even if Plaintiff could demonstrate that he needs an accommodation to perform the functions of his job, he is not entitled to the accommodation of his choice, but rather a <u>reasonable</u> accommodation. <u>See</u>, <u>e.g.</u>, <u>Scheer v. City of Cedar Rapids</u>, 956 F. Supp. 1496 (N.D. Iowa 1997); <u>EEOC v. Newport News Shipbuilding & Drydock Co.</u>, 949 F. Supp. 403 (E.D. Va. 1996); <u>Whillock v. Delta Airlines, Inc.</u>, 926 F. Supp. 1555 (N.D. Ga. 1995). For an

---

[4]    That is, the identified deficiencies in his performance are not related to his post-polio syndrome, or at least Plaintiff has not demonstrated that such a nexus exists.

accommodation to be reasonable, it must be effective.  See Bryant, 923 F. Supp. at 726.  In sum, even if Plaintiff could show that he is a qualified individual with a disability, the agency cannot be faulted for restricting his privilege to work from home on the three occasions giving rise to his three-count complaint when: (1) his productivity was reduced and his work product required extensive editing; (2) he failed to follow instructions and did not report to work when he was scheduled to chair a meeting; and (3) he failed to meet performance measures.  Vande Zande v. State of Wisconsin Department of Administration, 44 F.3d 538, 545 (7th Cir. 1995)("An employer is not required to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced.").  Accordingly, Plaintiff has failed to establish a prima facie case of unlawful employment discrimination under the Rehabilitation Act.

**D.     Plaintiff Cannot Demonstrate that the Actions Alleged in Count II of his Complaint were Motivated by Retaliation.**

Plaintiff alleges that shortly after an EEO counselor met with his then-supervisor to discuss his EEO complaint, he was issued a "Performance Memo" in retaliation for his EEO activity.  Complaint at p. 8.  The ROI regarding the allegations in Count I contains a statement from Dr. Linda Katz, Plaintiff's former supervisor, dated June 22, 1998.  See Ex. A at Ex. 18.  While it is true that on July 28, 1998, Dr. Katz notified Plaintiff of her proposal to suspend him from duty for three days for failing to follow instructions, that proposal stemmed from misconduct that occurred five months earlier, when Plaintiff failed to show up for a meeting he was supposed to chair on February 24, 1998 because he decided to work from home, despite Dr. Katz's instruction that he could not do so.  See Ex. A. at Ex. 6, p. 3; Ex. Q at ¶¶ 5-6.  Plaintiff

challenged this proposed employment action and Dr. Katz's termination of his participation in

FWAP based on his insubordination by filing a Step 1 grievance with his second-line supervisor

on August 13, 1998.  See Ex. L.   On January 29, 1999, Dr. Robert DeLap affirmed Plaintiff's

suspension and the denial of his request for reinstatement in FWAP, but reduced the period of

suspension from three days to two.  See Ex. N.

      To establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in a

protected activity; (2) his employer adversely acted against him; and (3) his protected activity

was causally connected to his employer's adverse action.  Haulbrook v. Michelin North America,

Inc., 252 F.3d 696, 705-07 (4th Cir. 2001)(ADA case).  Further, retaliation claims that grow out

of  previously filed EEO claims during the pendency of the case before the EEOC may be raised

for the first time in district court without first having to exhaust administrative remedies.  See

Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992).[5]

      Plaintiff can show that he engaged in prior protected EEO activity; specifically, the

administrative precursor to Count I of his complaint.  Plaintiff can also show that he suffered an

adverse employment action, i.e., his two-day suspension.  However, Plaintiff cannot show that

his protected activity was causally connected to his suspension.  While Plaintiff alleges that he

filed his EEO complaint in November 1997, see Complaint at 10, he also alleges that only three

months later his new supervisor, Dr. Katz, agreed to reinstate him in FWAP for one day a week

---

      [5]    Were it not for this exception to the exhaustion requirement for retaliation claims, Plaintiff
would be foreclosed from bringing Counts II and III before this Court because he initially chose to challenge
the agency's actions pursuant to a negotiated grievance procedure that permits allegations of discrimination
to be raised in a negotiated grievance procedure, 29 C.F.R. § 1614.301(a), and he did not exhaust his
administrative remedies pursuant to that procedure.  Guerra v. Cuomo, 176 F.3d 547 (D.C. Cir. 1999).

on February 24, 1998.  Id. at 5.  Indeed, Dr. Katz again reinstated Plaintiff in FWAP for one day

a week in February 1999, and then for two days a week in June 1999.  See Ex. Q at ¶¶11-12.

Further, after his 1999 performance rating was rescinded following the second grievance he filed

against Dr. Katz, see Ex. W, she again reinstated Plaintiff in FWAP for one day a week in

September 2000.  See Ex. Q at ¶18.  Dr. Katz's decisions to reinstate Plaintiff in FWAP on three

occasions can hardly be characterized as the actions of a supervisor bent on retaliation.  Far from

being causally related to Plaintiff's prior protected activity, the record demonstrates that both

alleged retaliatory actions taken by Dr. Katz against Plaintiff were fully justified.

     Turning first to Plaintiff's proposed suspension dated July 28, 1998, the incident giving

rise to that suspension was virtually a repeat of the incident he alleges in Count I.  In Count I,

Plaintiff alleges that:

> On April 16, 1996, my former supervisor, Anne Mustafa (now deceased) told me
> she stopped my use of the work-at-home schedule because she blamed me for
> drafting an issued letter which stated a specific date for a deadline instead of 'until
> further notice.'  She said that I needed to be more closely 'supervised.'  Seeing
> that there was no difference in 'supervision' when I was at the office, I sent an E-
> mail message to Mustafa on May 6, 1996 [at 7:42 p.m.] asking for her
> authorization to work at home on May 7, 1996.

See Complaint at pp. 3-4.  Plaintiff's actions speak for themselves; he was placed on AWOL

status and given an official reprimand for his failure to follow Ms. Mustafa's instructions on May

7, 1996.

     On February 24, 1998, history repeated itself.  Although Plaintiff was scheduled to begin

working from home on February 24, 1998, not all necessary approvals had been obtained before

that date.  Thus, on February 23, 1998, his new supervisor, Dr. Katz, told him to report to the

office the following day, and that he could begin working from home the following week.  See Ex. Q, at ¶ 5.  Plaintiff once again failed to follow instructions, and failed to show up for an important meeting for which he had the lead responsibility.  Id. at ¶ 6.  Inasmuch as the official reprimand of 1996 apparently did not deter a repetition of the same misconduct less than two years later, the agency was fully justified in applying progressive discipline in the form of a brief suspension from duty status.

In the grievance Plaintiff filed against Dr. Katz, he stated that his suspension and other actions taken against him were taken in reprisal, but he did not allege, much less prove, that the "continuous reprisal against me" was in response to his prior EEO complaint.  See Ex. L at 8.  Thus, Plaintiff cannot establish a causal connection between his prior protected activity and the two-day suspension he received in November 1998.  The discipline imposed by the agency was objectively reasonable, and Plaintiff cannot seriously contend that it was motivated by discriminatory animus.  Where, as here, Plaintiff cannot state a prima facie case, and cannot prove that the employer's legitimate non-discriminatory reasons for suspending him are pretextual, he cannot prevail and summary judgment should be granted for Defendant.  Cf., Spriggs v. Public Service Commission of Maryland, 197 F. Supp.2d 388, 395 (D. Md. 2002)(summary judgment for defendant employer where plaintiff's conclusory allegations failed to meet her ultimate burden of persuasion that legitimate, nondiscriminatory reasons for failure to promote were pretexts for discrimination).

**E.     Plaintiff Cannot Establish a Prima Facie Case of Retaliation in Count III of his Complaint.**

Turning next to Count III, Plaintiff alleges that his 1999 performance rating of "fails to meet performance measures," which was given to him on February 1, 2000, see Ex. T, was in retaliation for a brief he filed with the EEOC's Office of Federal Operations on January 24, 2000 in the EEOC matter alleged in Count I of his complaint.  On February 17, 2000, Plaintiff again filed a Step 1 grievance challenging both his rating and the agency's refusal to reinstate him in FWAP.  See Ex. U.  On March 9, 2000, Plaintiff's Step 1 grievance was denied by Dr. Charles Ganley.  See Ex. V.  Plaintiff then filed a Step 2 grievance on April 6, 2000, which resulted in a decision rescinding his 1999 performance rating but affirming the agency's denial of his request for reinstatement in FWAP.  See Ex. W.

An allegation that the plaintiff was subject to an adverse employment action is an essential element of a prima facie case of discrimination, and an absolute precondition to suit. Autry v. N.C. Dep't of Hum. Res., 820 F.2d 1384, 1386 (4th Cir. 1987); Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985), cert. denied, 475 U.S. 1082 (1986).  In defining what constitutes an adverse employment action, the Fourth Circuit observed in Page v. Bolger, 645 F.2d 227 (4th Cir.), cert. denied, 454 U.S. 892 (1981), that inquiries into whether there has been employment action affecting an employee have "consistently focused on the question of whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensation." Id. at 233 (emphasis added).  "By the same token, it is obvious to us that there are many interlocutory or mediate

decisions having no immediate effect upon employment conditions which were not intended to fall within ... Title VII." Id. (citation omitted) (emphasis added).

Plaintiff alleges that after he received his performance rating, he "successfully appealed that performance rating, and it was stricken." See Complaint at 9. Count III does not state a claim of retaliation because it does not allege that he suffered an actionable adverse employment action subsequent to his initial EEO activity. Morever, case law is clear that mediate actions like Plaintiff's placement on the Performance Improvement Plan ("PIP") immediately following his unsatisfactory performance rating simply do not constitute ultimate employment decisions, and are not actionable. Cottman v. Rubin, 2001 WL 257830, at *3 (D. Md. 2001) (Legg, J.) aff'd 35 Fed.Appx. 53, 2002 WL 849257 (U.S. Customs Service decision to place employee on PIP was not an adverse employment action).

Assuming, arguendo, that the performance-related restrictions on Plaintiff's FWAP privileges constitute adverse employment actions, Plaintiff cannot show that these restrictions were causally related to his prior protected activity. As previously noted, Dr. Katz thrice reinstated Plaintiff's FWAP privileges. Although Plaintiff's 1999 performance rating was rescinded based on a technicality, see Ex. W, the deficiencies noted in his evaluation certainly would not support any assertion by Plaintiff that his work performance improved when he was allowed to work from home twice a week in 1999. Plaintiff continued to work from home one day each week from 2000[6] to February 2003. See Ex. S at ¶ 6. However, he was allowed to

---

[6]    Plaintiff was restored to FWAP in 2000 because his rescinded performance rating was no longer a bar to his participation in the program.

work from home only one day each week because his supervisor had continuing concerns about the quantity and quality of his work product. See Ex. Q at ¶ 18.

Plaintiff is now on his third supervisor since Ms. Mustafa terminated his FWAP privileges in 1996 due to performance issues. His current supervisor, Dr. Charles Ganley, has concerns regarding Plaintiff's performance that are quite similar to those previously expressed by Ms. Mustafa and Dr. Katz. See Ex. S at ¶¶ 8-11. Although Dr. Ganley's criticisms of Plaintiff's work did not result in an overall rating of "fails to meet performance measures," see Ex. X, he terminated Plaintiff's participation in FWAP in February 2003 until there is an improvement in his written work. Id. at ¶ 11.

When informed of Dr. Ganley's decision, Plaintiff once again raised his medical issue. Id. at ¶ 12. Dr. Ganley informed Plaintiff that he could make a new reasonable accommodation request, but as of April 7, 2003, Plaintiff had not done so. Plaintiff was also told that he could use sick leave if he felt unable to get to work, but responded that he wanted to save his sick leave for retirement. Id. Even if Plaintiff could show that he is a qualified individual with a disability, however, the agency is not required to allow Plaintiff to work at home in order to allow him to save up his sick leave. Vande Zande, 44 F.3d at 545.

Neither Dr. Katz nor Dr. Ganley revoked Plaintiff's FWAP privileges because of his prior EEO activity. See Ex. Q at ¶¶ 9 and 15; Ex. S at ¶ 14. Rather, Plaintiff is no longer allowed to work from home because the performance problems that have been noted by three different supervisors over a period of seven years have continued. Plaintiff cannot show that the agency's legitimate, non-discriminatory reasons for supervising him more closely than peers who are

-29-

allowed to work from home two days a week are pretextual. Accordingly, Defendant is entitled to summary judgment as to Count III.

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice or the Court should enter judgment for Defendant pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Thomas M. DiBiagio
United States Attorney

_____          By:_____
         Date                    Larry D. Adams, Bar No. 03118
                                 Assistant United States Attorney
                                 6625 United States Courthouse
                                 101 West Lombard Street
                                 Baltimore, Maryland 21201-2692
                                 (410) 209-4883

OF COUNSEL:

Alex Azar II
General Counsel
Katherine M. Drews
Associate General Counsel
Richard G. Bergeron
Senior Trial Attorney
U.S. Department of Health and Human Services