9

MAY 2 0 1996

NOTE

From:   Regulatory Review Pharmacist (HFD-560)

To:     Anne Mustafa
        Acting Supervisor (HFD-560)

Subject: Restoration of Flexiplace

For medical reasons discussed below, I seek immediate restoration of flexiplace as a right of accommodation. Ever since I returned from major surgery in April 1995, I had been on flexiplace until you in your capacity as Acting Supervisor suspended it. I had given serious thought to taking a disability retirement because of the stress to me of travel to work in the morning, but could not afford to live on the income offered.

The following excerpts of letters pertinent to the stress are attached. One letter dated December 21, 1995 from me to a respiratory therapist explains on the first 2 pages what happens when I drive to work in the morning. The response letter dated January 5, 1996 from the respiratory therapist to me addresses my comments about the problems I encounter when driving to work. Amazingly enough since my surgery, I haven't noticed the same types of problems when driving home. The letter dated May 3, 1996 from a specialist in physical medicine (physiatrist) explains my condition.

I did not bring the medical matter up to you before, because it is personal. Since there appears to be no end in sight to your suspension, I felt compelled to seek relief by disclosing part of my medical history.

For this week, I see no reason to deprive me of flexing on Tuesday. I plan to come in on Thursday because of the DODP Process Workshop. Your decision is requested today.

Michael T. Benson

Attachments

EX 2




# UMD
## NEW JERSEY

## NEW JERSEY MEDICAL SCHOOL



Department of Physical Medicine and Rehabilitation
(201) 982-7195

University Hospital
150 Bergen Street, Rm. B-239
University Heights
Newark, NJ  07103-2406

May 3, 1996
To whom it may concern:

Michael Benson is a 44 year old man with a diagnosis of post-poliomyelitis.  The most recent reevaluation in the Jerry Lewis Muscular Dystrophy Association clinic was on 5/02/1996.  The respiratory examination was significant for a vital capacity of 1700 ml sitting, 850 ml supine, maximum insufflation capacity (MIC) (air stacked breaths from a manual resuscitator) of 1700 ml, peak cough flow (PCF) 5.4 L/s.  Three L/s is the very minimum needed to eliminate airway secretions.  The $SaO_2$ ranged from 92 to 94 percent.  Maximum end-tidal pCO2 was 47 mm Hg.  This patient has severe O2 desaturation during physical activities.

Assessment

This patient has chronic alveolar hypoventilation and, because of progressive neuromuscular disease, unless trained and properly equipped will develop acute respiratory failure which will require hospitalization, intensive care, intubation for respiratory support, and probably lead to tracheostomy.

Intervention

We trained this patient in nasal and mouthpiece intermittent positive pressure ventilation (IPPV), manually assisted coughing, and in mechanical insufflation-exsufflation.  BiPAP is inadequate to provide sufficiently deep insufflations for adequate clearance of airway secretions when present.  He therefore needs to be switched to using a volume ventilator.  Since acute respiratory failure can be prevented with the use of these noninvasive inspiratory and expiratory muscle aids and this patient has been trained in their use, the following equipment is now required for home use:

1. A portable volume ventilator (PLV-100) to use via mouthpiece during daytime hours and via nasal interface for nocturnal assistance on assist control mode, rate 10, volume 900 to 1300 ml.
2. An oximeter for feedback to maintain $SaO_2$ over 94% at all times with the use of noninvasive IPPV and assisted airway secretion elimination as needed.
3. A mechanical insufflator-exsufflator to clear airway secretions may eventually become necessary.
4. The patient should only use supplemental oxygen to maintain Sao2 greater than 90% during exercise.  Otherwise hypoxemia should be corrected by assisted ventilation.
The patient should also have a motorized scooter to enhance mobility.

Summary

Noninvasive IPPV and assisted airway secretion elimination should be used as needed to prevent oxyhemoglobin desaturation and, therefore, respiratory failure.  If you have any questions, please feel free to contact me at: 1-201-982 4393.

John R. Bach, M.D.
Professor of Physical Medicine and Rehabilitation
Co-Director, Jerry Lewis Muscular Dystrophy Association Clinic of UMDNJ-NJMS

(KA) EXHIBIT   9
Page   2   of   11   pages



# NEW JERSEY MEDICAL SCHOOL

Department of Physical Medicine and Rehabilitation
(201) 982-7195

University Hospital
150 Bergen Street, Rm. B-239
University Heights
Newark, NJ 07103-2406

May 3, 1996
To whom it may concern:

Michael Benson is a      year old man with a diagnosis of post-poliomyelitis. The most recent reevaluation in the Jerry Lewis Muscular Dystrophy Association clinic was on 5/02/1996.

This patient has severe O2 desaturation during physical activities.
Assessment
This patient has chronic alveolar hypoventilation and, because of progressive neuromuscular disease, unless trained and properly equipped will develop acute respiratory failure which will require hospitalization, intensive care, intubation for respiratory support, and probably lead to tracheostomy.
Intervention

Summary
Noninvasive IPPV and assisted airway secretion elimination should be used as needed to prevent oxyhemoglobin desaturation and, therefore, respiratory failure. If you have any questions, please feel free to contact me at: 1-201-982 4393.

John R. Bach, M.D.
Professor of Physical Medicine and Rehabilitation
Co-Director, Jerry Lewis Muscular Dystrophy Association Clinic of UMDNJ-NJMS

(KA) EXHIBIT  9
Page  3  of  11  pages

# ORTHOPAEDIC SPECIALISTS OF MARYLAND, P.A.

*Specializing in Orthopaedic Surgery*

Stewart L. Koehler, M.D.
Lee M. Schmidt, M.D.
D. Allan Lanzo, M.D.
Charles A. Hartjen, M.D.
Raymond A. Wittstadt, M.D.

August 20, 1996

6565 N. Charles Street, Suite 606
Baltimore, Maryland 21204
(410) 583-0160
Fax (410) 583-0166

Division of Employee Relations
HFA430 Office of Medical Consultant
Food and Drug Administration, Room 9-66
5600 Fishers Lane
Rockville, Maryland  20857

re:    Michael Benson

To Whom It May Concern:

    Michael Benson is a 55 year old man with a history of polio and secondary scoliosis due to polio.  His scoliosis became severe with a resultant significant chest wall deformity and significant pulmonary function compromise.  His primary function loss in November 1994, prior to surgery, revealed a severe restrictive ventilatory impairment consistent with scoliosis.  The patient was noted to have periods of hypoxemia, sleep disruption, nocturnal hyperventilation and daytime $CO_2$ retention.  He has required the use of nasal BiPAP while at sleep.  In November of 1994 and December of 1994 the patient underwent a two stage procedure consistent of thoracotomy, diskectomies and posterior instrumented arthrodesis of the spine with a period of traction between the two surgeries.  The patient had a substantial improvement of his curvature and an approximately three inch increase in torso length.  However, unfortunately, with his follow up pulmonary function tests in 1995 the patient had a further slight deterioration in his pulmonary function parameters.  The patient has had difficulty driving for the approximately 1 to 1 ½ hours required to drive to his work.  The sitting position in the automobile can compromise the mechanics of respiration and in a patient such as Mr. Benson, who is normally hypoxic, this additional compromise in respiratory function can be detrimental.  Mr. Benson has requested that you consider allowing him to work at home two days a week.  If this is technically feasible I strongly recommend you allow him to work at home, since this would be much less taxing to him and compromise his respiratory function much less than having to drive to work in an automobile on a daily basis.

    If I may provide any further information, please contact my office.

Sincerely,

*Charles A. Hartjen MD*

Charles A. Hartjen, M.D.

CAH:baw

EX 8

Michael T. Benson
2703 Waco Court
Baltimore, MD  21209
(410) 484-7262

December 21, 1995

Kathleen Klumpp, RRT
c/o Pulmonary Rehabilitation
Martha Jefferson Hospital
459 Locust Avenue
Charlottesville, VA  22902

Dear Kathy:

I now feel a need
to recline my car seat to relieve pressure on my diaphragm.

Page 2
Kathleen Klumpp, RRT

              Sometimes I feel a sense of
deoxygenating when driving to work (about an hour to an hour and
15 minutes).

(KA) EXHIBIT   9
Page  6  of  11   pages



## MARTHA JEFFERSON HOSPITAL

A  C A R I N G

T R A D I T I O N

KATHLEEN M. KLUMPP
PULMONARY REHABILITATION
MARTHA JEFFERSON HOSPITAL
459 LOCUST AVENUE
CHARLOTTESVILLE, VA 22902

January 5, 1996

Michael T. Benson
2703 Waco Court
Baltimore, Maryland 21209

Dear Mike,

It does sound like you are desaturating when sitting while driving your car probably secondary to an inability to take a deep enough breath in that position. By reclining somewhat, you free up your diaphragm for greater excursion.

Sincerely,

*Kathé*

Kathleen Klumpp, RRT
Martha Jefferson Hospital

(KA) EXHIBIT   9
Page   7   of   11   pages

459 Locust Avenue

Charlottesville

Virginia 22902

(804) 982-7000

Michael T. Benson
2703 Waco Court
Baltimore, MD  21209
(410) 484-7262

December 21, 1995

Kathleen Klumpp, RRT
c/o Pulmonary Rehabilitation
Martha Jefferson Hospital
459 Locust Avenue
Charlottesville, VA  22902

Dear Kathy:

Happy holiday season and best wishes for the new year.

Since my last letter to you, I received a copy (enclosed) of the writeup of my CAT scans.  They detect no problem with the condition of my lungs.

My pulmonologist tried to refer me to Dr. Marinos Dalakas, a neurologist at NIH for evaluation and treatment of PPS.  He does research on behalf of the federal government with PPS patients. My type of situation is not one that he currently handles.  I was referred to another neurologist who did an electromyelogram (EMG) on my arms.  He concluded that there is widespread chronic denervation and reinnervation in the arms, likely secondary to old polio.  He also concluded that at the time he did the EMG, there is no electrophysiologic evidence for acute denervation. We were hoping he would do an EMG of my diaphragm.  When he told me that the needle used in the EMG could puncture a lung, I chickened out.

He tried me on amantadine 100 mg. BID which reportedly relieves fatigue associated with multiple sclerosis and has been effective in doing the same in people with PPS.  With my first use of the drug, I was able to sit in my car without reclining the seat part way to relieve pressure on the diaphragm.  Other than that, I didn't detect any benefit or less fatigue.  I stopped taking it one week before getting a flu shot, and haven't resumed taking it since.  Interestingly enough, I now feel a need to recline my car seat to relieve pressure on my diaphragm.

He said that when riluzole is approved for amyotropic lateral sclerosis (ALS), he'd like to try me on it to see what it does for PPS.  His observations were that the drug is safe.  I read last week that FDA approved it, but it was a half-hearted approval, i.e., 57% of ALS patients on it survived 3 months longer than those on a placebo.  Those in favor of its approval claimed 3 months of extra life is worth the approval.  I don't feel overly optimistic using this drug.  From my memory of the literature I read on it from Rorer-Poulenc Co., it was helpful in patients with bulbar difficulties.  When I read this, I thought

(KA) EXHIBIT    9

Page 2
Kathleen Klumpp, RRT

you should be made aware of that statement and could ultimately
benefit from using it.  Rorer-Poulenc has an 800 number for this
type of information and will send its literature to you upon
request.  I can't find my copy at this time and don't recall
their 800 number.

He also talked about using Myotropin which is supposed to
be identical to Insulin Growth Factor (IGF-1) worked on by Kaup
Shetty at U. of Wisconsin Medical School.

Of the literature references you last sent to me, I gave a
copy of each my pulmonologist some time ago, and to my orthopedic
surgeon on December 15th at an appointment.

I talked with Dr. John Bach about my PFTs and he believes
the rod implants restrict the ribs and cause a decrease in
my VC and TLC values.  I mentioned this to my orthopedic surgeon
and asked whether the rods should be removed.  He said he
believes the rods are above the ribs and are not actually
contacting them, but possibly something grown on or attached to
the ribs might make contact with any of the rods thus preventing
the ribs from spreading.  He said he could send a copy of an
X-ray taken of me last week to Dr. Bach for an opinion.  He said
that the fusion is fully matured, and that the rods could be
removed.  I tried to reach Dr. Bach, but got no answer at his
office.  Presumably, the New Jersey Medical School staff is off
for the holidays.  I will try to see him, probably after the
first of the year.  Even if he were available now, the weather
has been too troublesome for me to cope with for driving from
Baltimore to Newark.  I might wait until the weather improves
before driving to Newark.

Dr. Bach might have or know of devices that could help me
rehabilitatively.  I still use the BiPaP S/T for sleep and for
lying down.  I don't know whether using the PFLEX will help.  It
could hurt.  I'll try to get Dr. Bach's view of ventilatory
muscle training (VMT) for inspiratory muscles.  VMT has proven
effective in patients with muscular dystrophy and other disease
conditions, according to the literature.  PPS is not cited in the
leterature that I have seen.  Sometimes I feel a sense of
deoxygenating when driving to work (about an hour to an hour and
15 minutes).  I sometimes relieve this by getting out of the car
and standing up, or the condition subsides after I can pull in
some air.  Other times I just cannot walk a moderate distance
without stopping and resting.  Maybe Dr. Bach has other devices
that could alleviate those problems.

From talking with my neurologist and reading the literature,
my gut reaction is that my phrenic nerve is either denervated or
not working right.  That nerve innervates the diaphragm which is

Page 3
Kathleen Klumpp, RRT

reported to be the muscle of inspiration.  I have difficulty with
being able to breathe in sufficient air whenever a deoxygenating
feeling sets in.

    A 40 pound loss probably would be helpful.  A better will
power would be great.  The anorexics would probably be effective,
but they tend to increase blood pressure.  My BP is currently
under control with an antihypertensive.

    I followed up on your suggestion to contact Joan Hedley at
GINI and am now a subscriber to Polio Network News.  I did not
subscribe to the International Ventilator Users Network.  One
previous PNN issue included an article by Linda Bieniek of
Chicago saying she had polio (not sure of which muscles),
scoliosis, difficulty in breathing, and surgery similar to mine.
The surgery resulted in growth in her height and improvement in
pulmonary function.  Because she had pulmonary improvement after
surgery and I didn't, I tried to find out why.  As I recall, she
said she had the surgery in 1985 with pulmonary function
improvement, but later incurred the effects of PPS with resulting
pulmonary problems.  In my case, apparently I had PPS at the time
of surgery.

    I've been meaning to update you on my situation, but
precommitments delayed my writing.  Now, I am on leave from
work until 1/8/96 and have more free time to write this letter.
I plan to go to Fort Lauderdale, Florida for a week after
Christmas until early January.  The office where I work has been
moved to a new location with the telephone number 301-827-2311.
My old number of 301-594-1006 is not in use.

    I'll try to update you if anything of significance happens.

                        Sincerely,

                        Mike

                        Michael T. Benson

Enclosures





# MARTHA JEFFERSON HOSPITAL

A  C A R I N G

T R A D I T I O N

KATHLEEN M. KLUMPP
PULMONARY REHABILITATION
MARTHA JEFFERSON HOSPITAL
459 LOCUST AVENUE
CHARLOTTESVILLE, VA 22902

January 5, 1996

Michael T. Benson
2703 Waco Court
Baltimore, Maryland 21209

Dear Mike,

Thank you for your last letter. I am glad you have contacted John Bach. He is the best one to evaluate your current situation and provide you with help on how to correct it. **The goal is to correct the alveolar hypoventilation, keeping your CO2 within normal range 24 hrs. per day,** and I suspect your oxygen levels will take care of themselves if you can accomplish the former. If it takes daytime as well as nighttime respiratory support to accomplish this, so be it. There are a lot of non-invasive options now. I wonder whether your Bi-Pap is sufficient to normalize your CO2 and O2 during the night.

It does sound like you are desaturating when sitting while driving your car probably secondary to an inability to take a deep enough breath in that position. By reclining somewhat, you free up your diaphragm for greater excursion. However, it would be a good idea to find out what your saturations are during the day at rest sitting, lying down and with exertion via oximetry.

It would also probably be helpful for you to learn how to increase the depth of your inspiration by **glossopharangeal breathing.** I have mentioned that to you before. It is the simplest and easiest rehabilitation aid that you can employ. Also, you might want to ask Dr. Bach (after he assesses you) whether you would be an candidate for an intermittent abdominal pressure ventilator consisting of an inflatable bladder in an abdominal belt. It is most effective in the sitting position, but your scoliosis and body weight might be contraindications to its use. Again, you might not need it either. Dr. Bach is your man here as well.

I am sending you two articles by Bach as well as the Summer 1995 issue of Polio Network News on Post-Polio Corrective Spinal Surgery. I highlighted the part of concern: I wonder if your respiratory muscles are sufficient to ventilate with the increased "dead space" which might have occurred as a result of your spinal surgery. I know that your PFT's were no better, but I am wondering about the extent to which you are desaturating now as compared to before the surgery as well as the status of your CO2.

Thanks for your tips on drugs—the amantadine I have known about. In fact, Dr. Lauro Halstead of the Polio Clinic and National Rehabilitation Hospital takes it.

Well, enough for now. Keep me posted. I am especially interested in knowing the results of an assessment by John Bach. Good luck to you in the New Year.

Sincerely,

*Kathie*

Kathleen Klumpp, RRT
Martha Jefferson Hospital

459 Locust Avenue

Charlottesville

Virginia 22902

(804) 982-7000

(XA) EXHIBIT  9
Page  11  of  11  pages

10



**DEPARTMENT OF HEALTH & HUMAN SERVICES**  

Public Health Service
Food and Drug Administration

# Memorandum

**Date**    · **JUN 1 7 1996**

**From**    Supervisory Chemist
Division of OTC Drug Products
Office of Drug Evaluation V

**Subject**    Official Reprimand  - Corrected

**To**    Michael Benson
Pharmacist
Division of OTC Drug Products
Office of Drug Evaluation V
Center for Drug Evaluation and Research

This is an Official Reprimand for your unauthorized absence from the office and for your failure to secure approval to work flexiplace on May 7, 1996.

In a meeting held on April 15, 1996, I informed you that, beginning April 17, 1996, you could no longer work a flexiplace schedule. I told you that you could work flexiplace on April 16, 1996, but that after that date, you were no longer approved to work flexiplace due to your apparent 'inability to work independently as demonstrated by a major error that you made in a reply to a citizen petition. I further explained to you that you should not plan to work flexiplace after April 16, 1996, until I was satisfied that you were able to work independently, as someone of your grade level should be capable of doing. I concluded the meeting by stating that, if anything was not clear, you were to let me know by the next day.

On April 16, 1996, I sent you an electronic mail message (e-mail) concerning the meeting regarding 1-desoxyephedrine. In this message, I re-emphasized that you are no longer approved to work a flexiplace schedule. You responded in an e-mail dated April 16, 1996, that, even if the blame for the error in the 1-desoxyephedrine letter was attributed to you, denial of your flexiplace to closely supervise you is inappropriate, i.e., an error in issuance of the letter would just as likely have occurred at work. After receiving your e-mail, I decided to reconsider my decision regarding my disapproval of your working a flexiplace schedule until after I had reviewed your April 12, 1996, drafts of issues 1.5 and 6.2 for the pediatric dosing notice of proposed rulemaking. I then reviewed these issues to determine if they were acceptable work products and found that they were not acceptable.

During a meeting on April 17, 1996, I discussed with you your unacceptable drafts of issues 1.5 and 6.2, your need for closer supervision, and my disapproval of your working a flexiplace schedule. In this meeting, you objected to my disapproval of your working flexiplace because you felt that you should not be held responsible for the error on the citizen petition. I replied that I still held you responsible for the error. I then reviewed pediatric dosing issues 1.5 and 6.2 with you.

EX 1            (XA) EXHIBIT    10
Page 1  of  7  pages

Page 2
Official Reprimand  - Corrected
Michael Benson


I indicated to you that, after reviewing these two work products, I felt that they were unacceptable because of major flaws and the poor quality of your writing. Therefore, I informed you that because I believed you still required close supervision, I could not allow you to work flexiplace at this time. I asked you if you understood why I believed you require close supervision and why I could not allow you to work a flexiplace schedule. You replied that you understood.

In an e-mail from you dated April 25, 1996, addressed to me, you stated that I misinterpreted our discussion on April 17, 1996, and that you did not agree with my decision not to allow you to work flexiplace because of my determination that you require close supervision. You further explained that you can perform the same work at home as you do in the office, and the work is reviewable in the office as in the past. You also stated that you were justified in seeking immediate restoration of your flexiplace schedule.

On the morning of May 7, 1996, I received an e-mail from you dated May 6, 1996, which you had composed at 7:42 p.m. In this e-mail you requested authorization to .work flexiplace on May 7, 1996, to work on the pediatric dosing issues. You explained that you thought it wasteful to require you to travel from Baltimore, with the high gas prices, when you could accomplish the same work at home that you could perform at the office. You also said that you wanted to request my approval before you left on May 6, 1996, but I was on the telephone.

After reading your May 6, 1996, e-mail, I tried calling you at home, but your line was busy. Therefore, I began composing an e-mail to you to inform you that you were not allowed to work flexiplace on May 7, 1996. At approximately 9:15 a.m. on May 7, 1996, you called me from home. You stated that you were waiting at home for a reply to your request to allow you to work a flexiplace schedule that day, May 7, 1996. I informed you that you did not have permission to work at home and that you needed to get to work as soon as possible. You informed me that you were going to report to work as soon as you could, that you live in Baltimore and it would take a while to get to work.

After speaking to you on the phone, I completed my e-mail to you in which I stated that you were not allowed to work a flexiplace schedule on May 7, 1996. Further, I suggested that you get to work as soon as possible. I also stated that I was available for you to talk with me about your request for flexiplace several times on May 6, 1996. I explained that it was not my concern that you waited until shortly before leaving the office to talk to me about your request. In my e-mail, I related to you how I believed your action of not reporting to work was willful and that you knowingly defied my

Page 3
Official Reprimand  - Corrected
Michael Benson

written instructions to you to report to your Corporate Boulevard office until further notice.

You arrived at work at 11:09 a.m. on May 7, 1996, and I met with you shortly after your arrival and explained to you how extremely upset I was that you had not secured my approval to work flexiplace at home. I informed you that I was charging you Absence Without Leave (AWOL) between the hours of 9:30 a.m. and 11:09 a.m. Had I not charged you with AWOL, I would have presumably considered your unauthorized absence from your office in the Corporate Building working unauthorized flexiplace from 8:30 a.m. to 9:15 a.m. since your flexiplace agreement states that you will work from 8:30 a.m. to 5:00 p.m.. Further, on an average, you have been signing in at 8:30 a.m.

You responded that you had risen early on the morning of May 7, 1996, in order to receive my e-mail response to your request to work flexiplace. You added that you were waiting at home until I responded to your request. You told me that you had telephoned me from home on the morning of May 7, 1996, to learn of my decision because you had not heard from me.

I told you that you had sufficient time on May 6, 1996, to discuss this matter with me and that it was unacceptable for you to send me an e-mail at 7:42 p.m. on May 6, 1996, to request permission to work flexiplace the following day (May 7, 1996). I also told you that you had not received my permission to work a flexiplace schedule by the time that you would have needed to leave your home in order to arrive to work by 9:30 a.m. Therefore, you should have started on your way to work in order to arrive by 9:30 a.m.

I informed you several times during this meeting that I had not given you permission to work a flexiplace schedule and that I considered you AWOL for the time that you were absent from the office on May 7, 1996 (9:30 a.m. - 11:09 a.m.). Therefore you were charged 1 3/4 hours of AWOL. While AWOL charges are not disciplinary actions, accumulated AWOL charges can form the basis for disciplinary or adverse action, up to and including removal from Federal service.

Throughout the meeting, you continued to say that you had requested permission, but I explained to you that your 7:42 p.m. e-mail on May 6, 1996, requesting to work flexiplace the following day was unacceptable. You stated that you had requested to have your flexiplace schedule reinstated in an e-mail dated April 25, 1996, which was in response to my e-mail of April 18, 1996, and that you had not received a response from me. I informed you that I had my comments regarding your April 25, 1996, response ready to discuss with you and that it states that your April 25, 1996, response is not adequate to support approval of your request to work a flexiplace schedule. I

Page 4
Official Reprimand  - Corrected
Michael Benson

explained to you that the fact that you had not received a response from me to your request to have your flexiplace schedule reinstated should have made you realize that you still did not have permission to work flexiplace.

I then discussed with you my comments regarding your e-mail dated April 25, 1996, which responded to my April 18, 1996, e-mail. I re-emphasized that your e-mail did not support reinstatement of a flexiplace schedule. I expressed my concern that you apparently had not taken my instructions seriously. You replied that you were taking this matter seriously. I informed you at this meeting that I was contemplating taking disciplinary action against you.

On May 20, 1996, at approximately 5:00 p.m., you handed me a request to restore your flexiplace privileges and to be allowed to work flexiplace the following day (May 21, 1996). Attached to your request was correspondence regarding your medical condition. I accepted your request; however, I told you that I needed to call the Division of Employee Relations (DER) for guidance on dealing with your request.

I telephoned DER and spoke to Pam Kelley, Employee Relations Specialist, concerning your request to restore your flexiplace privileges and the medical documentation that you had provided. Per Ms. Kelley's request, I faxed her your request and the medical documentation. Ms. Kelley told me that your medical documentation would be sent to FDA's consulting physician, Dr. James Vorsomarti, in order for him to determine if your medical documentation supports your requests to restore your flexiplace privileges. Ms. Kelley also advised me that until Dr. Vorosmarti had provided FDA an assessment of your medical documentation, I should inform you that you were to report to work as it would take a few days before DER would receive correspondence from Dr. Vorosmarti. I explained this information to you after my conversation with Ms. Kelley ended. I told you that you could call Ms. Kelley if you had any questions.

By memorandum dated May 21, 1996 (copy attached), Dr. Vorosmarti stated that he was unable to give an opinion on whether or not flexiplace is a valid accommodation for you due to several sections that were "whited out" in the medical documentation. Therefore, Dr. Vorosmarti indicated that you should be asked to provide copies of the medical reports without deletions, or provide copies of your clinical record.

Ms. Kelley arranged with you to pick up your medical documentation (without deletions) on May 23, 1996. Ms. Kelley provided Dr. Vorosmarti the medical documentation that she received from you.

Dr. Vorosmarti has reviewed the additional medical documentation that you provided and provided DER with a memorandum dated May 24, 1996 (copy attached). In this

Page 5
Official Reprimand  - Corrected
Michael  Benson


memorandum,  Dr. Vorosmarti  states that, in a memorandum  from you dated May 21,
1996, you are requesting  accommodation  in the form of working at home two days a
week.  Dr. Vorosmarti  also states that the medical documentation  (without deletions)
does not support your request because he feels that your medical condition will not be
changed  or worsened  by working at the office nor by driving to and from work.

Therefore,  based on Dr. Vorosmarti's  recommendation,  I have decided  not to restore
your flexiplace  privileges  at this time.  In the meantime,  if you feel incapacitated  to
come to work, you may request  and secure  leave approval  from me.

You are hereby  directed  to report for work in your Corporate  Boulevard  office until I
determine  that you are able to work independently,  at which time I will reconsider  my
decision.

I am officially reprimanding  you for your unauthorized  absence  from the office and
failure to follow my instructions when, despite my repeated  directions  that you were not
approved  to work a flexiplace  schedule,  you defied my instructions  by submitting to me
a request to work flexiplace  well after duty hours and staying at home in what could be
construed  as an attempt  to force or manipulate  me to allow you to work flexiplace.  I
also caution you that more severe disciplinary  action (up to and including your removal
from Federal service)  may be taken on any further unauthorized  absence  and/or  failure
to follow instructions  or other misconduct.

You are advised  that the material  relied upon for this Official Reprimand  is available
for your review.  You may contact Ms. Leah Mader or Ms. Renee  Davis in the Division
of Employee  Relations,  on 301-443-4200,  to make an appointment  to review this
material.

This Official Reprimand  is effective  the day you receive it, and a copy will be filed in
your Official Personnel  Folder for two years.

You have the right to have this Official Reprimand  reviewed  under the Departmental
grievance  procedure.  If you choose to do so, your Stage 1, informal  grievance  must be
submitted  to me in writing within 30 calendar  days after the effective  date of the
Official Reprimand.   You must specifically  state that you are making a Stage 1
grievance  presentation  under the Department  of Health and Human Services'  grievance
procedure  and you must furnish sufficient  detail to clearly identify the matter being
grieved.  You must also specify the personal  relief sought.

However,  if you believe the Official Reprimand  is based on prohibited  discrimination
due to race, color, religion,  sex, national  origin, disability,  or age, you may initiate a

Page 6
Official Reprimand  - Corrected
Michael Benson

complaint of discrimination in accordance with the Department's discrimination complaint procedures under regulations of the Equal Employment Opportunity Commission (EEOC). Should you elect to pursue a discrimination compliant, it must be initiated within 45 calendar days after the effective date of this Official Reprimand.

Finally, if you believe this Official Reprimand is based on discrimination or harassment because of sexual orientation, you may elect to have such an allegation addressed under either the Department's separate procedures for processing such allegations, or under any other procedure which covers you (i.e., the Department's grievance procedure described above). Under the Department's separate procedures, you are entitled to present such concerns to an EEO Counselor within 45 calendar days of the effective date of this Official Reprimand. This entitlement derives from Department of Health and Human Services (DHHS) policy and not from EEOC regulations and cannot be pursued to EEOC.

You may contact Ms. Margaret Bell in CDER's EEO Office at 301-594-6645 or FDA's Office of Equal Employment and Civil Rights on 301-443-3310 for information about initiating a discrimination complaint within DHHS under the EEOC regulations and/or under the separate DHHS procedures for sexual orientation harassment and/or discrimination.

You may contact Ms. Mader or Ms. Davis on the number listed above to inquire about your rights in this matter or to obtain a copy of DHHS Instruction 771-3, Employee Grievances.

_Anne Mustafa_

Anne Mustafa



Page 6
Official Reprimand  - Corrected
Michael Benson

complaint  of discrimination  in accordance  with  the  Department's  discrimination
complaint  procedures  under  regulations  of  the  Equal  Employment  Opportunity
Commission  (EEOC).  Should  you elect  to pursue  a discrimination  compliant,  it must
be  initiated  within  45 calendar  days after  the effective  date  of this Official  Reprimand.

Finally, if you believe  this Official  Reprimand  is based on discrimination  or harassment
because  of sexual  orientation,  you may  elect  to have  such an allegation  addressed  under
either  the Department's  separate  procedures  for processing  such allegations,  or under
any other  procedure  which covers  you (i.e., the Department's  grievance  procedure
described  above).  Under  the Department's  separate  procedures,  you are entitled  to
present  such concerns  to an EEO Counselor  within  45 calendar  days of the effective
date of this Official  Reprimand.  This entitlement  derives  from Department  of Health
and  Human  Services  (DHHS)  policy  and  not  from  EEOC  regulations  and cannot  be
pursued  to EEOC.

You may contact  Ms. Margaret  Bell in CDER's  EEO  Office  at 301-594-6645  or FDA's
Office  of Equal  Employment  and Civil  Rights  on 301-443-3310  for information  about
initiating  a discrimination  complaint  within  DHHS  under  the EEOC  regulations  and/or
under  the  separate  DHHS  procedures  for sexual  orientation  harassment  and/or
discrimination.

You may contact  Ms. Mader  or Ms. Davis  on the number  listed  above  to inquire  about
your rights  in this matter  or to obtain  a copy  of DHHS  Instruction  771-3, Employee
Grievances.

*Anne Mustafa*

Anne  Mustafa

*Michael T. Benson*                              6/17/96

I/acknowledge  receipt  of the original  of this            Date
memorandum.

(KA) EXHIBIT    1 0
Page  7  of  7  page

11

M E M O R A N D U M      DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

DATE:     JUN - 4 1996

FROM:     Michael T. Benson
         Regulatory Review Pharmacist (HFD-560)

TO:       Debra L. Bowen, M.D.
         Director
         Division of OTC Drug Products (HFD-560)

SUBJECT: Stage 1 Grievance

I am making a Stage 1 grievance presentation under the Department
of Health and Human Services' grievance procedure.

This grievance seeks withdrawal of the May 31, 1996 Official
Reprimand (copy attached) issued to me by Anne Mustafa because
the reprimand contains a materially false statement and appears
not to state any other charge of reprimandable misconduct. The
reprimand was issued to me for my "unauthorized absence from the
office and failure to follow instructions by working flexiplace
at home" during the time that Anne Mustafa instructed me that I
was no longer approved to work at home.

On pages 1 and 3, the reprimand states that I worked flexiplace
at home when Anne Mustafa instructed me that I was no longer
approved to work at home. At no time did I ever work flexiplace
at home as long as that privilege was not in effect. There was
no flexiplace earned on May 7, 1996, the day the event subject to
the reprimand occurred. Anne Mustafa charged me with 1-3/4 hours
of AWOL for May 7, 1996, although I requested maxiflex leave of
1-1/2 hours.

After deletion of the false statement, the reprimand's thrust
relates to my being charged with AWOL. Anne Mustafa states on
page 3 that AWOL charges are not disciplinary actions. An
Official Reprimand is obviously a disciplinary action. Based on
her statement, it appears that the remainder of the reprimand
(after deletion of the false statement) doesn't state facts that
constitute reprimandable misconduct. Further, the paragraphs
beginning on page 4 with "On May 20, 1966---" and ending after
the second paragraph on page 5 are immaterial to the charges as
made, and are inappropriate for inclusion. The third paragraph
on page 5 relates to the false statement and the AWOL charge.
For reasons stated, it ought not be included.

If an official reprimand is considered as an exception to AWOL
charges not being disciplinary actions, and Anne Mustafa wants to
issue an Official Reprimand, the one that issued should be
revised and rewritten as described above.

Ex 15

(KA) EXHIBIT   11
Page  1  of  2  pages



Page 2
Debra L. Bowen, M.D.


Page 5 of the reprimand states that it will be filed in my
Official Personnel Folder for two years.  If anyone sees the
reprimand as written and it results in adverse consequences to me
because of the false statement, the reprimand will be defamatory.
Even if I file a rebuttal that is placed in the folder, a third
person seeing the reprimand as stated and my rebuttal won't know
who to believe.

In retrospect, I should have tried to ask Anne Mustafa earlier in
the day on May 6th about working flexiplace on May 7th.  My
assumption that she would see my E-Mail message asking for the
authorization in enough time to let me know her answer was
erroneous.

As directed on page 5 of the Official Reprimand, I have submitted
the original of this Stage 1 Grievance to Anne Mustafa on
June 4, 1996.

Michael T. Benson

Attachment

12



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
Food and Drug Administration

JUN 17 1996

**Memorandum**

Date

From

Supervisory Chemist
Division of OTC Drug Products
Office of Drug Evaluation  V

Subject

Stage 1 Grievance  Decision

To

Michael Benson
Pharmacist
Division of OTC Drug Products
Office of Drug Evaluation  V
Center for Drug Evaluation  and Research

By memorandum  addressed to Dr. Debra L. Bowen, M.D., Director, Division of
OTC Drug Products, Office of Drug Evaluation  V, you submitted  a Stage 1
grievance  which was dated and received  by me on June 4, 1996.  Your Stage 1
grievance  seeks review of the Official Reprimand  I issued to you on May 31, 1996.

Department  of Health and Human Services (DHHS) Instruction 771-3, Employee
Grievances, states at Section 771-3-30, Informal Procedure, B1 Presentation:

a. To Whom Presented

"The employee  presents  the grievance. in writing to the Stage 1 Official
and provides  a copy of the written grievance  to the employee 's immediate
supervisor  (when the Stage 1 Official is not the employee 's  immediate
supervisor).

The Stage 1 Official is the first official within the Department  who has
authority over the matter grieved.  This is usually the official who made
the decision  or committed  the act or omission about which the employee
is dissatisfied. ..."

Although  you submitted  the original of your Stage 1 Grievance  to me and did not
forward a copy to Dr. Bowen, you addressed  your grievance  to Dr. Bowen.  It
should have been addressed  to me since I am the person who issued the Official
Reprimand  which is the matter you are grieving.

This memorandum  conveys my decision  on your Stage 1 grievance.

In your grievance  memorandum,  you noted your disagreement  with the Official
Reprimand  I issued to you for your unauthorized  absence  from the office and
failure to follow instructions  by working flexiplace  at home.  You stated that, since
you were charged  with 1.75 hours of Absence  Without Leave (AWOL), you

12/30/97  03:35   CDER/FDA ...  → 301 402 4732                    NO. 300  P005/013

Page 2
Stage 1 Grievance Decision
Michael . Benson

did not work flexiplace at home and, therefore, the false statement should be
redacted from the Official Reprimand.

The personal relief that you seek is to either 1.) Withdraw the Official Reprimand;
or 2.) Redact the false statement alleging that you worked unauthorized flexiplace
at home.

Your statement, "At no time did I ever work flexiplace at home as long as that
privilege was not in effect," is not accurate due to the fact that your flexiplace
agreement states that, when on flexiplace. your tour of duty is 8:30 a.m. to 5:00
p.m. Further, prior to May 7, 1996, on the average, you had been signing in at 8:30
a.m. when you worked a flexiplace schedule. Although you were charged AWOL
from 9:30 a.m. to 11:09 a.m., I did not hear from you until 9:15 a.m. and, therefore,
had I not charged you with an unauthorized absence from your office in the
Corporate Building, presumably, you would have been working at 8:30 a.m.,
therefore working unauthorized albeit uncompensated flexiplace at home from 8:30
a.m. to 9:15 a.m.

Your statement that, "Further, the paragraphs beginning on page 4 with 'On May
20. 1996, - - -' and ending after the second paragraph on page 5 are immaterial to
the charges as made, and are inappropriate for inclusion," is your opinion. The
information that you submitted to be reviewed by FDA's consulting physician,
James Vorosmarti, M.D., referenced your being allowed to work flexiplace at
home. Therefore, as a courtesy to you, and to keep you informed of the situation, I
included the updated information in the Official Reprimand.

As your supervisor, I feel compelled to inform you that when I informed you on
April 15, 1996, that you would no longer be allowed to work flexiplace effective
April 17, 1996, until further notice, you should have complied with my instructions
to you. Instead, you have insisted on more than one occasion that you should be
allowed to work flexiplace and have made two last minute attempts to coerce me
into a situation where you would be working flexiplace before I had a sufficient
opportunity to deliberate on your requests or respond to them.

There appears to be some confusion about AWOL as a disciplinary action, i.e., my
statement that, "While AWOL charges are not disciplinary actions, accumulated
AWOL charges can form the basis for disciplinary or adverse action, up to and
including removal from Federal service." My statement was to inform you that
although the 1.75 hours of AWOL that you were charged on May 7, 1996, was not
a disciplinary action, AWOL can be the basis for disciplinary or adverse action. An
Official Reprimand is a form of discipline that can result from an employee having

(KA) EXHIBIT  12
Page  2  of  3  pages

10/30/97  08:35   CDER/FDA    → 301 402 4752                    NO. 300  P006/013

Page 3
Stage 1 Grievance Decision
Michael Benson


an unauthorized (AWOL) absence. AWOL is the leave charge. The Official
Reprimand is the disciplinary action. As your supervisor, I was simply informing
you that your unauthorized absence which resulted in an AWOL charge is to be
taken seriously.

In summary, based on my review of the information provided, I do not find
sufficient evidence or argument to support withdrawal of the Official Reprimand.
However, because, technically, your working flexiplace was rendered moot by the
AWOL charge, I have decided to amend the language in the Official Reprimand.
A copy of the revised Official Reprimand is attached. I will place a copy of this
document in your Official Personnel Folder and will remove the document
originally issued to you.

If you wish to seek review of this decision, you may file a stage 2 formal grievance
to:

> Debra L. Bowen, M.D.
> Director, Division of OTC Drug Products
> Office of Drug Evaluation V, HFD-560
> Center for Drug Evaluation and Research
> Food and Drug Administration
> 9201 Corporate Boulevard, Room S208
> Rockville, Maryland 20850
> 301-827-2241

within fourteen (14) calendar days after your receipt of this stage 1 decision. A
stage 2 grievance must: (1) be presented in writing; (2) state it is a formal stage 2
grievance presentation; (3) be limited to matters reviewed at stage 1 but not
satisfactorily resolved; (4) furnish specific detail to identify clearly the matter being
grieved; (5) explain the basis for the grievance; (6) specify the specific personal
relief sought; (7) contain all available evidence, documentation and argument to
support the grievance and support the personal relief requested; (8) state why you
disagree with the stage 1 decision; and (9) be accompanied by copies of the stage 1
grievance and this stage 1 decision.

Questions about the grievance procedure may be directed to Leah Mader,
Employee Relations Specialist, in FDA's Division of Employee Relations on
301-443-4200.

Anne Mustafa


Attachment
Copy of this Decision
Copy of the Official Reprimand - Corrected

(KA) EXHIBIT   12
Page  3  of  3  pages

13

12/30/97  08:59    CDER FDA    C → 301 402 4732                    NO.300  P007/013

M E M O R A N D U M        DEPARTMENT OF HEALTH AND HUMAN SERVICES
                                    PUBLIC HEALTH SERVICE
                                FOOD AND DRUG ADMINISTRATION
                            CENTER FOR DRUG EVALUATION AND RESEARCH

DATE:      JUL - 1 1996

FROM:    Michael T. Benson
         Regulatory Review Pharmacist (HFD-560)

TO:      Debra L. Bowen, M.D.
         Director
         Division of OTC Drug Products (HFD-560)

SUBJECT: Stage 2 Grievance

I am making a Stage 2 grievance presentation under the Department
of Health and Human Services' grievance procedure.

This grievance seeks withdrawal of the June 17, 1996 Official
Reprimand - Corrected (hereinafter Reprimand 2) (copy attached)
issued to me by Anne Mustafa because issuance of the reprimand is
not permitted for the offense charged, and even if it were
permitted, its issuance is excessive punishment for what
occurred.

Reprimand 2 at page 1 says that the Official Reprimand is for my
unauthorized absence from the office and for my failure to secure
approval to work flexiplace on May 7, 1996.  In essence,
Reprimand 2 was issued for one charge of being absent without
leave (AWOL).

Anne Mustafa's first Official Reprimand dated May 31, 1996
(hereinafter Reprimand 1) (copy attached) was stated to be for my
unauthorized absence from the office and failure to follow
instructions by working flexiplace at home when she had
specifically instructed me that I was no longer approved to work
at home.

In my Stage 1 grievance* (copy attached) to Reprimand 1, I
argued that Reprimand 1 contained a materially false statement
when it stated that I worked flexiplace when my privilege was
suspended.  I also argued that Reprimand 1 appeared not to state
facts that constitute reprimandable misconduct if that false
statement were deleted.

In a June 17, 1996 memorandum containing her Stage 1 Grievance
Decision (hereinafter Decision Memo) (copy attached), Anne Mustafa
explained her basis for issuing to me Reprimand 2.  Reprimand 2
differs in substance from Reprimand 1 by omitting the statement
that I worked flexiplace at home on May 7, 1996.

*addressed to Debra L. Bowen, M.D.; decided by Anne Mustafa

(KA) EXHIBIT  12
Page  1  of  4  pages

-2-

In my Stage 1 Grievance, I stated that if an Official Reprimand is an exception to AWOL charges not being disciplinary actions, and if Anne Mustafa wants to issue an Official Reprimand, the one she wrote should be revised and rewritten for reasons stated therein.  That statement was intended to convey that an exception might exist if the AWOL charge were coupled with other alleged misconduct.  I did not acquiesce to being issued a revised reprimand for my first AWOL charge.

The 6th full paragraph on page 5 of Reprimand 2 and the 2d full paragraph on page 3 of the Decision Memo present me with 2 different procedural options.  Reprimand 2 says I can file a Stage 1 Grievance and submit it to Anne Mustafa in writing within 30 days of its effective date.  The Decision Memo says I can file a Stage 2 Grievance to yourself within 14 days after receiving her Stage 1 Decision.  I elected to file this Stage 2 Grievance first because of the shorter deadline.  Therefore, it would be procedurally inappropriate for me to file a Stage 1 Grievance on Reprimand 2 at this time.  Whether the time limitations for filing a Stage 1 Grievance to Reprimand 2 are suspended by the pendency of this Stage 2 Grievance and its possible appeal are not clear to me.

The Decision Memo's last paragraph on page 2 leading into page 3 discusses AWOL as a disciplinary action and refers to Reprimand 1 stating "While AWOL charges are not disciplinary actions, accumulated AWOL charges can form the basis for disciplinary or adverse action, up to and including removal from Federal service."  In effect, the sentence conveys that an accumulated amount of AWOL charges can be subject to disciplinary action, not merely an individual AWOL charge.  Anne Mustafa says that the 1.75 hours of AWOL charged on May 7, 1996 was not a disciplinary action.  Since discipline is a form of punishment, and my first AWOL charge already cost me loss of pay, that loss is a punishment in itself.  Since accumulated AWOL charges constitute more than one AWOL charge, and I do not have more than one AWOL charge, then according to the substance of her statement, the first AWOL charge is not susceptible to issuance of a reprimand.

I am aware that others have arrived late to work and obtained leave from their immediate supervisor, therefore, I did not expect to be charged with AWOL.  In 17-1/2 years working at FDA, I never was charged with AWOL until the May 7th incident.  I sent Anne Mustafa an E-Mail message on May 6th at 7:42 PM asking for authorization to work flexiplace on May 7th, and expected that she would see my E-Mail message in enough time to let me know her answer by E-Mail so that I could be at work on time if she denied my request.  I presumed that she was working into the evening at the office on May 6th and would see my E-Mail request message.  Even if the first AWOL charge was susceptible to a reprimand, a double punishment (loss of pay and issuance of the reprimand) would clearly be excessive in these circumstances.

(KA) EXHIBIT 13
Page 2 of 4 page

-3-

The last 2 sentences in the first full paragraph on page 3 of
Reprimand 2 tie in with the 2d full paragraph on page 2 of the
Decision Memo.  These sentences do not appear anywhere in
Reprimand 1.  Reprimand 2 and the Decision Memo omit a very
material fact, i.e., <u>I did not sign in by computer or by
telephone on May 7, 1996 to work flexiplace</u>.  Had I signed in, I
would have been required to send Anne Mustafa a copy of my notice
of signing in on E-Mail.  She never received any such notice from
me.  In the absence of her receiving such a notice, her stated
presumption that I was working flexiplace has no nexus to whether
I did or did not actually begin to work on flexiplace that day.
She said that my statement "At no time did I ever work flexiplace
at home as long as that privilege was not in effect." is not
accurate.  The question is whether I actually worked or signed in
to work flexiplace.  The answer is "No," thus, her reasoning that
I worked flexiplace is misplaced.  Her deletion of the false
statement in Reprimand 2 implies to me that she knows my
statement was accurate.

The 4th full paragraph on page 2 of the Decision Memo says I
should have complied with my instructions to her.  My
instructions were not to work flexiplace until further notice.  I
followed her instructions to the letter.  She continues in that
paragraph that I insisted on more than one occasion that I should
be allowed to work flexiplace and made two last minute attempts
to <u>coerce</u> her into a situation where I would be working
flexiplace before she had sufficient opportunity to deliberate on
my <u>requests</u> or respond to them.  To coerce means to restrain,
threaten, or compel, yet she refers to my attempts as requests.
I did not coerce her in any way.  In the 3rd full paragraph on
page 5 of Reprimand 2, she said that my request to work
flexiplace well after duty hours and staying at home could be
construed as an attempt to force or manipulate her to allow me to
work flexiplace.  I admit error in the timing of my E-Mail
message to Anne Mustafa, however, I did not force or manipulate
her in any way and was aboveboard with her.  She was free to
decide my requests, and she did, adverse to me.  Asking to work
flexiplace whether at the last minute or not is not coercion and
is not a violation of any of her instructions.

The first full paragraph on page 3 of the Decision Memo states in
pertinent part "---because, technically, your working flexiplace
was rendered moot by the AWOL charge, I have decided to amend the
language in the Official Reprimand."  That statement offers
multiple facts which fall over each other.  I did not work
flexiplace technically or untechnically so the AWOL charge could
not have rendered a non-existent flexiplace as moot.  She knew I
never did anything to indicate that I was working flexiplace on
May 7th.  I infer that the real reason she omitted to say I
worked flexiplace in Reprimand 2 was because I pointed out the
material falsity of the statement in my Stage 1 Grievance of
Reprimand 1, yet she didn't want to admit it in her Decision

-4-

Memo.  The AWOL charge was at her insistence, and could not have rendered my working flexiplace moot, because I did not work flexiplace or give an indication of working flexiplace on May 7th.

In my Stage 1 Grievance, I objected to the inclusion of paragraphs beginning on page 4 of Reprimand 1 talking about events on and after May 20, 1996 dealing with my medical condition as immaterial to my AWOL charge for May 7th.  The 3rd full paragraph on page 2 of the Decision Memo says she left the paragraphs in Reprimand 2 as a "courtesy" to me and to keep me informed of the situation.

Since Reprimand 2 can be seen by others, I feel that the "courtesy" is totally inappropriate.  I can be fully informed without the use of a reprimand containing immaterial information. Someone from Personnel said that my communications with Dr. Vorosmarti were confidential.  The material in Reprimand 2 that discusses his involvement strikes me as a breach of that confidentiality, if read by others.  In addition, the context in which Reprimand 2 is written can be construed as portraying me trying to fake my condition to obtain an accommodation based on a medical need.  Anne Mustafa refers to papers being "whited out." Those papers were what I gave to Anne Mustafa containing only items that were material to my request for accommodation.  I saw no need to include items that were not material and were personal.  Later, I sent undeleted copies of those papers to Dr. Vorosmarti.  It turned out that the papers I submitted to Dr. Vorosmarti didn't contain any reference from one of my treating physicians to request an accommodation for my condition.  I hadn't asked any of my physicians to make a report in accordance with 5 CFR § 339.104 which I never knew existed until someone from Personnel gave me papers discussing what is needed from a treating physician.  I thought that the condition and symptoms would speak for themselves, consequently I didn't sustain the burden of proof required for a determination that the accommodation should be granted.  I assure you I am not faking it.

For the aforegoing reasons, I am respectfully requesting that Reprimand 2 be withdrawn.

Michael T. Benson

Attachments