14



**DEPARTMENT OF HEALTH & HUMAN SERVICES**



Public Health Service
Food and Drug Administration

# Memorandum

Date          · JUL 18 1996

From
              Director, Division of OTC Drug Products
              Office of Drug Evaluation V

Subject
              Stage 2 Grievance Decision

To
              Michael Benson
              Pharmacist
              Division of OTC Drug Products
              Office of Drug Evaluation V
              Center for Drug Evaluation and Research

This memorandum conveys my decision regarding your Stage 2 grievance dated and
received by me on July 1, 1996. The grievance seeks withdrawal of the Official
Reprimand - Corrected that you received on June 17, 1996.

I believe it is important to note before I begin that your use of Official Center for Drug
Evaluation and Research (CDER) letterhead and apparent use of your FDA computer to
prepare your grievance document is inappropriate. A grievance is a personal matter
which may not be prepared on Government time or equipment and should not be
presented on Agency letterhead. I will expect that such inappropriate use of
Government resources will not recur.

I have reviewed all material relevant to the issuance of the Official Reprimand
including the Official Reprimand, the material relied upon to support the Official
Reprimand, your Stage 1 Grievance, the Stage 1 Grievance Decision, the Official
Reprimand - Corrected, and your Stage 2 Grievance.

The Department of Health and Human Services Grievance Procedures state in Section
771-3-40C.1.:

> "When there are no substantive facts in dispute, the Stage 2 Official may at his or
> her option either (1) proceed to a decision or (2) request an examiner even though
> substantive facts are not in dispute."

In reviewing your grievance, I find that there are no substantive facts in dispute. I find
the basic substantive facts of what occurred are not in dispute. Rather, your grievance
file indicates that you and your first-line supervisor have different opinions about your
being charged absence without leave (AWOL) and your working flexiplace at home,
and the appropriateness of your being issued an official reprimand for what occurred on
May 7, 1996. Therefore, I have decided not to appoint a grievance examiner to
conduct further inquiry into this matter, and this memorandum constitutes my final
decision on your grievance.

Page 2
Stage 2 Grievance Decision
Michael Benson

You stated in your grievance, "Issuance of the reprimand is not permitted for the offense charged, and even if it were permitted, its issuance is excessive punishment for what occurred." This is your opinion and is not supported by any regulatory or policy requirement. As your first-line supervisor, Anne Mustafa has the authority to decide what form of discipline is appropriate when her subordinate employees' conduct is less than expected. Further, in her Stage 1 decision memorandum to you, Ms. Mustafa clarified that, "An Official Reprimand is a form of discipline that can result from an employee having an **unauthorized (AWOL) absence**. AWOL is the leave charge. The Official Reprimand is the disciplinary action."

I am concerned that you do not appear to understand why you received the Official Reprimand. You presented the argument that you did not work flexiplace at home on May 7, 1996, because you were charged AWOL, and Ms. Mustafa explained to you in her Stage 1 grievance decision that the charge of working unauthorized flexiplace was being deleted from the corrected reprimand.

Nevertheless, you were absent from your duty station in Rockville without authorization and that can result in both an AWOL (leave) charge and disciplinary action for the underlying conduct that led to the AWOL charge. While you consider this a double penalty, it was clearly within Ms. Mustafa's discretion to take both actions and I find no basis to overturn her decision in your Stage 2 grievance.

Your presumption that Ms. Mustafa would be working late on the evening of May 6, 1996, reflects a lack of judgement on your part for which you have to accept responsibility. It is unclear to me why you even considered asking for approval to work flexiplace on May 7, 1996, given that you were informed on more than one occasion that, until further notice, you would not be allowed to work flexiplace. Ms. Mustafa will inform you in writing when you will be allowed to work flexiplace at home, and I recommend that you await Ms. Mustafa's determination that your performance is acceptable before the issue of flexiplace is raised.

For the record, I want to clarify with you that you were not given two different procedural options to seek review of the Official Reprimand as you claim in your grievance. The Official Reprimand - Corrected was just what is says, a corrected version of the Official Reprimand. The only change in that document was deletion of the reference to your working unauthorized flexiplace. It was not a new document which conveyed new grievance rights; it was a modified document that restated what the original document stated and was issued as an attempt to resolve one concern you raised in your Stage 1 grievance that appeared to Ms. Mustafa to have merit. The Stage 1 Grievance Decision clearly identified the procedure to be used to seek review of the Stage 1 decision which included the corrected reprimand.

(KA) EXHIBIT 14
Page 2 of 3 pages

Page 3
Stage 2 Grievance Decision
Michael Benson

Your rearguing of semantics related to whether you did not work flexiplace on May 7, 1996, has been adequately addressed by Ms. Mustafa's deletion of reference to that issue from the corrected reprimand. Therefore, I will not address that issue further.

Your discussion about your objection to the inclusion of references to your medical condition are unclear to me. I do not see anything in the corrected reprimand that states or implies that you were "faking" your medical condition. I see no reason to delete that information from the corrected reprimand as it is relevant to the flexiplace issue that is at the root of the incident which resulted in your AWOL charge and subsequent receipt of an Official Reprimand.

Based on my review of the information provided, I do not find sufficient evidence or argument to support withdrawal of the Official Reprimand, and your requested relief is denied.

This exhausts your administrative remedies available through the DHHS Grievance Procedure. If you have any questions about the grievance procedure, you may contact Leah Mader, Employee Relations Specialist, Division of Employee Relations, on 301-443-4200.

Debra L. Bowen, M.D.

15

AUG-04 97 12:56  FROM:OHRMS    301-443-0087    TO    PAGE:02

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## FOOD AND DRUG ADMINISTRATION

Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

Date:       23 July 1997

From:       Dr. J. Vorosmarti

Subject:    Mr. M. Benson

To:         Ms. P. Kelley

**MEMORANDUM**

Mr. Benson in his memo of 7/18/97 requests that he be allowed to continue working at home for two days a week. He cites as evidence for this another attack of feeling short of breath and that his heart was going to stop. This is not related to his post-polio syndrome or respiratory embarrassment but is probably a panic attack, as these occur only when on his way to work. He has never had any psychological/psychiatric evaluation of which I am aware. I suggest that he seek some help to see if he requires treatment for these.

I have no objection to his working at home for two days a week but I can find no medical reason for him to continue to do so, as I have stated in previous memos. I also note that he states that he generally only comes to work two days a week. This was never raised as a issue before if he has been doing so it has not been done on my suggestion.

J. Vorosmarti

EX 14

(KA) EXHIBIT 15
Page 1 of 14 pages

R=96%

Date: July 18, 1997

From: Michael Benson

Through: Leah Mader

To: J. Vorosmarti, MD

This notice updates my request for your recommending an accommodation for my working at home two days per week. Recently, while driving to work in the morning on Muncaster Road, I experienced a shortness of breath with an inability to inspire sufficient air. My heart felt like it was about to stop functioning. When those symptoms happened, I slowed down to 20 mph causing a long lineup of cars behind me. I contemplated pulling off the road, but saw no suitable place. Fortunately, after what seemed to me like several minutes, I was able to inspire more air and the heart symptoms subsided. The episode that I regard as most severe occurred on October 8, 1996. You said in a January 7, 1997 memorandum that you do not attribute that episode to respiratory embarrassment. I did note a similar shortness of breath prior to that episode. There have been several other less severe occurrences since my last request for accommodation.

In the January 7, 1997 response to my previous request for the same recommendation, you wrote that working at home two days a week will have no effect on my respiratory problems when driving to work the other three days a week.

When I worked at home, I generally came to the office two days a week, not three. As a rule, I worked 10-hour days at the office and used extra accrued time to compensate for the additional day off. By working from home, I minimized the likelihood of enduring the same type of symptoms described above. Ideally, I'd like to be able to avoid driving the Baltimore-Rockville distance to work, but cannot afford to do so at this time. If accommodated as requested, for days I would be obligated to be at the office, I would assume my own risk in commuting.

Michael Benson

EX 13

(KA) EXHIBIT  15
Page  2  of  14  pages

JAN-16 97 17:26  FROM:OHRMS/DE            301-443-0087        TO:59  2                    PAGE:02



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

Date:      7 January 1997

From:      Dr. J. Vorosmarti

Subject:   Michael Benson                    **MEMORANDUM**

To:        Ms. L. Mader


   I have read the fact sheet provided by Mr. Benson regarding post-polio syndrome. This adds nothing to his claim that he needs to work at home two days a week. I am not questioning his diagnosis nor the fact that he has respiratory problems. The fact remains that working at home two days a week will have no effect on his respiratory problems when driving to work the other three days a week. The episode he mentions that occurred in October was apparently not an episode of respiratory embarassment but one of tachycardia due to the "stress" of driving. This is the only episode of this reported. If Mr. Benson has developed cardiac problems he should submit medical evidence concerning this for review. No new medical records were submitted which support Mr. Benson's continued request for accomodation.

                                        J. Vorosmarti, MD

EX 12

(KA) EXHIBIT 15
Page 3 of 14 pages

R=95%                            301 443 0087          01-16-97 05:34PM P002 #35



FACT SHEET

# Post-Polio Syndrome

Prepared by
Office of Scientific and Health Reports
National Institute of
Neurological Disorders and Stroke
National Institutes of Health
Bethesda, Maryland 20892-2540

NIH Publication No. 96-4030

July 1996

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES
Public Health Service
National Institutes of Health

(KA) EXHIBIT   15
Page   4   of   14   pages

## What is post-polio syndrome?

Post-polio syndrome (PPS) is a condition that can strike polio survivors anywhere from 10 to 40 years after recovery from an initial attack of the poliomyelitis virus. PPS is characterized by a further weakening of muscles that were previously injured by polio infection. Symptoms include fatigue, slowly progressive muscle weakness, muscle and joint pain, and muscular atrophy. Some patients experience only minor symptoms, while others develop spinal muscular atrophy or what appears to be, but is not, a form of amyotrophic lateral sclerosis (ALS), also called Lou Gehrig's disease. PPS is rarely life-threatening.

The extent to which polio survivors will suffer from PPS depends on how seriously they were affected by the first polio attack. Patients who had only minimal symptoms from the original attack and subsequently develop PPS will most likely experience only mild PPS symptoms. People originally hit hard by the polio virus may develop a more severe case of PPS with a greater loss of muscle function, difficulty in swallowing, and more periods of fatigue.

More than 300,000 polio survivors in the United States may be at risk for PPS. Doctors are unable to establish a firm incidence rate, but they estimate that the condition affects 25 percent of these survivors.

## What causes PPS?

PPS is caused by the death of individual nerve terminals in the motor units that remain after the initial attack of polio. This deterioration of individual nerve terminals might be an outcome of the recovery process from the acute polio attack. During this recovery process, in an effort to compensate for the loss of nerve cells (neurons), surviving motor neurons sprout new endings to restore function to muscles. This results in large motor units that may add stress to the body. As a result of this rejuvenation, the individual may have normal-functioning muscles for some time. But after a number of years, the motor neurons with excessive sprouting may not be able to maintain the metabolic demands of all

their new sprouts, and a slow deterioration of the individual terminals may result.

Restoration of nerve function may occur in some fibers a second time, but eventually nerve terminals are destroyed and permanent weakness occurs. This hypothesis is consistent with PPS's slow, stepwise, unpredictable course. Through years of studies, scientists at the National Institute of Neurological Disorders and Stroke have shown that PPS is a very slowly progressing condition marked by long periods of stability.

## How is PPS diagnosed?

Doctors arrive at a diagnosis of PPS after observing the patient and asking about symptoms. PPS may be difficult to diagnose in some because it is hard to determine what component of a neuromuscular deficit is old and what is new. Health professionals say that the only way to be sure a person has PPS is through a neurological examination aided by other laboratory studies that exclude all other possible diagnoses. Patients must visit the doctor periodically to establish that their muscle weakness is progressive.

Objective assessment of muscle strength in PPS patients may not be easy. A change in muscle strength is determined in specific muscle groups, or limbs, using various muscle scales, such as the Medical Research Council (MRC) scale or scales that quantify muscle force. Doctors use magnetic resonance imaging (MRI), neuroimaging, and electrophysiological studies, muscle biopsies, or spinal fluid analysis as tools to investigate the course of decline in muscle strength.

Once PPS is diagnosed, some patients worry that they have polio again, or even ALS. In general, PPS is not life-threatening. The only exception is in patients who experience severe respiratory impairment. Studies have proven that, compared to control populations, PPS patients lack any elevation of antibodies against the polio virus, and since PPS affects only certain muscle groups, it is not considered a recurrence of the original polio. Further, there is no evidence that the polio virus can cause a persistent infection in humans. Other studies have demonstrated that ALS, which progressively weakens muscles, does not occur more frequently in PPS patients, and PPS is not a form of ALS.



## How is PPS treated?

Scientists are working on a wide variety of treatment possibilities for patients with PPS, including drug treatments, some of which show promise. Doctors at the National Institutes of Health (NIH) have tried treating PPS patients with alpha 2 recombinant interferon, but the treatment proved ineffective. A study in which PPS patients received high doses of prednisone demonstrated a mild improvement in their condition, but the results were not statistically significant. This, in addition to the drug's side effects, led researchers to recommend that prednisone not be used to treat PPS.

In an effort to reduce fatigue in PPS patients, scientists conducted a study using low doses of the drug pyridostigmine and found that it did reduce fatigue in some patients. Research using this drug continues. In a controlled study conducted by NIH scientists, the drug amantadine was not helpful in reducing fatigue. Scientists are also conducting more research on the use of selegiline, a drug that in an anecdotal report was thought to improve strength in PPS patients.

The future in PPS treatment may center around nerve growth factors. NINDS scientists have plans to begin a multicenter, controlled trial to test whether insulin-like growth factor (IGF-1) can enhance the ability of motor neurons to sprout new branches, maintain existing branches, and rejuvenate synapses (the space between nerve cells where signals pass from one cell to another). A preliminary study is in progress. Since PPS results from the degeneration of nerve sprouts, IGF-1 may target the heart of the problem, and may help to regenerate new sprouts. Other growth factors now under investigation have similar properties.

## What is the role of exercise in the treatment of PPS?

There has been much debate about whether to encourage or discourage exercise for polio survivors or individuals who already have PPS. Some doctors believe that too much exercise can worsen the patient's condition, and that rest will preserve energy. These doctors think patients will wear out their muscles by overusing them in exercise activities. However, others consider this notion unfounded and not scientifically documented.

There is much misinformation on this subject and many doctors do not know what effect exercise has on individuals with PPS. A commonsense approach, in which patients use individual tolerance as their limit, is currently recommended. Tolerance is the level at which one starts having discomfort or fatigue. Researchers at the NIH are addressing the exercise issue, not only to determine if exercise is helpful, harmful, or ineffective, but also to define the most effective type — isotonic, isometric, isokinetic, or repetitive.

## Can PPS be prevented?

People who are polio survivors often ask if there is a way to prevent PPS. Presently, no prevention has been found. But doctors recommend that polio survivors follow standard healthy lifestyle practices: consuming a well-balanced diet, exercising in moderation, and visiting a doctor regularly.

## What research is being conducted?

Scientists are working on a variety of investigations that may someday help individuals with PPS. Some basic researchers are studying the behavior of motor neurons many years after a polio attack. Others are looking at the mechanism of fatigue, and trying to tease out information from the brain, muscles, and neuromuscular junction (the site where a nerve cell meets the muscle cell it helps activate). Trying to determine if there is an immunological link in PPS is also an area of intense interest. Researchers who discovered inflammation around motor neurons in the muscle are trying to find out if this is due to an immunological response.

Other investigators are searching for the polio virus, or mutated versions of it, fragments of which have been amplified from the spinal fluid. The significance of this finding is not known however, and more research is being done.

(KA) EXHIBIT  15
Page  6  of  1 4  pages



## Where can I go for more information?

The National Institute of Neurological Disorders and Stroke conducts and supports a wide range of research on neurological disorders, including PPS. For information on the research programs of the NINDS, contact:

Office of Scientific and Health Reports
NIH Neurological Institute
P.O. Box 5801
Bethesda, Maryland 20824
(301) 496-5751
(800) 352-9424

The organizations listed below can provide printed information and assistance to PPS patients:

International Polio Network
4207 Lindell Boulevard, #110
St. Louis, Missouri 63108
(314) 534-0475

Polio Survivors Association
12720 La Reina Avenue
Downey, California 90242
(310) 862-4508

(KA) EXHIBIT _15_
Page _7_ of _14_ pages

NOV-05 98 10:53 FROM:OHRMS OE.    301-443-0087    0:301 827 2316    PAGE:03
J. VOROSMARTI    14242796    P.02



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## FOOD AND DRUG ADMINISTRATION

Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

Date:    4 November 1998

From:    Dr. J. Vorosmarti

Subject:  Mr. Michael Benson

To:      Ms. L. Mader

**MEMORANDUM**

I have reviewed the letter from Dr. Hartjen in regard to an episode of rapid heart rate that Mr. Benson had on his way to work on 10/8/98. This was stated to be caused by the stress of traffic that morning.

This information does not change my opinion regarding Mr. Benson's working at home 2 days a week. Based on the past evidence and this episode it appears that Mr. Benson my be experiencing anxiety attacks for which he has not been evaluated nor treated. If so, working at home 2 days a week will not prevent them from occurring on the days he would have to go to work. My suggestion is that Mr. Benson needs to have an evaluation to determine whether this episode and his other episodes of breathlessness occurring only on the way to work are caused by anxiety or whether there is some other cause for these symptoms.

J. Vorosmarti, MD

EX 10

(KA) EXHIBIT 15
Page 8 of 14 pages



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**FOOD AND DRUG ADMINISTRATION**

Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

**MEMORANDUM**

Date: 5 September 1996

From: Dr. J. Vorosmarti

Subject: Mr. M. Benson

To: Ms. Leah Mader

Dr. Bradley and I have discussed this case and have come to the following conclusions.

Mr. Benson has progressive neuromuscular disease and is post scoliosis surgery to correct scoliosis, presumably caused by his neuromuscular problem. He has significant pulmonary function compromise with reduced ventilation which is said to cause significant desaturation when he exercises. A review of his pulmonary function results show little change between 1994 and 1996, so his problems of decreased ventilation are probably a result of decreased efficiency of the muscles of respiration.

He has requested accommodation in the form of working at home 2 days a week. He says this is necessary because when driving to work in the morning it feels as though he is "deoxygenating". Dr. Bach, in his letter of 3 May 1996 states that "unless trained and properly equipped (he) will develop acute respiratory failure, etc." There is no record of what sort of training Mr. Benson has had, nor whether he requires any supplemental oxygen other than while sleeping (because of sleep apnea and hypoventilation).

Mr. Benson's problem is chronic and probably progressive. However, we are of the opinion that remaining at home two days per week will have no beneficial effect on his disease, nor that working in the office will cause any decrement in function that would not occur as a natural consequence of his disease. There is no medical reason for his complaints of feeling "deoxygenated" while driving in the morning but not in the afternoon. Therefore, we do not feel that his request for this accommodation has any medical basis.

J. Vorosmarti, MD

EX 9

(KA) EXHIBIT 15
Page 9 of 14 pages

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

Date:       31 May 1996

From:       Dr. J. Vorosmarti                    MEMORANDUM

Subject:    Mr. M. Benson

To:         Ms. L. Mader

    Mr. Benson sent me a letter dated 29 May 1996 in which he states he had surgery to his spinal column last year to correct some scoliosis in an attempt to ease his breathing problem, but that this actually made it worse. Scoliosis has not been mentioned previously as part of his problem. He also requested that I allow him to continue his flexiplace schedule of 2 days a week at home until other documentation is received.

    The information from Dr. Bach dated 6 May 1996 does not list any work accomodations that must be made for Mr. Benson, but lists only the equipment and therapy required by him. As stated in my prvious memo, the medical information in this letter does not indicate that working two days a week at home is needed, nor that he is not capable of driving to and from work 5 days a week. There is no other medical information about his respiratory problem that I feel is needed, but if Mr. Benson wishes to provide whatever he thinks is pertinent I will be happy to review it. as long as it is from one of his treating physicians. Mr. Benson should also be informed that I am unable to give him permission to continue on his flexiplace schedule: that is his supervisor's prerogative.

J. Vorosmarti, MD

EX 7

(KA) EXHIBIT  15
Page 10 of 14 pages

Michael T. Benson
Division of OTC Drug Products (HFD-560)
Food and Drug Administration
9201 Corporate Boulevard
Room S-230
Gaithersburg, MD  20850

May 29, 1996

James Vorosmarti, M.D.
Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66 (HFA-430)
5600 Fishers Lane
Rockville, MD  20857

Dear Dr. Vorosmarti:

Reference is made to your memoranda of May 21 and 24, 1996 about my medical condition.

To address your comments of May 21, my sense of deoxygenation is when I feel I cannot breathe and get rapid heart palpitations while waiting for the ability to breathe again (which feels like a reoxygenation).  I was told that this condition arises because when sitting in a car seat which is lower than a regular seat, the pelvis and diaphragm are pushed further upward giving the lungs less room to expand.  To the average individual, this is no problem.  I have a severe scoliosis condition which alone compromises my ability to breathe.  This ability is further compromised by post poliomyelitis of the respiratory muscles.

Why I deoxygenate riding in the morning and not in the afternoon is not clear to me.  I can only guess that it's due to sleeping with a BiPap S/T device with oxygen added under order from my original pulmonologist in D.C. continued by my current pulmonologist in Baltimore.

With regard to my surgery, I had two procedures in 1994.  My first procedure was a diskectomy from certain spinal vertebrae followed by traction for 2 weeks.  The second procedure was a spinal fusion and rod implant.  I recuperated at home to allow the spinal fusion to mature until April of 1995 when I returned to work.  Originally, the expectation was that partial straightening of my spine would allow my lungs more room to expand to improve my vital capacity.  My pulmonary function test results were worse.  I have been told that further straightening of the spine creates an area called a "dead space," an extra space over which the respiratory or ventilatory muscles must push air.  Noone suspected post poliomyelitis at the time of my surgery.  I have also been told that the respiratory muscles must now work harder to push air out of a longer area.

EX 6

(KA) EXHIBIT  15
Page  11  of  14  pages

Page Two
James Vorosmarti, M.D.

To address comments in your May 24th memo, neither driving
to work in the morning nor working is expected to change or
worsen my post poliomyelitis or scoliosis condition.  My main
concern is not to experience respiratory distress which I have
experienced when driving to work in the morning.

Ideally, I'd prefer not to have to make the drive in from
Baltimore every day, but am striving to balance the needs of my
work with the stress involved with the drive.  Since April 1995
until recently, I had been generally working at home on Tuesdays
and Thursdays so that it was not necessary to ride or drive 2
days in a row.  I also generally have worked and continue to work
longer hours for use in taking off Fridays as a personal day to
minimize my number of days to drive to work.

The May 3, 1996 letter from Dr. Bach relates to my most
recent medical consultation about my condition.  It was not
designed to explain why at times I experience a dyspnea type
reaction when driving about an hour to an hour and fifteen
minutes in the morning to work.  His letter also contains a typo
making me 10 years younger.

If I provide you with pertinent medical documentation to
support the points discussed above, would you then grant my
request?  If so, I will seek such documentation from my
physician specialists.  Getting all the documentation together
may take time since the physicians may be too busy to prepare
writings immediately.  If you feel that such documentation would
help my cause, I request that during the pendency of time it will
take to obtain the documentation, I be allowed to work my
flexiplace (not flexitime) schedule of 2 days at home.  I will
try to get the documentation to you as quickly as I can.

Sincerely,

Michael T. Benson

FAX cc: HFA-430

(KA) EXHIBIT 15
Page 12 of 14 pages

J. VOROSMARTI                                          Y4242796              P.02



## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

Date:     24 May 1996

From:     Dr. J. Vorosmarti                    **MEMORANDUM**

Subject:  Mr. M. Benson

    I have reviewed the same documents provided by Mr. Benson, but now without the large amounts of information missing. In addition, Mr. Benson in his forwarding memo of 21 May 1996, now makes it clear that he is requesting accommodation in the form of working at home two days a week.

    The medical information supplied does not support this request. Mr. Benson's condition will not be changed or worsened by working at the office nor by driving to work and I see no medical reason for this accommodation request.

J. Vorosmarti, MD

Ex 5

(KA) EXHIBIT __15__
Page __13__ of __14__ pages

301 443 0087

'OROSMARTI                    30. 242796              P.02



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## FOOD AND DRUG ADMINISTRATION

Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

Date:        21 May 1996

From:        Dr. Vorosmarti

Subject:     Mr. Michael Benson                    **MEMORANDUM**

To:          Ms. L. Mader

    I have reviewed the following information before writing this memo: Letter from Mr. Benson to Ms. Mustafa, dated 5/20/96; Letter from Dr. Bach dated 5/3/96; Letter from Mr. Benson to Ms. Klumpp, his respiratory therapist dated 12/21/96; letter from Ms. Klumpp to Mr. Benson dated 1/5/96. These last 3 items have large sections "whited out".

    Mr. Benson states that he had major surgery in 4/95, following which he was on flexitime until this was stopped by Ms. Mustafa. He states that the stress of driving to work in the morning causes a sense of "deoxygenation", which he does not describe. His medical condition is alveolar hypoventilation caused by a progressive neuromuscular condition called post-poliomyelitis. Because of the almost total lack of information I am unable to give any opinion on whether or not flexitime is a valid accommodation for Mr. Benson. His pulmonary condition does not appear to require this accommodation, as driving at differing times of the day should have no effect on his ability to breath. Since he states that he only has this problem on the way to work in the morning, I think that there is most probably some other non-organic reason for his symptoms. There is no information concerning his major surgery in 4/95 and how this is connected to his being allowed flexitime.

    Mr. Benson should be asked to provide copies of the above reports whithout the deletions, or provide copies of his clinical record for review.

J. Vorosmarti, MD

Ex 4

(KA) EXHIBIT ___15___
Page _14_ of _14_ pages

16

<u>AFFIDAVIT</u>



I, Dr. J. Vorosmarti, make the following statement voluntarily to
Thomas A. Statum, identified to me as a Contract Investigator for
Kensington Associates.  I am aware that this statement may be
used in evidence and that it is not confidential.

Q.  Would you state your full name and title?

A.    JAMES VOROSMARTI JR., MD

Q.  What is your official relationship with the Food and Drug
Administration?

A.    CONTRACT CONSULTANT IN OCCUPATIONAL MEDICINE
TO the OFFICE of HUMAN RESOURCES MANAGEMENT

Mr. Michael T. Benson requested that he be allowed to work from
his home from two days per week as an accommodation to his
condition of Post-Polio Syndrome.  In a memorandum dated 5
September 1996 you state your opinion that "remaining at home two
days per week will have no beneficial effect on his disease, nor
that working in the office will cause any detriment in function
that would not occur as a natural consequence of his disease."

Q.  Did you or anyone at your request conduct a medical
examination of Mr. Benson?

A.      NO

initials

(KA) EXHIBIT   i 6
Page  1  of  2  pages

i

Q.  Did you consult with any other physicians concerning Mr. Benson's condition?

A.       *No*

Q.  Is there anything else you would like to add to this affidavit?

A.       *NO*

I swear under penalty of perjury that the above statement is true and complete, to the best of my knowledge and belief.  I have read this statement, consisting of _2_ pages and have initialed each page.

DR. J. VOROSMARTI                         7/6/98
                                          DATE

initials

(KA) EXHIBIT____16____
Page _2_ of _2_ pages

17

## Affidavit

"Q.  Would you please state your name, grade, position, title and race?"

A.  Debra Bowen, GS-15, Medical Officer, Director, Division of Over-the-Counter Drug Products, Caucasian

"Q.  Are you the second level supervisor of Mr. Michael Benson?"

A.  Yes

"Q.  Mr. Benson was a participant in the Department of Health and Human Services Flexible Workplace Project from 1 March 1995 until his participation in the project was terminated on 16 April 1996 by his then supervisor, Ms. Anne Mustafa (now retired).  Please explain why Mr. Benson's participation in this project was terminated."

A.  Based on communication between Michael Benson and his first line supervisor regarding her concerns about Mr. Benson's work performance, Ms. Anne Mustafa did not renew his participation in the Flexible Workplace Project.  The flexible workplace agreement signed by Mr. Benson prior to Ms. Mustafa's decision stated, "Management has the right to remove the employee from the project for such reasons as: the employee's performance...etc."

"Q.  Mr. Benson has stated that he sought and was denied the right to work at home two days a week as an accommodation for his diagnosed condition of Post Polio Syndrome of the respiratory muscles.  Could you explain why this request was denied?"

A.  Mr. Benson disputed Ms. Mustafa's April 1996 decision regarding his participation in the flexible workplace schedule based on her concerns about his work performance.  He *also further requested* that his flexible workplace schedule be reinstated on the basis of an existing medical condition and submitted medical documentation to the Division of Employee Relations, Office of Human Resources and Management Services.

_____ 4/23/98
Initials

To my knowledge, as a result of this further request and in compliance with the applicable FDA Staff Manual Guide, Ms. Mustafa solicited advice from physicians who consult with FDA on medical issues, Drs. James Vorosmarti and Mark Bradley.  These consultants medically advised, "Mr. Benson's problem is chronic.. However, we are of the opinion that remaining at home two days per week will have no beneficial effect on his disease, nor that working in the office will cause any decrement in function that would not occur as a natural consequence of his disease..There-fore, we do not feel that his request for this accommodation has any medical basis."  Consequently, Ms. Mustafa informed Michael Benson of her management decision regarding this further request on October 9, 1996.

"Q.  Is there anyone else you feel I should talk to who may have relevant information regarding this investigation?"

A.  Kathryn Vengazo, Division of Employee Relations; Drs. James Vorosmarti and Mark Bradley, FDA consulting physicians; Ms. Anne Mustafa and Dr. Linda Katz, Mr. Benson's first line supervisors in the Division of OTC Drug Products.

"Q.  Is there anything else you would like to add to this affidavit?"

A.  I deny that I, or any of my subordinate managers, based decisions regarding Mr. Benson on prohibited discrimination.

I swear under penalty of perjury that the above statements are true and complete, to the best of my knowledge and belief.  I have written this statement and initialed or signed each page.


_Debra L. Bowen, M.D._                      _June 23, 1998_
Debra L. Bowen, M.D.                        Date

18

FROM : TASTATUM              PHONE NO. : 540 722 9490         Jun. 19 1998 09:35AM P2



## AFFIDAVIT

I, Linda M. Katz, M.D., make the following statement voluntarily
to Thomas A. Statum, identified to me as a Contract Investigator
for Kensington Associates.  I am aware that this statement may be
used in evidence and that it is not confidential.


Q.  Would you please state your name, grade, position title and
race?

A.  Linda M. Katz
    GS-15
    Deputy Director/Supervisory Medical Officer
    Caucasian

Q.  Are you the immediate supervisor of Mr. Michael T. Benson?

A.  yes


Q.  When did you become his immediate supervisor?

A.  4/1/97



Q.  Mr. Benson was a participant in the Department of Health and
Human Services Flexible Workplace Project from 1 March 1995 until
his participation in the project was terminated on 16 April 1996
by his then supervisor Ms. Anne Mustafa.  Has Mr. Benson
requested you to reinstate him in the Flexiplace Project?

A.  yes


Q.  At this time do other employees under your supervision
continue to have Flexiplace schedules?

A.  yes

If so, how many employees under your supervision are on
Flexiplace schedules?  16/24


                                        LmK
                                        Initials

06/23/98  08:22    CDER/FM OTC → 540 722 9490        18        NO.112  P003/003

FROM : TASTATUM              PHONE NO. : 540 722 9490        Jun. 19 1998 09:36AM P3

**Q.** Is there anyone else you feel I should talk to who may have relevant information regarding this investigation?

**A.** Anne Mustafa
Debra Bowen

**Q.** Is there anything else you would like to add to this affidavit?

**A.** I reinstated Mr. Benson's Maxiflex in February 1998. On 2/24/98, the day in which the agreement became effective, he violated the terms of the agreement by failure to attend a meeting that he had agreed to chair despite my informing him on 2/23/98 that he could not actually do Maxiflex on that day.

I swear under penalty of perjury that the above statement is true and complete, to the best of my knowledge and belief. I have read this statement, consisting of __2__ pages and have initialed each page.

_____                    6/22/98
LINDA M. KATZ, M.D.                          DATE

                                             JMK
                                             initials

R-98%                        540 722 9490        06-19-98 10:55AM  P003 #08

19

```
E L E C T R O N I C   M A I L   M E S S A G E

                            Date:     27-Feb-1998 01:59pm EST
                            From:     Linda Katz
                                      KATZL
                            Dept:     HFD-560        CRP2 S208
                            Tel No:   301-827-2222 FAX 301-827-2315

                                  ( BENSON )

                                  ( KENNEDYM )
                                  ( BOWEND )
                                  ( MERRITTB )
```

TO: Michael Benson

CC: Michael Kennedy
CC: Debra Bowen
CC: Babette Merritt

Subject: Flexiplace

Mike Benson will not be allowed to do flexiplace until further notice.

Linda