# EXHIBIT B

MEMORANDUM    DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

DATE:    October 9, 1996

FROM:    Acting Supervisory Chemist
Division of OTC Drug Products (HFD-560)
Office of Drug Evaluation V
Center for Drug Evaluation and Research

SUBJECT:    Request for Accommodation

TO:    Michael Benson
Pharmacist
Division of OTC Drug Products (HFD-560)
Office of Drug Evaluation V
Center for Drug Evaluation and Research

On August 26, 1996, you submitted to Leah Mader, Employee Relations Specialist, Division of Employee and Labor Management Relations, Office of Human Resources and Management Services, additional medical documentation to support your requested accommodation of working at home two days per week. Ms. Mader advised me, as your first-line supervisor, that you had submitted additional medical documentation to support your request.

The documentation has been reviewed by FDA's consulting physicians, James Vorosmarti, M.D., and Mark Bradley, M.D. The two physicians have agreed on their medical assessment and concluded:

> "Mr. Benson's problem is chronic and probably progressive. However, we are of the opinion that remaining at home two days per week will have no beneficial effect on his disease, nor that working in the office will cause any decrement in function that would not occur as a natural consequence of his disease. There is no medical reason for his complaints of feeling 'deoxygenated' while driving in the morning but not in the afternoon. Therefore, we do not feel that his request for this accommodation has any medical basis."

A copy of their evaluation report is attached for your records.

As I have noted on my September 30, 1996, reviews of your first drafts of OTC pediatric dosing PR issues 3.1 and 4.1 submitted to me on July 9, 1996, and July 31, 1996, respectively, these work products do not meet an acceptable level of work performance for the reasons noted on those drafts.

/ /

Request for Accommodation                                                    Page 2
Michael Benson

In addition, I have spoken with Michael Kennedy, your team leader, and have found that the
work you have done on several FEDERAL REGISTER documents being prepared for agency
review and a request for a medical review have required significant supervision of your work
because of lack of timeliness and the need to revise and/or change the format. This level of
oversight of the work of a GS-14 employee should not be necessary. In addition, you are aware
that I have reviewed the information that was given to the medical officer for review and have
determined that at the time of the review request, you should have been able to review the
material yourself as an expert in OTC nighttime sleep-aid drug products and drafted an
appropriate letter to address the matters raised in that information. We met on October 3,
1996, on this matter and I told you at that time that you have not performed at your expert
grade level, GS-14, for this work task and that this is unacceptable. Therefore, I have determined
that you are not working independently and at an acceptable level at this time.

Based on the above information, your request to work at home two days a week is denied. If at
any time you determine that you are not medically able to drive to work, you can request and
secure leave approval. You have indicated to Ms. Mader that the majority of times you
experience problems breathing is while you are in route to work but not before you leave for
work. Based on your comment, I suggest that you look into another mode of transportation to
work such as taking the train, joining a car pool, and/or seeking employment closer to your
home. You may also wish to call the Benefits branch on (301) 827-4140 to seek information
about disability retirement.

Dr. Vorosmarti and Dr. Bradley do not dispute that you have a chronic and probably progressive
neuromuscular disease; however, the medical documentation that you have submitted does not
support your requested accommodation to work at home.

If you have questions about the content of this memorandum, please consult me. If you have
questions about the procedures used in requesting medical documentation, please contact Leah
Mader on 301-827-4180.

Anne Mustafa

Attachment

# EXHIBIT C

OCT 14 1998

NOTE

From:     Regulatory Review Pharmacist (HFD-560)

To:       Linda M. Katz, M.D.
          Deputy Director (HFD-560)

Subject:  Requested Medical Documentation re: Working at Home

Your October 9, 1998 memorandum to me asked for medical
documentation regarding my request to work at home 4 days a week,
and included a faxed copy of Dr. Vorosmarti's October 8, 1998
memorandum with comments.  Attached are the following records:

1. A faxed October 9, 1998 unsigned letter from Medi-Rents &
   Sales, Inc. stating that I rent, among other things, a
   volume ventilator and pulse oximeter.

2. A copy of a 4-page report from Stephen Pollock, M.D.,
   cardiologist,. under the heading Midatlantic
   Cardiovascular Associates, P.A.

3. A copy of 5 pages of clinical notes from my family
   physicians in a practice group of the following visits:
   January 23, 1998 and April 20, 1998:
        Dr. Lakhani (don't know her first name)
   August 11, 1998 and September 10, 1998:
        Jeffrey Zibell, M.D.

I showed you my rented pulse oximeter and tried to bring in the
LP6 volume ventilator that I use at home.  The ventilator was
connected to a battery that was heavy.  I was unable to
disconnect the battery from the ventilator.

Dr. Bach mentioned in his letter that I am to use the volume
ventilator at work during the day.  I have found that the volume
ventilator brings my $O_2$ saturation levels from the low 90s to
97-98%.  It makes sense for me to work at home where I have
access to the ventilator for that purpose.

I request that Dr. Vorosmarti be taken off my case and another
physician substituted.  His comments and remarks in prior records
have indicated to me inconsistency and a biased unwillingness to
grant me a recommendation for a reasonable accommodation for my
condition, regardless of what is submitted to him.

*Michael T. Benson*

Michael T. Benson

Attachments

# EXHIBIT D

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION
Office of Human Resources and Management Services
Division of Employee Relations
Office of the Medical Consultant
c/o Room 9-66, HFA-430
5600 Fishers Lane
Rockville, Maryland 20857

Date          30 October 1998

From          Dr J Vorosmarti

Subject       Mr M Benson

To            Ms K Vengazo


I have reviewed the additional information supplied by Mr Benson. This includes office notes from Drs Lakhani and Zibell dated 1/23/98, 4/20/98, 8/11/98 and 9/10/98 and the results of the evaluation of his cardiac status by Dr Pollock on 9/15/98 and 9/29/98. The reports from Dr Pollock show that there is no cardiac disease but did show significant pulmonary dysfunction on exercise testing. On exam Dr Pollock found a markedly protuberant abdomen with no muscle tone. No cyanosis was noted. Dr Pollock did mention that repeat pulmonary function studies should be done. On 9/15 his respiratory rate was twelve which is normal and certainly did not indicate any respiratory deficiency at that time.

The notes from Dr Lakhani and Dr Zibell show that he visited their office for follow-up on his hypertension and diabetes mellitus and not for any respiratory problems. The note on 9/10/98 states that on 9/9/98 Mr Benson felt anxious, short of breath and had a "racing heart" and had vague chest discomfort. The circumstances of this episode are not described. His exam on 9/10 was normal. This episode again may be due to an anxiety attack. His diabetes is diet controlled. He was recently switched from one anti-hypertensive to another.

The note from 1/23/98 states that Mr Benson has a post-polio syndrome and that his phrenic nerve is affected by history. There is no evidence in that note or in previous records that any phrenic nerve problem was previously confirmed. The note goes on to say that he uses an oxygen concentrator when he uses his bi-level positive alveolar pressure machine while sleeping. There is no evidence that he requires oxygen supplementation or a breathing machine during the times he is awake. His pulse oximeter was said to show oxygen saturations between 92-94% when he is off oxygen. In none of these notes did Mr Benson complain about not being able to work or drive and neither of these physicians mentioned that he required any accommodations or was restricted in any way. The only physical finding was that he had a soft pot belly, scoliosis to the right and prostatic hypertrophy.

Although Dr Bach suggested in 5/96 that Mr Benson use a portable ventilator with a mouth piece during the day and a mask at night with intermittent positive pressure breathing, there is no evidence that he has used this at work. In a telephone conversation with Dr Katz on 10/29/98 she mentioned that he had recently pointed out to her an oxygen tank in his office but she has never seen him use this in the office. There is no evidence that he has or has requested a handicapped parking permit, which I would expect him to have if he has as much trouble on exertion as he states he does. His oxygen saturation measured by his pulse oximeter is in the 92-

94% range when he is breathing room air. This should equate to an arterial oxygen tension of about 75-80 mm Hg, assuming that his arterial pH is normal or near normal. This is not indicative of hypoxia, as this does not begin to be a problem until the arterial oxygen tension is about 60 mm Hg or less. In none of the records I have are there any results of arterial blood gas levels, which I would also expect to have been done if he has as much difficulty as he states he has. None of his physicians has ever noted that he requires the use of the secondary muscles of respiration to breath or that he has ever appeared to be in any respiratory distress.

In summary, Mr. Benson has scoliosis, poor abdominal musculature and slightly decreasing Functional Vital Capacity over the past 4 years. He requires mechanical ventilation when sleeping because of the decrease in lung function when lying down. There is no evidence he requires oxygen supplementation when awake and upright. There is no evidence that driving causes any hypoxia. It has been stated that this might be the case because of the posture while driving. However, no suggestions, other than he not drive to work, such as using seat supports in the car have been suggested. The other problem is that Mr. Benson always seems to have his episodes of feeling as though he cannot breathe on the way to work and at no other time. This has happened only infrequently over the past several years. This episode and the one he described to his physician on 9/10/98 appear to possibly be due to anxiety attacks as I have stated previously. Allowing Mr. Benson to work at home will have no effect on his pulmonary problem and his sedentary position should allow him to work in the office and not cause any degradation of his disease.

J. Vorosmarti, MD

# EXHIBIT E



**MEDI-RENTS & SALES, INC.**

HOME OXYGEN &
MEDICAL EQUIPMENT

743 SOUTH CONKLING ST.
BALTIMORE, MD 21224
410-327-7252
FAX 410-276-7243

.0-09-98

To whom it may cocern;

  Micheal Benson is a patient of Medi-Rents and Sales Inc. since November 13, 1993.
Mr. Benson rents from our company the following pieces of equipment:

            PORTABLE OXYGEN SYSTEM
            VOLUME VENTILATOR
            BiPAP SYSTEM
            PULSE OXIMETER
All of this equipment is used on a continuance basics. If you should have any questions
please feel free to call me at the above number.


                        Sincerely,


                        Lydia Miskimon
                        Special Accounts

# EXHIBIT F

UNITED STATE OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Baltimore, District Office
18 South Howard Street, Third Floor
Baltimore, Maryland 21201

MICHAEL T. BENSON            :

    COMPLAINANT         :

           :    EEOC NO. 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X

    V.          :

           :    AGENCY NO. FDA-D-012-98

DONNA SHALALA,        :

    SECRETARY,       :    BEFORE: GARY GILBERT

DEPARTMENT OF HEALTH AND  :        ADMINISTRATIVE JUDGE

   HUMAN SERVICES,     :

           :

     AGENCY        :

---

## COMPLAINANT'S RESPONSE TO AGENCY'S
## FIRST SET OF INTERROGATORIES

     Michael Benson, Complainant by and through his Designated Representative Attorney William G. Dansie responds to the Agency's First Set of Interrogatories as follows:

    Interrogatory: 1.    Describe in detail each and every reason upon which you base your claim for compensatory damages in your Complaint including, but not limited to, the nature, extent and duration of any ailment or loss; each and every fact and occurrence upon which you rely in claiming compensatory damages; the date and circumstances of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, future pecuniary losses and other non-economic damages, or any other basis for your claim for compensatory damages and the precise amount you claim for each item or instance.

    Response:    For 204 days FDA Management employees refused to permit me to work from home for no legitimate reason. As a result I had to drive to work on Tuesdays and Thursdays. As a consequence, I suffered respiratory distress symptoms (resulting from neurological damages) at $10,000.00 per day for a total of $2,040,000.00 and (b) additional travel time at 2 ½ hours days x my hourly pay of $38.33 for a total of $19,548.30.

    The dates on which I have worked from home, but was not allowed to, and drove or was driven to work on Tuesday and Thursday as follows:

<u>1996</u>

April 18, 23, 25, 30
May 7, 9, 14, 21, 23, 28, 30
June 4, 11, 18, 20, 27
July 2, 9, 11, 18, 23, 30
August 1, 13, 20, 22, 27
September 10, 12, 19, 24, 26
October 1, 3, 10, 15, 17, 24, 29, 31
November 5, 7, 21, 26
December 3, 5, 12, 17, 19

<u>1997</u>

January 7, 9, 14, 16, 21, 23, 28
February 4, 6, 11, 13, 18, 20, 27
March 4, 6, 11, 13, 18, 20, 27
April 1, 3, 8, 10, 15
May 1, 6, 8, 13, 15, 20, 22, 27, 29
June 3, 5, 10, 17, 19, 24, 26
July 3, 10, 17, 22, 24, 29, 31
August 5, 7, 12, 19, 21, 26, 28
September 2, 4, 9, 11, 16, 18, 23, 25
October 7, 9, 14, 16, 21, 28
November 4, 6, 13
December 2, 4, 9, 11, 16, 18, 23

<u>1998</u>

January 6, 8, 13, 15, 20, 22, 27, 29
February 3, 5, 10, 12, 17, 19
March 3, 5, 12, 17, 19, 24, 26
April 2, 7, 9, 14, 21, 28, 30
May 5, 7, 12, 14, 19, 21, 26, 28
June 2, 4, 9, 11, 16, 18
July 2, 7, 9, 14, 21, 28
August 4, 6, 11, 13, 27
September 1, 8, 17
October 1, 6, 13, 15, 20, 29
November 3, 5, 10, 12, 17
December 3, 8, 17

<u>1999</u>
January 7, 12, 21, 26, 28

Interrogatory: 2.    Identify each and every person directly or indirectly involved in or who has knowledge of the facts, occurrences or bases for your claim for compensatory damages described in your answer to Interrogatory 1, above.

Response:    Gerald M. Rachanow (HFD-560), car pooler
5600 Fishers Lane
Rockville, MD 20857
(301) 827-2307

Fred Hyman (HFD-540), occasional carpooler
5600 Fisher Lane
Rockville, MD 20857
(301) 827 - 2064

Charles Hartjen, MD orthopedic surgeon
6565 N. Charles Street, Suite 606
Baltimore, MD 21204
(410) 583-0160

John Bach, MD physiatrist
New Jersey Medical University Hospital
Department of Physical Medicine and Rehabilitation
150 Bergen Street, Room B-239
Newark, New Jersey 07103-2406
(973) 972-4393

Kathleen Klumpp, RRT Respiratory Therapist
C/o Pulmonary Rehabilitation
Martha Jefferson Hospital
459 Locust Avenue
Charlottesville, VA 22902
(804) 982-7000

Interrogatory: 3.    Identify every communication, written and oral, by every person identified in your answer to Interrogatory 2, above, concerning the facts, occurrences or bases for your claim for compensatory damages described in your answer to Interrogatory 1, above.

Response:    Dr. Hartjen gave me a letter dated August 20, 1996 (ROI Ex. 9, p.4). That letter strongly recommended to FDA that I be allowed to work at home because driving to work for an extended time in a low car seat compromises respiration, especially that of someone like me with a hypoxic condition. I forwarded it to the Division of Employee Relations (DER) which sent it to Dr. James Vorosmarti for evaluation. Included with that letter were my pulmonary function test (PFT) results of November 21, 1994 and June 16, 1995. I have attached copies of those results to these responses. By letters of September 14,

1996, I asked FDA's EEO office to supplement the ROI with those PFT results. It is not clear whether they did or not. A copy of my request is attached to these answers.

Dr. Hartjen mailed a second letter to FDA's DER describing my rapid heart beat incident of October 8, 1996 while driving on the way to work and repeated his recommendation that I be allowed to work at home. That letter was forwarded to Dr. James Vorosmarti for evaluation. I don't have a copy of that letter. By a second letter dated September 14, 1996 (copy attached), I asked FDA's EEO office to supplement the ROI with that letter or a copy of it.

Dr. Bach wrote a May 3, 1996 letter (ROI Ex 9 p.2) describing my condition in some detail and his recommendation on how it should be treated. Dr. Vorosmarti saw that letter.

Dr. Bach wrote a September 28, 1998 letter (copy attached) recommending that I use a volume ventilator frequently during the day when at work. He also recommended that I be allowed to work at home rather than driving in to work, because sitting in a low car seat for an extended time increases hypoxia and hypercapnia and causes a rapid heart beat. That letter was seen by Dr. Vorosmarti. It is not in the ROI.

Gerald Rachanow is my co-carpooler and has seen me in distress while traveling to work on a number of occasions. While driving my car with him to work, I recently stopped to stand up and stretch to try relieve my hypoxia to slow a rapid heart beat, and shivered while doing that. He suggested that he drive us in to work that day. I agreed. He drove us in to work.

Fred Hyman was with Gerald Rachanow one morning when I drove our carpool. Both were with me when I turned off Shady Grove Road to Crabb Branch Way and pulled up in froint of a Giant Food store in a shopping center for possible help, if it were to be needed. I recuperated from an uncontrollable rapid heart beat while waiting and my heart rate slowed. Fred Hyman sat in front seat and offered to drive. My heart rate slowed to a point where I felt in better control of myself, so I continued to drive in to the office.

Kathleen Klumpp discussed my condition in telephone calls and in a letter (ROI Ex, p.11).

On arrival at work, while driving with Gerald Rachanow, or with Gerald Rachanow and Fred Hyman, I walk slower than either or both of them from the driven car to the entrance door to our building. Gerald Rachanow at times told me to take my time. Once, when I drove, Fred Hyman suggested I get out of my car close to the building door entrance and he offered to park the car. I let him park my car.

Interrogatory: 4.    Identify each and every physician, health care provider or other professional you have consulted, for any purpose, in connection with the basis of your claim for compensatory damages.

Response:    Charles Hartjen, MD (orthopedic surgeon).
           John Bach, MD (physiatrist; i.e., physical medicine specialist)

Interrogatory: 5.    Describe in detail your consultation(s) with each person identified in your answer to Interrogatory 4, above; including, but not limited to, the number and duration of the consultation(s), the dates or time periods of your consultation(s) with each person, the reason for the consultation(s), the procedures and/or tests employed during the consultation(s), the treatment prescribed as a result of the consultation(s), the person's field of specialization, the person's qualifications and numbers of years of experience and the terms of any remuneration you paid or agreed to pay the person.

Response:    At the suggestion of Kathleen Klumpp in her letter (ROI Ex 11 p.9), I went to see Dr. Bach. On May 2, 1996, Dr. Bach examined me with a device, which measured my vital capacity sitting and lying down, my oxygen saturation levels and carbon dioxide end tidal volume. He recommended the use of a volume ventilator, I did not ask Dr. Bach for a recommendation to work at home at that time, thinking that his letter (RIO Ex9 p.2) was a self-evident recommendation.

At a visit with Dr. Charles Hartjen in 1996 (I don't recall the date), I mentioned my respiratory difficulties when driving to work and asked if he could write a recommendation that I be allowed to work at home. He wrote a letter dated August 20, 1996 (RIO Ex 9 p4).

After having had a severe rapid heart beat on the way to work on October 8, 1996, I provided information on what occurred to Dr. Hartjen's secretary (I don't remember the date). I learned that Dr. Hartjen sent a letter to DER when Dr. Vorosmarti denied my request for recommendation again (RIO Ex 15, p 8). I don't have a copy of that letter.

In September 1998, I had 2 episodes of very rapid heartbeat at work shortly after arriving. I called Dr. Bach to ask for his advice on what could be done. He suggested I see him for an examination. On September 24, 1998, I was examined, by Dr. Bach who took the same type of data he obtained in my May 1996 visit. He suggested I use the volume ventilator more frequently during the day at work and use the oximeter to monitor my oxygen blood saturation levels to see that the ventilator causes my levels to go to the high 90's. I told him of my respiratory difficulty while driving to work and asked him if he could make a recommendation that I be allowed to work at home. He wrote a letter dated September 28, 1998 (copy attached) with that recommendation.

Beginning May or June of 1996, I rented a volume ventilator and an oximeter from Medi Rents and Sales and used them. My 1998 health care insurance carrier was no longer in the Federal Employee Health Benefits Program, so I switched to Freestate. Freestate does not do business with Medi Rent and Sales, but does business with Neighborcare. Effective in January 1999, I rented the same type equipment from Neighborcare. I use the oximeter to monitor my oxygen saturation blood levels. When I see the figure below 94%, I generally use the volume ventilator to bring the level up to the high 90s.

Payments, if any, received by the above health care provider were from any of my insurance carriers and by deductibles, if any, that I paid. I do not have information on the number of years of experience of the health care providers discussed above. Attached, are

copies of pages from the Official ABMS Directory of Board Certified Medical Specialists, 1996 with listing of descriptive backgrounds information relating to Drs. Bach and Hartjen.

Interrogatory: 6.    Identify any and all documents that refer or relate to or reflect any consultations and/or services that you received from the individual(s) referred to in your answers to Interrogatory 4 and 5, above,

Response:    In addition to the letters referred to in answers 4 and 5, a copy of a receipt from Neighborcare is attached.  A copy of a letter from Medi Rents and Sales is also attached.

Interrogatory: 7.    Describe in detail every instance in which you have ever suffered or sought counseling or health care for any physical, nervous, emotional or mental illness or disorder; including, but not limited to, the nature, extent and duration of such illness or disorder; the name and address of each health care provider who has treated, examined, or consulted with you; the approximate date(s) of each treatment, examination or consultations and if the illness or disorder resulted in any disability, each disability and its duration.

Response:    Objection, overbroad.

Interrogatory: 8.    To the extent not already provided in your answers to the foregoing interrogatories, describe in detail any pre-existing, concurrent or subsequent condition from which you have ever suffered, including the diagnosis and treatment you received for the condition.

Response:    Pre-existing (P), Concurrent (C), Subsequent (S)

Poliomyelitis (P)
With resulting flaccid paralysis of the abdominal muscles (P, C, S)
Scoliosis (P, C, S)
Postpolio Syndromes of Respiratory Muscles (P, C, S)
Sleep Apnea (P, C, S)
Prostatitis (P)
Onychomycosis of right thumb (P)
Seborrheic dermatitis (P, C, S)
Appendicitis (P)
High Blood Pressure (P, C, S)
Diabetes Mellitus Type II (P, C, S)
Acute Labyrinthitis (P)
Tonsilitis (P)
Labyrinthitis (P)
Benign Prostatic Hypertrophy (P, C, S)

Interrogatory: 9.    If you have recovered from injury, condition or harm identified in your answers to the foregoing interrogatories, state the approximate date of

your recovery.

> Response:    The acute phase of poliomyelitis would have lasted until some time in 1948, possibly 1949.

> Appendicitis recovery was in the summer of 1958 after an appendectomy.

> Tonsillitis recovery was after a tonsillectomy when I was too young to remember.

> Labyrinthitis recovery was approximately October 1983 after treatment with diphenhydramine.

> Onychomycosis was successfully treated with griseofulvin in 1965.

> Prostatitis was successfully treated at GBMC in the summer of 1990.

> Interrogatory: 10.    If you are presently disabled as a result of the injury, condition or harm identified in your answers to the foregoing interrogatories, describe in detail the nature and impact of the disability upon your lifestyle, including the activities you are unable to perform as a result of your alleged disability.

> Response:    My walking rate is slowed because I deoxygenate on slight exertion. I use a handicap permit to minimize walking distances from where I park my car. I notice a rapid heart beat when sitting in a car after a prolonged time in the morning. I am unable to immediately begin work upon arrival at the office in the morning and need to rest to "reoxygenate" before beginning work. Sometimes I feel as if I am deoxygenating while sitting at work. At times like those, I would normally use my rented volume ventilator to bring my oxygen levels to normal. My ability to inhale air in normal quantities is reduced. Consequently, I inhale shallow amounts of air, which contain a proportionately lower amount of oxygen, which leads to a rapid heart beat and respiratory distress. I usually stop and wait before sitting down in my car, otherwise, I have a tendency to deoxygenate briefly.

> Interrogatory: 11.    Explain precisely the factual basis of your allegation that the Agency caused the alleged injury, condition or harm for which you demand compensatory damages.

> Response:    By working at home, I avoid the stress on my already strained respiratory system caused me by sitting in a car seat for a prolonged time and I also have access to a rented volume ventilator to bring my oxygen saturation level upward when needed. On the way to work, I feel a rapid heart beat and sometimes feel as if I will pass out. Those symptoms have occurred occasionally while at work. When those symptoms occur, I cannot tell if they will stop. This uncertainty frightens me. This is the "suffering" I refer to for non-economic damages. Dr. Vorosmarti, claims in an affidavit (ROI Ex 16 p.2) that he never consulted anyone else about my condition, yet he claims that a Dr. Bradley agreed with him to deny my request for accommodation (ROI Ex 15 p9). Dr. Bradley never signed the memo. Also, I had asked the DER to refer my case to a contract physician other

than Dr. Vorosmarti, yet it did not do so. I presented to Dr. Vorosmarti compelling evidence in support of my request for recommendation for an accommodation. It included among other items, letters from 2 physicians recommending that I be allowed to work at home, and a fact sheet by NIH, a DHHS agency saying that postpolio syndrome is not life threatening, except for cases of respiratory impairment (RIO Ex 15 p5). My September 28, 1998 letter from Dr. Bach said I need to use a volume ventilator more frequently at work, yet Dr. Vorosmarti continued to deny my request. From those circumstances, I conclude that Dr. Vorosmarti's evaluation was false.

FDA management officials are physicians. They are aware of at least some of the medical documentation that I submitted in support of my request to work at home, so they know or should know that denial of my working at home would cause me to incur the symptoms that I have suffered. Management has tried to make my working life more onerous by denying me a work-from-home schedule in the hope that I would leave, and has worked together with DER to accomplish that end. This conclusion is corroborated by a memo from Anne Mustafa (copy attached), suggesting I take disability retirement. It is also corroborated by the fact that Debra Bowen did not give Linda Katz a copy of a NIH fact sheet saying post polio syndrome is not life threatening, except in cases of respiratory impairment. This after saying or implying she would do so, when I gave Dr. Bowen a copy. Management has claimed it wants me to be at the office under close supervision, yet it did nothing different with regards to supervision than when I had been at work before. Originally, Anne Mustafa, my former immediate supervisor denied my flexiplace schedule claiming that a letter that I drafted was issued with incorrect date. After I explained why that date was put into the letter, she said maybe I had a point, but then claimed she was dissatisfied with other areas of my work. I have heard that a female employee also drafted a letter that issued with an incorrect date, yet she incurred no consequences from management.

Anne Mustafa gave me the lowest rating I ever had, and she failed to mention parts of my work that would be favorable to my evaluation. I conclude that she had a motive for doing that because I detected her oversight into material in her prior handling of a subject on which I later worked, and she was reluctant to give me credit for it. DER used a contract physician who it knew or had reason to know would use the cloak of his authority to deny valid requests for reasonable accommodations routinely. After Anne Mustafa retired, Dr. Linda Katz became my immediate supervisor. On belief, she was directed by DER and at least one person in a position above her to deny my use of a work-at-home schedule. Her performance evaluation of my work was unbalanced by not including input from one of the reviewers of a document on which I worked, but took into account only the input of Anne Mustafa after she was no longer my immediate supervisor, before she retired. I characterize management's denial of my request for a work-at-home schedule in bad faith, and as a scheme designed to try to force me to leave. Since many of the people in my workplace are permitted to work at home, there was and continues to be no hardship to my office if I work at home. I could be teleconferenced in to meetings, just like others. Had I been allowed to work at home, I also would have avoided unnecessary travel time. Had the request for reasonable accommodation been granted, the correct official reprimand and 2-day suspension would not have been susceptible of issuance to me. AWOL time would not have been charged, and sick leave would not have been used.

Interrogatory: 12.    Describe in detail any and all corrective action or compensation you seek in connection with the above-captioned complaint(s), to the extent not already provided in your answer to Interrogatory 1, above, including, but not limited to, a list of all such losses or expenses, the precise amount you claim the Agency owes you as a result of each such loss, the date upon which you incurred each such loss or expense and the identity of all documents supporting this claim.

Response:

A.    Paying me for 2 days of my being suspended from work November 18, 19 and 20, 1998: $613.28 (The suspension was reduced from 3 days to 2 days.)

B.    Annulling and voiding the above-referenced suspension.

C.    Annulling and voiding the June 17, 1996 Corrected Official Reprimand (ROI Ex 10, pp1-7).

D.    Restoring 8 hours of sick leave used each day on October 8, 1996 and January 5,6, and 19, 1999 due to my physical inability to travel to work by automobile on those days for a total of 32 hours.

E.    Paying me $59.38 for 1 ¾ hours of salary deducted for AWOL charged on May 7, 1996.

F.    Voiding that AWOL charge.

G.    Authorizing me to work at home 4 days a week up to 10 hours a day.

H.    Attorneys fees.

I.    See also answer to interrogatory no.1.  Copy of time sheet attached.

Interrogatory: 13.    Describe in detail every claim you have made for details, such as workers' compensation, unemployment compensation, disability benefits, retirement benefits, or veterans' benefits, after the date of the incident(s) described in your complaint, including the nature and date of each such claim, whether the claim was accepted and whether and in what amount benefits were received.

Response:    N/A

Interrogatory: 14.    Describe in detail all income you have received after the date of the discriminatory conduct alleged in the above-captioned complaint(s) including, but not limited to, the name(s) of employer(s), the dates on which you received the income and the total compensation you have received.

Response:     Objection: overbroad and irrelevant.

Interrogatory: 15.     If you claim to have a qualifying physical or mental handicap under the American with Disabilities Act or the Rehabilitation Act, describe in detail the nature of said handicap.

Response:     Impaired ability to breathe due to damaged phrenic nerve which innervates the diaphragm. The diaphragm contracts and expands normally. It pushes air containing carbon dioxide out and air containing oxygen to be inhaled. My inability arises from the diaphragm's inability to accomplish either function completely. I use breathing assist devices to that end, i.e., a BiPaP S/T at night to expel carbon dioxide and a volume ventilator in the day to make up for the air I am unable to inhale and to bring in proportionately more oxygen. My respiratory condition is further compromised by severe scoliosis, which is secondary to my original case of polio.

Interrogatory: 16.     If not already provided in your answer to Interrogatory 15, above describe in detail all major life activities you are unable to perform as a result of your alleged handicap. (For the purpose of this interrogatory, major life activity: is defined as caring for one's self; performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working or similar activities.)

Response:     I have an impaired ability to walk beyond a slow rate without becoming breathless. I find that I get a rapid heartbeat and feel that my oxygen level desaturates after sitting in a low seat for an extended time shortly after arising from sleep in a supine position. I find that when I desaturate from oxygen without use of a volume ventilator to restore normal oxygen levels makes me feel like I am on the verge of passing out. As described in interrogatory #15 above, I have an impaired ability to breathe.

Interrogatory: 17.     With respect to any handicap identified in your answer to Interrogatory 15 and Interrogatory 16, describe in detail all health care you have received; including, but not limited to, the identity of the health care provider or other person providing the diagnosis or treatment, the procedures or tests employed in the diagnosis the course of treatment, the identity of all documents related to the diagnosis and the treatment of handicap, an explanation of all medication and rehabilitative therapy prescribed and the dates on which you were examined, diagnosed or treated.

Response:     Richard Waldhorn, MD (pulmonologist)
              Department of Pulmonology
              Georgetown University Medical Center
              3800 Reservior Road, NW
              Washington, DC 20007-2113
              (202)784-2000

Dr. Waldhorn conducted a sleep study at Georgetown Hospital on me in November 1993. I used to fall asleep in the middle of the day. Results showed that I stopped breathing for long periods of times while asleep. Dr. Waldhorn explained that the carbon dioxide levels built up in me, bathed my brain and caused me to fall asleep. To remedy that

problem, Dr. Waldhorn directed that I sleep with a device called a BIPAP-S/T. This device rests my respiratory muscles and basically does the work of those muscles. It cause me to exhale the carbon dioxide which I would otherwise retain while asleep. Use of that device has cured that symptom. Dr. Waldhorn also directed me to instill 0.5 liters/minutes of oxygen into the device while asleep, and to use 2.0 liters/minutes with exertion. I was referred to Dr. Waldhorn by a Kaiser Permanente HMO pulmonary specialist. Because Kaiser Permanente did not cover the BIPAP-S/T and other durable medical equipment, I switched to another insurance carrier that covered those devices.

Michael Lansing, MD (pulmonologist)
20 Crossroad Drive
Owings Mills, MD, 21117
410-363-5700

Dr. Lansing examined me. Under his direction, I had a stress test and pulmonary function tests run at Northwest Hospital in Randallstown, MD on November 21, 1994 and on June 16, 1995, and used a portable device called Oxy-Lite, which I used to inhale oxygen while in my car and, if necessary, at work. I found it heavy and that it did not help me when used. Dr. Lansing also ordered a CAT scan of my lungs done at Northwest Hospital I left the CAT scan images at the office of Dr. Hartjen. The CAT scan indicated that my lungs were capable of function.

Bruce Rabin, MD,PH.D (neurologist)
Division of Neurology
Sinai Hospital
2401 West Belvedere Avenue
Baltimore, MD 21215-5271
410-578-5706

On August 25, 1995, Dr. Rabin examined me. In a follow-up on September 15,1995, Dr. Rabin did electromyelogram testing on me (copy of letter results attached). He suspected that the phrenic nerve was degenerated and said to me that there was a risk of my lung being punctured during such a test. I decided not to take that chance. He prescribed amantadine and when I called him to ask his advice on taking amantadine when I expected to get the flu shot, he suggested discontinuing its use.

Starting November 1993, I rented from MEDI Rents and Sales, A BiPaP-S/T an oxygen concentrator and was checked out by respiratory therapist, Linda Ludy. She checked me out from time to time and was in contact with Dr. Lansing.

Charles Hartjen, MD

I was examined by Dr. Hartjen prior to November 30, 1994 when he operated on me at GBMC Hospital I Baltimore, MD by removing certain intervertebral dics from curved vertebrac that are part of my scoliosis. He put me in traction until December 15, 1994 when he performed a spinal fusion on me. GBMC Hospital released me on December 30, 1994.

Subsequently, I saw Dr. Hartjen for follow-up visits to monitor post-op progress. I went in for an X-ray in early 1995 to check on pain and yearly x-rays in late 1995 and 1996.

I had chest x-ray work done prior to my orthopedic surgery in 1994 at the Maryland General Health Care Clinic in Timonium, MD.

I talked with Kathleen Klumpp, RRT on the telephone several times and we exchanged letters discussing my pulmonary condition. I never saw her in person.

Interrogatory: 18.    Describe in detail every accommodation that you requested the Agency to provide for your alleged handicap condition; including, but not limited to, the precise measures you asked the Agency to take, the identity of the Agency official(s) to whom you communicated your request, the manner in which you communicated your request, the date(s) on which you communicated your request, the identity of the health care provider(s) or other person(s) who helped you to formulate your request for an accommodation and the measures actually taken by the Agency to grant or deny your request.

Response:    Numerous times, I orally asked Anne Mustafa, my former immediate supervisor (retired), and Linda Katz, my current immediate supervisor to allow me to work 2 days a week on a work at home schedule. By memo dated October 6, 1998 (copy attached), I asked Linda Katz for authorization to work at home 4 days a week and in support, gave her a September 28, 1998 letter from Dr. John Bach recommending that I be allowed to work from home in support of my request. She forwarded it to Dr. Vorosmarti, who by memo dated October 8, 1998 (copy attached) denied my request for recommendation for a reasonable accommodation. Linda Katz by memo dated October 9, 1998 (copy attached) denied my request based on Dr. Vorosmarti's response. I submitted notes from my family physician and cardiologist as requested by Dr. Vorosmarti in his October 8, 1998 memo. He denied my request by memo dated October 30, 1998 (copy attached) and I was first informed of that denial by memo dated November 17, 1998 (Copy attached).

Interrogatory: 19.    Describe in detail the factual basis of your conclusion that the accommodation described in your answer to interrogatory 20, above, would have enabled you or assisted you to perform the functions of your job. 19

Response:    Objection. There is no interrogatory no. 20 above.

Interrogatory: 20.    Identify each person who, to your knowledge or belief, possesses personal knowledge of facts or evidence concerning any aspect of the allegations contained in or the factual basis of the above-captioned complaint(s); including, but not limited to, each person's relationship to Complainant, his/her address and telephone number(s) and his/her title.

Response:    See earlier answers to interrogatories.

Interrogatory: 21.    For each person identified in response to Interrogatory 20, above, describe in detail the knowledge you believe that he/she may possess.

Response:    Do not understand question.

Interrogatory: 22.    For each person you are considering calling as an expert witness at the hearing in this matter describe in detail his/her qualifications to testify in the capacity of an expert at the hearing, including, but not limited to, his/her identity, his/her training or education, his/her experience in the relevant profession, the identity of document he/she reviewed or will review in preparation for the hearing, the date(s) and duration of your meeting with him/her, the tests or procedures he/she employed or will employ to gather information and the treatises and other sources upon which he/she relied or will rely for the conclusion or opinions about which he/she may testify.

Response:    John Bach, MD
Professor or Physical Medicine
Am unable to answer the balance of this interrogatory at this time.
(Need to check on other parts).

Interrogatory: 23.    For each person you are considering calling as an expert witness at the hearing in this matter, describe in the detail the testimony he/she will be providing at the hearing; including, but not limited to, the subject matter upon which each expert may testify, the substance of his/her conclusions and opinions, the basis of his/her conclusions and opinions and the method by which he/she arrived at his/her conclusion and opinions.

Response:    I expect an expert to testify as follows: driving in a low car seat for an extended time compromises the mechanics of respiration exacerbating the low oxygen level of a person with pre-existing hypoxia, such as myself. The symptoms experienced frequently lead to hyporcapnca, increase the risk of pulmonary hypertension, tachycardia, and an enlarged right ventricle which can prove fatal (as mentioned in the NIH Fact Sheet (ROI ex 15, p.5)). These symptoms can be expected to continue after the affected driver or passenger leaves his car, such as when I incurred severe tachycardia in September 1998 shortly after arriving at the office.

Interrogatory: 24.    Identify every other person you consulted concerning the subject describe in your response to interrogatory 23, above, but whom you decided not to call as an expert witness at the hearing in this matter.

Response:    None.

Interrogatory: 25.    Identify all documents or other tangible evidence that refer to or relate to any aspect of the factual basis of the above-captioned complaint(s).

Response:    Provided in answers above.

Interrogatory: 26.    Identify by Complainant's name or agency case number all complaints of discrimination in which you have been involved; including, but not limited to, complaint(s) in which a federal employee has alleged that you discriminated against him/her, complaint(s) for which you were approved as a witness in an EEOC hearing, complaint(s) for which you were questioned or interviewed by an investigator and complaint(s) you filed.

Response:    No other case, except for this case.

Interrogatory: 27.    Identify each person who was consulted in connection with answering these interrogatories, indicating the specific interrogatory upon which each person was consulted.

Response:    My attorney, William G. Dansie, reviewed answers I prepared.

Respectfully submitted,

William G. Dansie, Attorney at Law
Designated Representative
601 Indiana Avenue, NW
Suite 814
Washington, DC 20004
(202) 783-1597

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February 1999, a copy of the foregoing Complainant's Response to Agency's First Set of Interrogatories was mailed via first class mail to:

Richard G. Bergeron Esquire
Agency Representative
Department of Health and
Human Services
Office of the General Counsel
Cohen Building, Rm. 5362
330 Independence Ave, SW
Washington, D.C. 20201.

William G. Dansie