# EXHIBIT G

UNITED STATE OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Baltimore, District Office
18 South Howard Street, Third Floor
Baltimore, Maryland 21201

MICHAEL T. BENSON                        :

    COMPLAINANT                          :

    V.                                   :        EEOC NO. 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X

                                         :        AGENCY NO. FDA-D-012-98
DONNA SHALALA,
    SECRETARY,                           :        BEFORE: GARY GILBERT
DEPARTMENT OF HEALTH AND                 :                ADMINISTRATIVE JUDGE
    HUMAN SERVICES,                      :

        AGENCY                           :

---

## COMPLAINANT'S RESPONSE TO AGENCY'S REQUEST FOR ADMISSIONS

      Michael Benson, Complainant, by and through his Designated Representative Attorney at Law William G. Dansie, hereby responds to the Agency's request for Admissions as follows:

      Request:    1.    Do you admit or deny that in a memorandum dated May 20, 1996, you informed your supervisor that your physical condition did not pose the same types of problems when driving home as you has experience while driving to work?

      Response:    Admit

      Request:    2.    Do you admit or deny that while you were in the Flexible Workplace Arrangement Program ("FWAP") during 1995 and early 1996, you were able to report to your workplace at least two days per week and perform the duties of your job?

      Response:    Deny

      Request:    3.    Do you admit or deny that while you were taking amantadine 100mg, BID, you were able to sit in your car "without reclining the seat part way to relieve pressure on the diaphragm?"

Response:    Can not admit or deny, therefore must deny, (Part of time admit, part of time deny)

Request:    4.    Do you admit or deny that since you voluntarily ceased taking Amantadine, you stated in a letter dated December 21, 1995, that you felt "a need to recline [your] car seat to relieve pressure on [your] diaphragm?"

Response:    Admit, with the qualification that the word "voluntary" means on the advice of my neurologist.

Request:    5.    Do you admit or deny that while you are in your office, you are able to perform the duties of your job?

Response:    Can not admit or deny, therefore must deny. (Sometimes at the office, I become deoxygenated.)

Request:    6.    Do you admit or deny that you were restored to the FWAP in February, 1998?

Response:    Can not admit or deny, therefore must deny (I had 2 days flexiplace and only 1 day was restored)

Request:    7.    Do you admit or deny that on February 24, 1998, you failed to report to your workplace even though you had been informed on the previous day that you would have to report to work to chair a meeting?

Response:    Deny

Request:    8.    Do you admit or deny that your supervisor did not authorize you to work at home on May 27, 1996?

Response:    Admit

Request:    9.    Do you admit or deny that as recently as April, 1998, and continuing to the present, you have been a member of a car pool, and that you have had to drive from your home to your workplace in Rockville everyday that you have not had to report to work?

Response:    Can not admit or deny, therefore must deny. (Drive can mean to be a passenger)

Request:       10.       Do you admit or deny that, except for a brief period in February, 1998, you had no FWAP agreement in place after March 6, 1996?

Response:       Deny

Respectfully submitted,

William G. Dansie, Attorney at Law
Designated Representative
601 Indiana Avenue, NW
Suite 814
Washington, DC 20004
(202) 783-1597

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on the 19th day of February 1999, a copy of the foregoing Complainant's Response to the Agency's Request for Admissions was mailed via first class mail to:

Richard G. Bergeron
Agency Representative
Department of Health and
Human Services
Office of the General Counsel
Cohen Building, Rm. 5362
330 Independence Ave, SW
Washington, D.C. 20201.

                                          William G. Dansie

# EXHIBIT H

**UMD**
NEW JERSEY

NEW JERSEY MEDICAL SCHOOL

Department of Physical Medicine and Rehabilitation
(201) 982-7195

University Hospital
150 Bergen Street, Rm. B-239
University Heights
Newark, NJ 07103-2406

September 28, 1998

To Whom It May Concern:

Michael Benson is a 57 year old man with a diagnosis of post-poliomyelitis. The most recent reevaluation was on 9/24/98. The respiratory examination was significant for a vital capacity of 1450 ml, maximum insufflation capacity (MIC) (air stacked breaths from a manual resuscitator) of 2030 ml, peak cough flow (PCF) 3.7 L/s from the MIC and 7 L/s from the MIC with the addition of an abdominal thrust. The $SaO_2$ ranged from 91 to 93 percent. Maximum end-tidal pCO2 was 45 mm Hg.

Assessment

This patient has chronic alveolar hypoventilation and chronic atelectasis and, because of progressive neuromuscular disease, unless trained and equipped will develop pneumonia and acute respiratory failure during the next severe chest cold. This will require hospitalization, intensive care, intubation for respiratory support, and probably lead to tracheostomy. He will use his LP6 at work for maximal insufflations at 2000 ml frequently during the day and continue to use high span BiPAP overnight.

Intervention

We trained this patient in nasal and mouthpiece intermittent positive pressure ventilation (IPPV), manually assisted coughing, and in mechanical insufflation-exsufflation. Since acute respiratory failure can be prevented with the use of these noninvasive inspiratory and expiratory muscle aids and this patient has been trained in their use, the following equipment is now required for home use:

1. A portable volume ventilator (PLV-100) to use via mouthpiece during daytime hours on assist control mode, rate 10, volume 900 to 1300 ml and a BiPAP machine for nocturnal support.

2. An oximeter for feedback to maintain $SaO_2$ over 94% at all times with the use of noninvasive IPPV and assisted airway secretion elimination as needed.

In addition, sitting in an automobile with a low seat for an extended time leads to difficulty breathing by hampering lung expansion. Since this can worsen hypoxia and CO2 retention and cause tachycardia and distress, it is recommended that Mr. Benson be permitted to work at home as much as possible.

Summary

Noninvasive IPPV and assisted airway secretion elimination should be used as needed to prevent oxyhemoglobin desaturation and, therefore, respiratory failure. If you have any questions, please feel free to contact me at: 1-973-972 4393.

John R. Bach, M.D.
Professor of Physical Medicine and Rehabilitation
Co-Director, Jerry Lewis Muscular Dystrophy Association Clinic of UMDNJ-NJMS





# EXHIBIT I

# Midatlantic Cardiovascular Associates, P.A.

Woodholme Medical Office Building
1838 Greene Tree Road
Suite 535
Baltimore, Maryland 21208
———
410-653-3923
Fax: 410-653-1296

Henry I. Babitt, M.D.
Benjamin V. DuBois, M.D.
Russell E. Hillsley, M.D.

Stephen H. Pollock, M.D.
Allan S. Pristoop, M.D.
Jeffrey L. Quartner, M.D.
David A. Zimrin, M.D.

September 15, 1998

Jeffrey Zibell, M.D.
7220 Park Heights Avenue
Baltimore, Maryland 21208

Re:  Michael Benson

Dear Jeff:

I had the privilege of seeing Michael in cardiac evaluation at your request.  He is a 57 year old gentleman referred for progressive exertional dyspnea.

He gives a very interesting history.  As you know, he had polio as a child which affected his abdominal muscles and resulted in significant scoliosis.  He had multiple spinal fusions as a teenager.  In 1994, he noticed progressive exertional dyspnea and was found to have decreasing oxygen saturation and abnormal pulmonary function.  It was felt to be secondary to respiratory muscle involvement in post-polio syndrome.  He had some type of surgery following which was not successful and actually his PFTs got worse.  He has been stable until the last month or two when he has noted markedly increased exertional dyspnea.

He has no symptoms of chest pain, chest pressure, no orthopnea, PND, or edema.  His exercise capacity was quite limited.  There is no peripheral edema and no prior history of heart disease.  He has no palpitations.

| | |
|---|---|
| Current Medications: | He is on Procardia which was switched to Hytrin, Glyburide. |
| Past Medical History: | Remarkable for hypertension, adult onset diabetes mellitus, BPH.  He has had multiple spinal fusions. |
| Family History: | Shows that his father had coronary disease, mother had hypertension.  He has a brother who is alive and well. |
| Social History: | He is married and works full-time for the Food and Drug Administration as a regulator. |
| Review of Systems: | Remarkable for the increased abdominal girth secondary to the loss of abdominal musculature. |
| Physical Examination: | He is a healthy gentleman in no acute distress. |

Page Two
September 15, 1998
Michael Benson

Pulse is 70 and regular, blood pressure is 140/80, and respiratory rate is 12. Weight is 214.5 lbs.

HEENT:                          Unremarkable.

Neck:                           Supple without adenopathy or thyromegaly.

Chest:                          Clear to auscultation and percussion.

Cardiovascular System:          Jugular venous pressure is normal. Carotids are
                                brisk. S1 and S2 are normal. There are no
murmurs, rubs, gallops, or clicks.

Abdomen:                        It is markedly protuberant with no muscle tone.
                                Benign without organomegaly.

Extremities:                    Without cyanosis, clubbing or edema. Distal pulses
                                are 2+ and symmetric.

Database:                       Resting cardiogram was within normal limits.

                                Stress test was normal in that it showed absent
                                ischemic changes but he was markedly dyspneic
at the 1:00 mark, probably consistent with significant pulmonary dysfunction. My guess is
that he probably desaturated significantly with exercise.

Assessment:

        1.      Exertional dyspnea.

Discussion:                     More than likely, this symptom is secondary to
                                progressive respiratory dysfunction from his prior
polio. I doubt that this is a cardiac etiology. To be thorough, we will do a 2D echo to
evaluate LV function, but my suggestion is that she undergo a pulmonary reevaluation, ie.
PFTS. Thank you for referring her to us.

                                With warm personal regards,

                                Stephen H. Pollock, M.D., F.A.C.C.

SHP/scm
Dictated but not read.

**MIDATLANTIC CARDIOVASCULAR ASSOCIATES, P.A.**
1838 Greene Tree Road
Suite 535
Baltimore, Maryland 21208
(410) 653-3923

## EXERCISE TREADMILL TEST REPORT

**Patient: Michael BENSON**                    **Date:** 9/15/98

**Referring Physician:** Jeffrey Zibell, M.D.

**Height:**          **Weight:**          **DOB:** 6/13/41     **Sex:** Male

**Patient History and Indications for Test:** 57 year old gentleman who has a history of polio which affected his abdominal muscles and long standing shortness of breath. Recently, his shortness of breath has become much worse and he is more limited than normal. He has no symptoms of chest pain or chest pressure. There is no prior history of heart disease or heart murmur. No evidence of heart failure.

**Medications:**

**Resting EKG:** Normal

**Protocol Selected:**     Bruce
**ST-lead Selected:**      V5

| Stage Name | Time | Speed (MPH) | Elev (%) | METS | Dev (MM) | Slope (MM/Sec) | Heart Rate | Blood Pressure |
|---|---|---|---|---|---|---|---|---|
| Rest |  |  |  |  | +0.5 | -1 | 91 | 142/88 |
| --Stopped Exercise at Test Time: 1:37 |  |  |  |  | 0.0 | +0 | 126 |  |

**Physician's Interpretation:**
1.    Protocol - Bruce.
2.    Exercise Time - 1:37.
3.    Peak Heart Rate - 132 or 70% of age predicted maximal heart rate.
4.    Arrhythmias - None.
5.    Symptoms - Marked exertional dyspnea that occurred at the 1:00 mark.
6.    EKG - No changes.

**IMPRESSION:** This test is negative for myocardial ischemia. It shows markedly diminished exercise capacity probably on the basis of pulmonary dysfunction.

SHP/esy                              Stephen P. Pollock, M.D., F.A.C.C.

MID-ATLANTIC CARDIOVASCULAR ASSOCIATES, P.A.    N/  E        Benson, Michael
1838 Greene Tree Road                                    ID         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
Baltimore, MD 21208                                      DOB        6/13/41
(410) 653-3923                                           REF. PHY.  Zibell
                                                         CARD.      Pollock
                                                         DATE       9/29/98

## ECHOCARDIOGRAM REPORT

**VIDEO TAPE STORAGE:** Tape Number W-98-075          Footage   7:17 to 14:05

**CLINICAL:**

| DOPPLER | | M-MODE | |
|---|---|---|---|
| **Peak Aortic Flow** _1.4_ (1.0-1.7 m/s) | | **Left Ventricle** | |
| | | Lvidd _4.3_ | (3.5-5.5 cm) |
| **Peak Mitral Flow** _0.8_ (0.6-1.3 m/s) | | Lvids _2.2_ | (2.5-4.0 cm) |
| | | Plvw _0.9_ | (0.8-1.1 cm) |
| **Peak Pulmonary Flow** _1.3_ (0.6-0.9 m/s) | | Ivs _0.9_ | (0.7-1.2 cm) |
| **Peak Tricuspid Flow** _0.7_ (0.3-0.7 m/s) | | | |
| **Regurgitation:** _____ | | **Right Ventricle** | |
| _____ | | Rvidd _2.2_ | (0.7-2.5 cm) |
| _____ | | **Atrium** | |
| _____ | | La _3.3_ | (1.9-4.0 cm) |
| **Mitral Pressure Half-Time** ____ (60 m/sec) | | **Aortic Artery** | |
| | | Root _2.9_ | (2.0-3.7 cm) |
| **Mitral Valve Area** ____ cm | | Valve _1.7_ | (1.6-2.6 cm) |

**COMMENTS:**    This is a technically adequate M-mode and 2-D colorflow Doppler study.

The left ventricular cavity size, wall thickness, and global systolic function are normal. There are no regional left ventricular wall motion abnormalities. The estimated left ventricular ejection fraction is in the range of 68%. The left atrial, right atrial and right ventricular cavity sizes are normal. The pericardial cavity shows a trivial anterior space.

The mitral, tricuspid, and pulmonic valves are normal in appearance and excursion. There is no evidence of mitral valve prolapse. The aortic root size is normal. The aortic valve is trileaflet, with normal appearance and excursion.

The colorflow Doppler study is unremarkable, with no evidence of mitral, tricuspid, pulmonic or aortic valve regurgitation. The mitral and tricuspid valve peak inflow velocities are normal. The aortic valve peak outflow velocity is normal. The pulmonic outflow velocity is mildly increased.

**IMPRESSION:** This is an essentially normal echocardiogram and colorflow Doppler study. Trivial anterior space is noted. There is a mild increase in pulmonic outflow velocity.

SHP/esy                                        Stephen H. Pollock, M.D., F.A.C.C.

# EXHIBIT J



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Baltimore District Office

10 S. Howard Street, 3rd Floor
Baltimore, MD 21201
PH: (410) 962-7711
TDD: (410) 962-6065
FAX: (410) 962-6633

September 28, 1999

BY CERTIFIED MAIL:
DEPT. OF HEALTH & HUMAN SERVICES
Office of EEO & Civil Rights
Food and Drug Adm.
Parklawn Building
5600 Fishers Lane, Room 8-72
Rockville, MD 20857

RE:  EEO Complaint of Michael T. Benson
     EEOC Case No.: 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X
     Agency Case No.: FDA-D-012-98

To Whom It May Concern:

      Transmitted herewith is the transcript of the Decision delivered
from the bench (Findings of Fact and Conclusions of Law) in the above
captioned complaint of discrimination, the investigative file and the
original copy of the hearing transcript.  EEOC regulations at 29 CFR
§1614.109(g) state that the administrative judge shall send copies of the
entire record, including the transcript, and the findings and conclusions
to the parties by certified mail, return receipt requested.  Accordingly,
a copy of the Decision and the hearing transcript is being sent to the
Complainant.

      It is our understanding that the Complainant has already been
provided a copy of the Investigative File in preparation for the hearing.
A copy of the Decision is being sent to the Agency representative and the
Complainant's representative, if one has been designated.

      Please send an informational copy of your decision to the
Administrative Judge.

                                   Sincerely,

                                   Gary M. Gilbert
                                   Supervisory Administrative Judge

Enclosures:

cc:
Michael T. Benson
William G. Dansie, Esq.
Richard G. Bergeron, Esq.

1           The third point I want to make is that the

2    Agency somehow is being blamed for the fact that there

3    was ongoing exchange of information between Mr. Benson

4    and Dr. Vorosmarti.    Well, the plain truth is that

5    Mr. Benson is nothing if not persistent.

6           And in fact, the Agency is required, under

7    law, particularly since the enactment of the ADA, to

8    have  --  engage  in  an  ongoing  dialogue  with  its

9    employees   with   regard   to   these   reasonable

10   accommodation requests.

11          So, for example, if Mr. Benson tomorrow

12   submits documentation that his condition has somehow

13   worsened, then we would be under an obligation to

14   reassess  that  --  a  decision  on  the  reasonable

15   accommodation issue.

16          Those are the three points I want to make

17   in response to what's been said.

18          JUDGE GILBERT:   Okay.

19          And Mr. Dansie, anything you'd like to

20   add?

21          MR. DANSIE:   No, I think we've pointed out

22   everything.

23          JUDGE GILBERT:   All right.   Well, let me

24   address the questions of timeliness because they are

25   fairly clear in this matter.   There are four issues

1    raised in the complaint, as I noted earlier.

2            I guess I'm mistaken in understanding that

3    the earlier two were actually being withdrawn as

4    individual issues.  And well that they should be, I

5    might add.

6            Both the June 17, 1996 reprimand and the

7    May 7, 1996 charge of AWOL were distinct, concrete

8    employment actions, which there is no question from

9    the record Mr. Benson knew of the decisions and knew

10   the reasons for those decisions quite contemporaneous

11   with those decisions.

12           Notwithstanding that, he did not raise

13   those as an EEO complaint until substantially beyond

14   the 45 day requirement that he contact an EEO

15   counselor.  I don't see that we need to address the

16   question of whether, with regard to these two issues,

17   the filing of the grievance would bar Mr. Benson from

18   pursuing these matters as an EEO complaint.

19           And I draw that conclusion because they

20   are so obviously untimely.  But regardless of whether

21   he filed an EEO -- excuse me, a grievance on the

22   matter or not, he would be barred from pursuing these

23   two matters.

24           The remaining two issues, which again, at

25   some point, seem to blend together and just as quickly

1    seem to separate themselves, are a bit more troubling.

2    With regard to the decision by the Agency to remove

3    Mr. Benson from the flexiplace program, I once again

4    conclude that it was, in fact, not timely filed and

5    brought as a proper complaint of discrimination.

6              Notwithstanding    the    quite    innovative

7    argument by counsel for Complainant that because it

8    was brought within 45 days -- or EEO counseling, that

9    is,    was    sought    within    45    days    of    the    last

10   correspondence from Dr. Vorosmarti, it is clear that

11   Mr. Benson was told time and time again by the Agency

12   that the decision to remove him from flexiplace was,

13   in fact, final.

14             And although, because of its continuing

15   obligation to provide reasonable accommodation, the

16   Agency correctly continued to consider any additional

17   documentation Mr. Benson submitted in support of a

18   request for reasonable accommodation, it was, in fact,

19   done outside the scope of the decision to remove him.

20             And in fact, had Dr. Vorosmarti responded

21   in a contrary form of saying that -- that is, had he

22   responded    to    Mr.    Benson's    submission    of    medical

23   documentation ultimately by saying that he supported

24   and concluded that Mr. Benson should have bee provided

25   reasonable accommodation, it would have been not in

1    the context of reviewing the decision to remove him,

2    but rather in the context of a new request for

3    reasonable accommodation.

4              And for those reasons, Mr. Benson's

5    complaint with regard to his removal from the

6    flexiplace program is once again not timely.

7              And let's go off the record just a moment

8    because I think we have someone at the door here.

9              (Whereupon, the foregoing matter went off

10             the record briefly at 3:22 p.m.)

11             JUDGE GILBERT:    Administrative Judge

12   Anechi Modu has entered the room to observe.

13             With regard to the fourth and final issue,

14   that is the question of whether the flexiplace program

15   should have been -- or rather whether Mr. Benson

16   should have been permitted to be reinstated to the

17   flexiplace program as a form of reasonable

18   accommodation, I am prepared to allow that case --

19   that matter to at least survive the question of

20   timeliness.

21             And the reason for that is it really

22   doesn't matter whether Mr. Benson was -- whether it

23   was timely at that point or not. In fact, the Agency

24   has a continuing obligation -- as counsel for the

25   Agency pointed out during his comments in this matter,

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
BALTIMORE DISTRICT OFFICE
CITY CRESCENT BUILDING
10 South Howard Street, 3rd Floor
Baltimore, Maryland 21201

---

| | |
|---|---|
| MICHAEL T. BENSON<br>2703 Waco Ct.<br>Baltimore, MD 21209<br><br>COMPLAINANT<br><br>v.<br><br>DONNA SHALALA, SECRETARY<br>U.S. DEPARTMENT OF HEALTH & HUMAN SRVCS<br>Chief, Complaints & Adjudication Branch<br>Office of Equal Employment & Civil<br>Rights/<u>FOOD AND DRUG ADMINISTRATION</u><br>Parklawn Building<br>5600 Fishers Lane, Room 8-72<br>Rockville, Maryland  20857<br><br>AGENCY | EEOC CASE NO.:<br>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X<br><br><br><br><br>AGENCY CASE NO.:<br>FDA-D-012-98 |

---

## DECISION

APPEARANCES:

COMPLAINANT'S REPRESENTATIVE: William G. Dansie, Esq.
601 Indiana Ave., N.W.
Suite 814
Washington, DC 20004


AGENCY'S REPRESENTATIVE:     Richard G. Bergeron, Esq.
D.H.H.S.\OGC
330 Independence Ave.,S.W.
Room 5362
Washington, DC 20201


BEFORE: GARY M. GILBERT
ADMINISTRATIVE JUDGE

1          (Whereupon, the foregoing matter went off

2          the record at 3:59 p.m. and went back on

3          the record at 4:26 p.m.)

4          JUDGE GILBERT:  All right, at this time

5     I've heard the parties' comments with regard to the

6     motion for summary judgement, and let me address that

7     motion.

8          Actually, let's go off the record just one

9     moment.

10         (Whereupon, the foregoing matter went off

11         the record at 4:26 p.m. and went back on

12         the record at 4:27 p.m.)

13         JUDGE GILBERT:  Let me begin by noting

14    that, for purposes of this motion for summary

15    judgement, I will, of course, consider the facts in

16    the light most favorable to the Complainant.  And this

17    is something of an interesting case.

18         Now, the Commission's regulations provide

19    for issuance of a decision without hearing modeled

20    much upon the Federal Rules of Civil Procedure, Rule

21    56.  When considering a motion for summary judgement,

22    of course, the evidence is considered in the light

23    most favorable to the non-moving party.

24         And I note in this regard the decision of

25    the United States Supreme Court in Celotex v. Catrett,

1    C-a-t-r-e-t-t, 477 US 317, 1986.  And I will insert

2    some  additional  citations  with  regard  to  the

3    Commission's rules with regard to granting of summary

4    judgement  or,  as  the  Commission  refers  to  in  its

5    regulations, the use of decisions without hearing.

6              In this complaint, Mr. Benson asserts that

7    the Agency engaged in unlawful discrimination when it

8    failed  to  provide  reasonable  accommodation  of  his

9    physical impairments, specifically by not permitting

10   him to participate in the Agency's flexiplace program.

11             The initial question before us is does --

12   is Mr. Benson, in fact, a qualified individual with a

13   disability?  I note that the Commission's regulations

14   and compliance manual provide that a disability under

15   the  ADA  is  one  of  the  following  --  or  is  the

16   following:

17             Where  an  individual  has  a  physical  or

18   mental  impairment  that  substantially  limits  a  major

19   life  activity.   In  the  alternative,  where  the

20   individual  has  a  record  of  such  an  impairment.   Or

21   third, where the Complainant is regarded as having at

22   least one of these parts of the definition.

23             With  regard  to  whether  Mr.  Benson  has  a

24   physical impairment, it is undisputed that Mr. Benson

25   does,  in  fact,  have  a  physical  impairment.   That

1    impairment is Post Polio Syndrome.

2         The    Agency    has    argued    that,

3    notwithstanding  the  fact  that  Mr.  Benson  has  a

4    physical  impairment,  that  it  does  not  rise  to  the

5    threshold  of  disability  because,  it  asserts,  it  does

6    not  substantially  limit  one  or  more  major  life

7    activities.

8         In contrast, the Complainant has proffered

9    that, were we to proceed to trial in this case, they

10   would demonstrate that it does, in fact, substantially

11   limit the major life activity of breathing.

12        There is sufficient documentation in the

13   file.  And in addition, in considering the facts in

14   the  light  most  favorable  to  the  Complainant,  I

15   conclude  that  Mr.  Benson  does,  in  fact,  have  a

16   disability  because  his  Post  Polio  Syndrome

17   substantially  limits  the  major  life  activity  of

18   breathing.

19        There  is  considerable  evidence  in  the

20   investigative file, which was supplemented by proffers

21   today,  regarding  the  problems  he  has  breathing  both

22   while sleeping and occasionally while commuting to and

23   from the work place.

24        In  addition,  although  the  evidence  in

25   support  of  this  is,  I  grant,  rather  sparse  in  the

1    file, we have heard proffers that the condition that

2    Mr.   Benson   suffers   can   potentially   be   life

3    threatening.

4              For those reasons, I believe Complainant

5    clearly gets past the threshold of having a physical

6    or mental impairment that substantially limits a major

7    life activity.

8              The fact that breathing is a major life

9    activity is undisputed.  It's referred specifically to

10   both   in   the   legislation   and   in   the   Commission's

11   regulations.

12             It   is   given   as   an   example   in   the

13   Commission's compliance manual governing definition of

14   a disability which was issued March 14, 1995, EEOC

15   director's   transmittal   number   915.002,   where   major

16   life activities are defined as follows:  examples of

17   major   life   activities   listed   in   the   Title   I

18   regulations include caring for one's self, performing

19   manual   tasks,   walking,   seeing,   hearing,   speaking,

20   breathing, learning and working.

21             Substantially   limited   is   defined   as

22   follows:  An impairment is substantially limited if it

23   prohibits or significantly restricts an individual's

24   ability to perform a major life activity as compared

25   to the ability of the average person in the general

1    population to perform the same activity.

2         The determination of whether an impairment

3    substantially limits a major life activity depends on

4    the nature and the severity of the impairment, the

5    duration or expected duration of the impairment, and

6    the permanent or long term impact of the impairment.

7         According, we turn our attention to

8    whether Mr. Benson is a qualified individual with a

9    disability. And in fact, the Agency has not disputed

10   that Mr. Benson is otherwise able to perform all of

11   the essential functions of the job.

12        In support of this argument, the Agency

13   has asserted that Mr. Benson not only is able to

14   perform all the essential functions of the job, but is

15   able to do so without any form of reasonable

16   accommodation.

17        Therefore, I once again conclude that Mr.

18   Benson is a qualified individual with a disability.

19        The Rehabilitation Act and the Americans

20   With Disabilities Act provides that an employer must

21   provide reasonable accommodation to qualified

22   individuals with disabilities who are employees,

23   applicants or -- and otherwise require a reasonable

24   accommodation.

25        What is reasonable accommodation depends

1    upon circumstances of the particular case, but may

2    include such things as modifications or adjustments

3    that enable an employee with a disability to perform

4    the job or to enjoy equal benefits and privileges of

5    employment such as those that are enjoyed by other

6    similarly situated employees who do not have

7    disabilities.

8        Examples of reasonable accommodation which

9    the Commission has highlighted in the past include

10   such things as making existing facilities accessible;

11   job restructuring; the use of part time modified work

12   schedules; acquiring or modifying equipment; changing

13   tests, training materials or policies; providing

14   qualified readers or interpreters; and reassignment to

15   a vacant position.

16       Here I note the Commission's regulations

17   under the Americans With Disabilities Act which also

18   provide guidance under the Rehabilitation Act, which

19   can be found at 29 CFR Section 1630.202(i) promulgated

20   in 1997.

21       Mr. Benson asserts that he requires

22   reasonable accommodation in the form of participation

23   in the flexiplace program because it enables him to

24   perform his job. He asserts that, in the absence of

25   that, he is not as able to perform the job.

1          Now, counsel for Complainant, in raising

2    his argument today, has commented that, in fact, who

3    could  benefit  more  from  flexiplace  program  than

4    Complainant.  And in some regards, that is a very fair

5    statement.

6          The  effects  and  the  benefits  to  the

7    Complainant probably exemplify as clearly as ever I

8    have  seen  why  a  flexiplace  program  is  a  useful  and

9    positive alternative to the way we get things done in

10   the work place as any that I have seen.

11         However, the question in this case turns

12   upon  the  question  of  whether  or  not  Mr.  Benson

13   requires to participate in the flexiplace program in

14   order to perform the essential functions of this job.

15         The  testimony  has  --  the  proffer  for

16   testimony and the investigative file will reveal that

17   Mr. Benson, prior to being on the flexiplace program,

18   was  in  fact  able  to  commute  to  and  from  work  on  a

19   regular basis and that, after he began participation

20   in the flexible work place program, continued to be

21   able to commute to work on two days a week.

22         In fact, when Mr. Benson initially applied

23   for and began his participation in the flexible work

24   place  program,  he  did  not  specifically  request

25   participation as a form of reasonable accommodation,

60

1    but merely to participate as did other employees.

2              It is not until, at best, the 11th hour

3    that there has been any suggestion that Mr. Benson

4    would require reasonable accommodation to exceed two

5    days per week.  The 4th Circuit, not long ago, had a

6    case which I think is particularly on point.

7              In Johnson v. Shalala, a case which made

8    its way to the United States Court of Appeals for the

9    4th Circuit, and the citation I have here is 280 cases

10   730 decided April 20th, 1993.

11             In that case, the 4th Circuit considered

12   a circumstance where the Department of Health and

13   Human Services denied an individual a form of

14   reasonable accommodation where that employee who had

15   serious problems in being able to commute during

16   normal rush hour circumstances because of a disability

17   had requested a deviation from the regular schedule of

18   30 minutes or more and the Agency had provided, which

19   the employee believed to be an insufficient allowance

20   of only 15 minutes.

21             And the Court of Appeals, which really was

22   addressing the question of whether the totality of

23   circumstances in that case rose to the threshold of

24   being a constructive discharge, concluded that there

25   is insufficient evidence to show that the employee

61

1    actually required the additional time for flexibility

2    in going to and from the work place.

3                    (Whereupon, the proceedings were concluded

4    at 4:43 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1    actually required the additional time for flexibility

2    in going to and from the work place.    In this

3    particular instance, that is the case at hand.    I

4    conclude that the Complainant, although clearly an

5    individual who would benefit substantially from

6    participation in the flexible work place program, does

7    not require that as a form of reasonable accomodation.

8            Now, having said that, I also not that

9    recently, in the last several months, Mr. Benson has

10   been readmitted to the Agency's flexible work place

11   program on one day a week and I believe there have

12   been discussions between the parties, both with regard

13   to this case and outside the scope of this case, about

14   his expanding his participation in the program to as

15   many days as two days per week.

16           In this regard, let me remind the Agency

17   of its continuing obligation to provide reasonable

18   accomodation, although I conclude that there is

19   insufficient evidence at this point to demonstrate

20   that Mr. Benson needs to participate.    Obviously at

21   some point in time, if he's able to show a need to

22   participate in the program, the Agency will have to

23   consider that on its merits.

24           More    importantly,    let    me    say    the

25   following:    there has been a significant period of

1    time that has passed from the time when Mr. Benson was

2    removed from the flexible work place program.

3    Complainant would have the Commission conclude that

4    his removal from the work place program was unfair or

5    unlawful.

6         However, as I discussed earlier today,

7    because I do not find the question of his removal from

8    the flexible work place program to have been timely

9    filed, I need not and will not address the question of

10   whether he was removed for proper reasons or not.

11        The passage of time, however, assuming

12   that the Agency had a valid reason for removing him

13   from the work place program, at some point the

14   signficance or the consideration of his participation

15   in the flexible work place program becomes no longer

16   tainted or denied -- or, should be denied because of

17   whatever has happened in the past.  And I say this

18   because I think it's very important that the Agency

19   remember its obligation not to retaliate or consider

20   the fact that Mr. Benson has pursued for his purposes

21   a reasonable accomodation, his request for a

22   reasonable accomodation in any future decision of

23   whether to allow Mr. Benson to participate in the

24   flexible work place program.

25        Accordingly, for the reasons that I've

1    discussed above, it would be my intention at this time

2    to issue an order which will dismiss this proceeding

3    with prejudice and conclude the Complainant has not

4    established sufficient evidence to show that, although

5    he is a qualified individual with a disability, the

6    participation in the flexible work place program is

7    required as a form of reasonable accomodation under

8    the law.

9                 And at this time, that ends our session

10    today.

11                 Let me thank everyone.  After we go off

12    the record, I'll be available if there's any questions

13    procedurally.

14                 Thank you.  Off the record.

15                 (Whereupon, the proceedings were concluded

16    at 4:43 p.m.)

17

18    _9/28/99_                    _____

19    Date                         GARY M. GILBERT
                                   ADMINISTRATIVE JUDGE

20

21

22

23

24

25

NOTICE

Pursuant to 29 CFR §1614.109(g) of the Equal Employment Opportunity Commission's regulations, the Administrative Judge's decision (i.e., findings of fact and conclusions of law on the merits of the complaint) shall become a final decision binding on the Agency 60 calendar days after the Agency's receipt of the decision unless within that time period the Agency itself issues a final decision adopting, rejecting, or modifying the decision. If the Agency does not issue a final decision within the time period prescribed above, the Agency shall notify the Complainant that pursuant to §1614.109(g) and 1614.110 of the Equal Employment Opportunity Commission's regulations, the Administrative Judge's decision shall become the Agency's final decision.

The Agency's final decision must contain notice of the right to appeal to the Commission, the name and address of the agency official upon whom an appeal should be served, notice of the district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits. A copy of EEOC Form 573, Notice of Appeal/Petition, shall be attached to the decision.

62

## CERTIFICATE

This is to certify that the foregoing transcript in the

matter of:         ORAL ARGUMENT


Before:            EQUAL EMPLOYMENT OPPORTUNITY COMMISSION


Date:              MAY 25, 1999


Place:             BALTIMORE, MARYLAND


represents  the  full  and  complete  proceedings  of  the

aforementioned  matter,  as  reported  and  reduced  to

typewriting.



*Eric Hendrixson*
_____

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com