# EXHIBIT K



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 19848
Washington, D.C. 20036

Michael T. Benson,
Complainant,

v.

Tommy G. Thompson,
Secretary,
Department of Health and Human Services,
(Food and Drug Administration),
Agency.

Appeal No. 01A01719
Agency No. FDA-D-012-98
Hearing No. 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X

## DECISION

Pursuant to 29 C.F.R. § 1614.405, the Commission accepts the complainant's appeal in the above-entitled matter. The record reveals that complainant filed a formal EEO complaint alleging that the agency had discriminated against him on the basis of disability (post polio syndrome) when he was denied permission to work at home two days per week. At the conclusion of the investigation, complainant was provided a copy of the investigative report and requested a hearing before an EEOC Administrative Judge. Following an oral hearing on the agency's motion for summary judgment, the Administrative Judge determined that summary judgment was appropriate and issued a decision, finding no discrimination. The agency did not issue a final order, and consequently, the Administrative Judge's decision became the agency's final action. 29 C.F.R. § 1614.109(i).

After a review of the record in its entirety, including consideration of all statements submitted on appeal, it is the decision of the Commission to affirm the agency's final order, because the Administrative Judge's issuance of a decision without a hearing was appropriate and a preponderance of the record evidence does not establish that discrimination occurred.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

2                                        01A(1719

    1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

    2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision or **within twenty (20) calendar days** of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973,

3                                    01A0171.9

as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*
Carlton M. Hadden, Director
Office of Federal Operations

AUG 0 7 2002
Date

## CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed. I certify that this decision was mailed to complainant, complainant's representative (if applicable), and the agency on:

AUG 0 7 2002
Date

Equal Opportunity Assistant

# EXHIBIT L

Cover Message

Date:       November 17, 1998

From:       Michael T. Benson
            Regulatory Review Pharmacist
            Division of OTC Drug Products (HFD-560)

Subject:    Stage 2 Grievance

To:         Robert DeLap, M.D., Ph.D.
            Director, Office of Drug Evaluation V (HFD-105)

This is a Stage 2 Grievance presentation under Track 2 of FDA's
Dispute Resolution System (DRS) (Instruction 771-1-70) as
supplemented by a memorandum of understanding between the
National Treasury Employees Union and FDA (Interim MOU #3).

I became aware of the matters that aggrieve me on February 27,
1998, and on July 28, 1998.  Because of my not being at a meeting
on February 24, 1998, my immediate supervisor, Dr. Linda Katz
notified me by E-Mail on February 27, 1998 that I could not work
a flexiplace schedule until further notice.  Dr. Katz also
notified me by memo on July 28, 1998 that she proposed to suspend
me for 3 days, and that my flexiplace work agreement was
terminated.  On August 12, 1998, I orally replied to Dr. Debra
Bowen about the memo by Dr. Katz, and on August 13, 1998, I
followed up with a written memo to Dr. Bowen.  By memo dated
October 23, 1998, Dr. Bowen upheld Dr. Katz and decided that my
suspension was to be effective November 18, 19, and 20, 1998.
Details appear on the attached pages in the form of an appeal.

The personal relief I seek is (1)  reimbursement of salary not
paid to me because of the suspension, (2)  removal from my
personnel file of the record of the suspension, and (3)
reinstatement of my working at home.

After my suspension, I will be on leave until November 30, 1998.
My understanding is that grievance procedures provide for a
prompt response.  I would appreciate a response by c.o.b.
December 11, 1998.

Michael T. Benson

Attachments

Statement of the Decision:

I.  Dr. Debra Bowen upheld Dr. Linda Katz' proposal to suspend me
for 3 days stating at page 4 of her October 23, 1998 memo (copy
attached)  "Your failure to follow your supervisor's instructions
which were clearly stated, that you were not to begin to work
flexiplace until all signatures for approval were appropriately
obtained, is the reason for this disciplinary action.  You had
not secured these required signatures before you left work on
February 23, 1998, and your securing a signature by facsimile
minutes before you decided to begin to work at home on February
24, 1998, did not, despite your argument to the contrary,
constitute concurrence by your supervisor as authorization for
you to work at home that day.  You clearly failed to comply with
your supervisor's instructions and expectations."

I understood Dr. Katz' instructions in one way, i.e, to get all
signatures on the flexiplace agreement before the start of work
on February 24th.  Dr. Katz apparently had an expectation that
the instruction meant to get all signatures on the flexiplace
agreement by c.o.b. February 23rd.  That expectation was not made
apparent to me.  There was no instruction that said c.o.b.
February 23rd was the time limit for getting all signatures on
the flexiplace agreement.

In a July 28, 1998 memo (copy attached), Dr. Katz states

    1.  "When we left work on February 23, 1998, it was with the
        understanding that you would be at work in Rockville on
        February 24, 1998."

    2.  "contrary to my instructions and CDER procedures, you
        personally delivered the FWAP agreement to Shelley
        Johnson on February 23, 1998."

Dr. Katz never instructed me not to personally deliver the
flexiplace agreement to Shelley Johnson.  Shelley Johnson had no
CDER procedure-related problem with my delivery of the agreement
to her.  I have found no such procedure noted anywhere.

II.  With regard to working at home on February 24, 1998, Dr.
Bowen disagrees that my rights under the Rehabilitation Act of
1973 have been violated at page 5 of her memo.

From that decision, I appeal.

-2-

Material Facts:

I. <u>Suspension</u>

On February 23, 1998 I had 4 out of 6 signatures needed on an agreement to work flexiplace, and asked Dr. Katz whether I could work flexiplace on February 24th if I didn't get all signatures in time. She said "no." She never said that all signatures had to be in the agreement by <u>c.o.b.</u> February 23rd in order for me to work flexiplace on the 24th. Later that afternoon, I obtained the 5th signature and went to the office of the flexiplace coordinator who wasn't in. I left the agreement in her office for her signature, called her on the morning of February 24th, and reached her about 8:30 AM. She signed the agreement before I was due to report to work and sent an E-Mail message to that effect to Dr. Katz. On Tuesday February 24, 1998, I signed in by E-Mail to work flexiplace, sent the message to Team Leader Mike Kennedy and to the timekeeper, and worked flexiplace from home.

II. <u>Work from Home</u>

On the morning of February 24, 1998, I heard on WTOP radio that the weather forecast called for snow. My pulmonary condition is compromised by a combination of scoliosis and impaired respiratory muscles. I have been diagnosed with post polio syndrome (pps) of the respiratory muscles in which the phrenic nerve has degenerated either partially or completely, therefore the diaphragm muscle either cannot contract and expand, or does so less than normal. As a result, my ability to take in oxygen is diminished. I am chronically hypoxic, and at times hypercapnic. Either symptom can cause the heart to beat rapidly.

Sitting in a low car seat for an extended time causes the lungs to contract which causes less air to be inhaled than normal. In my condition where the act of inspiration is already impeded, sitting in a car seat for an hour and 15 minutes to drive to work strains me to a hypoxia deeper than what I already have and triggers a rapid heartbeat. When that last symptom occurs, I feel like I will pass out. Sometimes, I stop my car and stand up for relief. In inclement weather such as cold or snow I fear having to stand outside with my hypoxic condition. Shortly after arriving at work, I shift my weight to a desk or wall to try to relieve my hypoxic symptoms.

My orthopedic surgeon recommended that I be allowed to work at home because sitting in a car for a long time compromises respiration. An NIH fact sheet (Publication No. 96-4030) (copy attached) says pps is not life-threatening except for cases of

-3-

severe respiratory impairment. I submitted these and other items to Dr. James Vorosmarti, FDA contract physician who refused to grant my request for a reasonable accommodation to work at home 2 days a week.

In July of 1997, I gave to Dr. Bowen the NIH fact sheet stating that pps of the respiratory muscles is life-threatening, and asked her to give it to Dr. Katz. Dr. Bowen said or implied that she would give it to Dr. Katz. Some two weeks later, I showed a copy of the fact sheet to Dr. Katz who told me she hadn't seen it and did not get a copy of it from Dr. Bowen. Dr. Katz still did not reinstate my flexiplace schedule. At the time of my August 12th transcribed oral presentation to Dr. Bowen, I also noted that upon first discussing my pulmonary condition, Dr. Bowen and Kathryn Vengazo of the Division of Human Resources (DHR) looked at each other with what appeared to me to be a skeptical look about what I said. Those facial expressions do not show up on the transcript (copy attached), but it appears to me that Kathryn Vengazo prepared the language in Dr. Bowen's memo about the "impartial" FDA medical consultants.

Dr. Vorosmarti has issued inconsistent statements (see attached copy of excerpt of one of his reports and his affidavit in a pending EEO complaint), and has demonstrated to me a biased unwillingness to recommend my request for a reasonable accommodation to work from home no matter what is submitted to him. That bias shows from a statement in his memorandum dated May 31, 1996 in which he wrote "There is no other medical information about his respiratory problem that I feel is needed, but if Mr. Benson wishes to provide whatever he thinks is pertinent I will be happy to review it as long as it is from one of his treating physicians." If Dr. Vorosmarti doesn't feel any other medical information about my respiratory problem is needed, and I continue to incur the consequences of oxygen desaturation while driving to work and after arriving at work, what good is it to submit any documentation to him? To me, his statement is evidence of bias.

Issue I: Did I fail to follow Dr. Katz' February 23rd instructions not to work flexiplace on February 24th under the facts stated above?

Answer: No.

Point I: All signatures to the agreement were obtained prior to the time I was scheduled to arrive at work on February 24th.

-4-

Point II:  Dr. Bowen concluded that (1) by my not obtaining all signatures on the agreement by c.o.b. February 23rd, and (2) by my working a flexiplace schedule on February 24th, I "clearly" failed to comply with my supervisor's instructions.  That conclusion is not supported by the facts.

Argument:  Failing to comply with Dr. Katz' expectations isn't grounds to invoke the disciplinary act of suspending me for 3 days.  I cannot read her mind.  Dr. Katz did not say all signatures had to be on the agreement by c.o.b. February 23rd.  The fact that Dr. Katz said the understanding and not our understanding implies that Dr. Katz realizes that what she meant was not necessarily my understanding.  Even if my delivery had violated CDER procedures, that is not grounds to suspend me for 3 days.

Issue II:   Had I been compelled to travel to the office on February 24, 1998 after hearing a weather forecast of snow, would that order have violated my right to a reasonable accommodation under the Rehabilitation Act of 1973?

Answer:     Yes

Point II    With a prediction of snow in the weather forecast, I would have been subject to a frightening position of standing in snow on February 24, 1998 to try to allow contracted lungs to expand to alleviate my hypoxic condition compounded by sitting in a car after an extended time.

Issue III:  Did cancellation of my flexiplace agreement violate my right to a reasonable accommodation to work at home under the Rehabilitation Act of 1973?

Answer:     Yes.

Point III:  Travel to work for about an hour and 15 minutes in a low car seat exacerbates my hypoxia and has at times triggered a tachycardia.  This set of symptoms can be prevented by allowing me to work at home.  Therefore, cancellation of my flexiplace agreement violated my right to reasonable accommodation under the Rehabilitation Act.

-5-

Argument:  The evidence and recommendations submitted in support of a recommendation for reasonable accommodation to work at home to Dr. Vorosmarti are compelling and self-evident.  In my physical condition, management's refusal to allow me to work at home or on a flexiplace schedule is a denial of my request for a reasonable accommodation, especially in light of many others in our Division who have been allowed to work a flexiplace schedule. It therefore was and continues to be a violation of my right to a reasonable accommodation under the Rehabilitation Act to cancel my work at home schedule.

## OTHER RELATED MATTERS

Twice in September 1998, I felt a rapid heart beat upon walking into our building shortly after driving to work.  I was checked by a physiatrist (physical medicine specialist) who recommended I use a volume ventilator at work to raise my oxygen saturation blood levels, and that I work at home as much as possible.  I requested a 4-day workweek at home and submitted the letter to Dr. Katz.  Dr. Vorosmarti reviewed the letter and asked for data from my cadiologist and family physician for 1998, and a letter confirming my use of the oximeter and volume ventilator.  I sent everything asked, and requested that another physician be put on my case because of Dr. Vorosmarati's past inconsistent statements and biased unwillingness to grant me a recommendation regardless of what is submitted to him.  Despite my request for another physician to handle my case, the Division of Human Resources (DHR) forwarded my information to Dr. Vorosmarti.  Today, I learned for the first time that he denied my request.  He did not comment on my physician's recommendation for use of a volume ventilator when working, a most important point.  He commented on a number of other related items and came up with a statement "There is no evidence that he has or has requested a handicapped parking permit---"  I have one, but, so what? He had a misstatement about me having an oxygen tank in the office.  I had showed Dr. Katz a pulse oximeter which I use.

Meanwhile, I have had several of these incidents of oxygen desaturation and rapid heart beat while driving and riding to work and am anxious to avoid repeating that experience.  I would like to be able to use my rented volume ventilator at home when sensing a drop in my oxygen saturation levels during the day, as recommended by one of my physicians.  On Monday and Tuesday November 9th and 10th, I sensed a deep oxygen desaturation while at work.  My rented volume ventilator would have helped me overcome that desaturation quicker.  Therefore, I wish to work from home.

-6-

Dr. Bowen's memo at page 7 refers to an alternative resolution. It was a proposed agreement submitted for my signature (copy attached) after I had forwarded to Dr. Bowen an August 13, 1998 memo (copy attached) at the suggestion of a representative of the National Treasury Employees Union. The proposed agreement was "take it or leave it." On that basis, I found it unacceptable primarily because it would compromise my pending EEO complaint to agree to have flexiplace cancelled. The attorney representing me in the EEO Complaint advised me not to sign that agreement. I had submitted a proposed agreement (copy attached) which was not acceptable to Dr. Bowen and Kathryn Vengazo.

Dr. Bowen's memo at page 2 says I submitted 5 Exhibits (copy attached) with my August 13th written reply. An examination of my written reply to Dr. Bowen shows no exhibits were submitted with it. Upon obtaining the exhibits from DHR and examining them, I note that 4 of them relate to leave or lunch and have nothing to do with flexiplace on meeting dates. The one message relating to the subject issued June 14, 1998 and was sent after the February 24th meeting date.

Dr. Bowen's memo at page 4 refers to E-Mail messages of June 11, 1996 and January 1997 (copy attached). The E-Mail message of January 10, 1997 has nothing to do with flexiplace. The E-Mail message of June 11, 1996 corroborates what I said at the August 12th transcribed hearing about the MaPPs being unclear and inconsistent with each other. Its subject heading is FWAP Clarification. To illustrate where people have been working flexiplace on dates scheduled for meetings, attached is a copy of a Russell Calendar Manager (RCM) printout that shows a notice that people can be teleconferenced into those meetings. People customarily had been working flexiplace schedules on dates of those meetings, so the notice that anyone on flexiplace will be teleconferenced at home was put on the calendar to announce the allowance of the practice to continue. Those people were not penalized for working flexiplace on the day of a meeting, and neither should I be penalized. The June 11, 1996 E-Mail message indicates that MaPP 6002.2 (copy attached) is the policy in our Division, i.e., that employees are expected to attend meetings on their day to work a flexiplace schedule. It also says that failure to attend meetings may result in the termination of the employee's participation in flexiplace. That statement doesn't make termination of flexiplace mandatory. I was listed as a recipient of that message, but do not recall seeing it, or getting it some 2-1/2 years ago. A read/receipt indication would show that I did see the message. Such a record is not in the case file. Therefore, it cannot be shown that I actually saw that message. Assuming that I am to be held responsible for

-7-

being aware of the June 11, 1996 E-Mail message clarifying policy
in the midst of conflicting procedures, the Rehabilitation Act is
a statute enacted by Congress. When the two are in conflict, the
Rehabilitation Act (the law of the land) is supreme to the policy
of a Division. Although Dr. Vorosmarti has not recommended my
request for a reasonable accommodation for me to work at home
thus far, 2 other physicians have, and Dr. Vorosmarti's decision
is to be the subject of an EEO proceeding. I have been made
aware that you know about at least one other person under the
umbrella of ODEV who has complained about Dr. Vorosmarti's prior
decisions. That person finally received a recommendation for
reasonable accommodation from another agency contract physician.
Working at home on a meeting date was not stated as grounds for
imposing the 3-day suspension.

An RCM printout for an October 21, 1998 meeting showed noone as
chairperson for a fileability premeeting on Rid Lice Mousse. I
asked our Project Manager whether my name should be included as a
chairperson now that I've found out that I am the lead person for
this class of product. She then put me in as chairperson.
Later, she changed the chairperson to herself on discussion with
her supervisor (copies of RCM printouts attached). The
uncertainty of who is chairperson is a problem that needs to be
cleared up in our Division. To hold me responsible for being a
chairperson when noone says anything to me in advance and when
at least 2 people have been working on the same class of drugs
is unreasonable, especially when being charged with misconduct
for not chairing the meeting (which is not stated as the reason
for the proposed suspension). I have located minutes of the
first pre-meeting about Ban Lice Mousse (copy attached). It
shows noone as chairperson. I am either shown as chairperson or
not for meetings on pediculicides. This policy is inconsistent
as to whether a lead person always chairs meetings on his/her
drug areas of responsibility.

Dr. Bowen's memo at page 6 says she will not rescind the 1996
reprimand. For purposes of this proceeding, I wasn't asking for
it. I have raised it in a pending EEO proceeding. It was
mentioned in Dr. Katz' memo of July 28, 1998. At the oral
response to her memo, I stated that I seek to have it declared
null and void and if it were done outside of the pending EEO
hearing, that's fine with me.

There are numerous points raised in the transcribed oral response
of August 12th that need not be rehashed and reargued since they
do not form the basis for failure to follow supervisory
instructions as the reason for a suspension. They are secondary
in nature.

-8-

Dr. Bowen has (1) disregarded my request to deliver the NIH fact sheet copy to Dr. Katz, (2) looked skeptically during part of the August 12th oral presentation when I discussed my physical condition in relation to the Rehabilitation Act, and (3) refused to ever give me any award (such as an On-the-Spot award) even though I have helped our Division solve numerous complex issues over the years. These incidents indicate a continuous reprisal against me. Dr. Bowen's decision memo indicates to me that she decided my case in a light unfavorable to me. That light is amplified by repeated use of the words "clearly" when matters are obviously not clear. Overall her decision is consistent with the above-mentioned continuous reprisal incidents.

I take this matter seriously, and sincerely trust that you will look at my case unbiasedly.

CONCLUSION

For reasons discussed above, Dr. Bowen's decision to suspend me for 3 days and to cancel my right to work from home is without justification.

It is urged that the decision be reversed.

Respectfully submitted,

Michael T. Benson

Attachments

1.  October 23, 1998 memo
2.  July 28, 1998 memo
3.  NIH Fact Sheet
4.  Transcript of August 12, 1998 oral reply
5.  Excerpt of Dr. Vorosmarti's statement
6.  Excerpt of Dr. Vorosmarti's affidavit
7.  Management proposed alternate resolution
8.  My proposed alternate resolution
9.  5 E-Mail messages
10. August 13, 1998 memo
11. 2 E-Mail messages
12. RCM printout re: teleconference at home
13. MaPP 6002.2
14. 3 RCM printout versions of October 21, 1998 meeting
15. Notes of January 12, 1998 meeting

# EXHIBIT M

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Food and Drug Administration

# Memorandum

Date:    OCT 23 1998

From:   Director
        Division of Over-the-Counter Drug Products

Subject: Decision on Proposed Suspension

To:     Michael T. Benson
        Pharmacist
        Division of Over-the-Counter Drug Products
        Office of Drug Evaluation V
        Center for Drug Evaluation and Research

In a memorandum dated July 28, 1998, Dr. Linda Katz, Supervisory Medical Officer, notified you of her proposal to suspend you from duty without pay from your position of Pharmacist, Division of Over-the-Counter Drug Products, Office of Drug Evaluation V, Center for Drug Evaluation and Research, Food and Drug Administration, Department of Health and Human Services, for a period of three calendar days for failure to follow instructions.

You were provided the opportunity to make an oral and/or written reply to the proposal to suspend.  On August 12, 1998, you and your NTEU representative, Jim Timper, presented an oral reply to the proposal.  At this reply, you presented ten exhibits for my consideration:

1    Calendar Manager Appointment Sheet for February 24, 1998, 9:00 a.m.
2    Calendar Manager Appointment Sheet for February 12, 1998, 2:30 p.m.
3    Calendar Manager Appointment Sheet for January 12, 1998, 9:00 a.m.
4    Calendar Manager Appointment Sheet for January 21, 1998, 10:00 a.m.
5    Calendar Manager Appointment Sheet for June 2, 1998, 9:30 a.m
6    Calendar Manager Appointment Sheet for July 22, 1998, 1:30 p.m.
7    Print File List dated August 10, 1998, 1:08 p.m., X:\CDERMAPP.  The following information is circled on the sheet: 6002.2.pdf, 4/18/96, 2:32 p.m., 28,5
8    CDER MAPP 6501.1, Flexible Workplace Arrangements Program for the Office of Drug Evaluation V, page 1
9    CDER MAPP 4657..2, page 2
10   Electronic Mail Message dated February 27, 1998, from Linda Katz to Michael Benson, Subject: Flexiplace

**Decision on Proposed Suspension -- Michael T. Benson -- Page 2**

You requested an extension of time to present a written reply, and I agreed to allow you until the close of business August 13, 1998, to provide a written reply.  On August 13, 1998, you provided a written reply and five additional exhibits for my consideration.

The exhibits attached to your written reply are:

- Copy of an electronic mail message dated June 27, 1997, from me to a distribution list which included your name; Subject: Reminders
- Copy of an electronic mail message dated May 9, 1997, from me to a distribution list which included your name; Subject: RE: Clarification is Needed
- Copy of an electronic mail message dated January 27, 1997, from me to a distribution list which included your name; Subject: Time Reporting Procedures for HFD-560, with Time Reporting Procedures for Division of OTC Drug Products attached
- Copy of an electronic mail message dated June 14, 1998, from Murray Lumpkin, M.D., Deputy Center Director for Review Management, to a distribution list; Subject: Reminder about Flexiplace and meetings
- Copy of an electronic mail message dated January 22, 1998, from Murray Lumpkin, M.D., Deputy Center Director for Review Management, to a distribution list; Subject: The 30 minute lunch issue

In your replies, you raised the following issues:

- You argued that you were not given any oral or written notice that you were expected to chair the meeting on February 24, 1998.  To support your argument, you provided Exhibits 1 through 6 which were not consistent in listing the name of the person who would chair each meeting.  Specifically, the Russell Calendar Manager listing for the meeting on February 24, 1998, listed you as an attendee, but did not specify who would chair the meeting (Exhibit 1).  However, Exhibits 2, 5 and 6, Russell Calendar Manager listings for meetings on February 12, June 2, and July 22, 1998, respectively, did list you on the appointment sheet as the chair for those meetings.  Likewise, you were not listed as the meeting chair on Exhibits 3 and 4 for meetings on January 12 and January 21, 1998; on these dates the name of the meeting chairperson was not listed.

Decision on Proposed Suspension -- Michael T. Benson -- Page 3

While you offer this as an argument for why you should not reasonably have been expected to know that your supervisor and team expected you to chair this meeting, I do not find this argument persuasive. You well know that you are the lead person in this Division for the Soltec application. Further, as discussed on several occasions with Divisional staff (at team leaders' meetings and at all-hands meetings) and in order to encourage ownership and responsibility at the appropriate reviewer level since our reorganization into a Division, it has been our procedure to encourage the lead review scientist (including interdisciplinary scientists and pharmacists) for a project to chair the project meetings.

Therefore, although it may have been more desirable for the team member entering the meeting information into the calendar manager to have listed your designation as chairperson, it was not essential that your name be so listed on that meeting notice. Further, your exhibits offer simply the observation that the project management staff in our Division, who are responsible for blocking out the meetings on the electronic calendar manager, do not always specify the name of the meeting chair when preparing meeting notices. This omission certainly does not relieve the recognized lead review scientist from the responsibility for chairing a meeting on a project for which that reviewer is responsible.

- You argued that you did not know that employees on flexiplace were expected to attend meetings scheduled on their "flex" day. You did not know that the MaPP specifying this meeting requirement was in effect. While you acknowledged that the MaPP specifying this requirement was issued in April of 1996, you allege that the staff of the Division was not advised of the issuance of the MaPP. You indicated that the ODE V modifications and the CDER MaPPs were not clear in their language as to the requirements regarding meeting attendance on "flex" days (Exhibits 8 and 9). You emphasized that you felt that there was ambiguity between the language in these two written documents that discuss whether the employee on flexiplace is "expected to attend meetings" or "not prevented from attending."

This argument is not sufficient to excuse your failure to follow your supervisor's instructions as charged in the proposal to suspend. As a senior expert reviewer and a professional in the Division, you must meet the expectations of your position, follow your supervisor's instructions, and attend meetings that you clearly are aware that you need to attend. In addition, after both

Decision on Proposed Suspension -- Michael T. Benson -- Page 4

the CDER and ODE-V MaPPs were published, Dr. Lumpkin sent an E-mail to all employees (you were included on this list) on June 11, 1996, notifying staff about the possibility of confusion because both the Offices and ORM may issue MaPPs on this issue.    Dr. Lumpkin informed all staff that Office MaPPs were intended to be more restrictive, not less restrictive. Subsequently, in January 1997, Ms. Jane Axelrad notified CDER employees by E-mail that ODE-V had issued a clarifying MaPP on this issue, which referenced both the existing ORM and ODE-V MaPPs of interest.    In addition, I discussed on two separate occasions at our weekly Divisional all-staff meetings, the modifications proposed and made to the CDER MaPP by ODE-V.

As I have previously stated at these Divisional all-hands meetings, when you do not attend these meetings, you are responsible for making sure that you avail yourself of all the information discussed at these meetings. Further, as a professional in CDER, it is your responsibility to apprise yourself fully of any restrictions, requirements, or expectations related to your participation in any discretionary program that CDER affords its personnel.   Therefore, any semantic failings of the language in these two documents which you have tried to distinguish, should have been available and well-known to you before you applied again to participate in the "flex" program in 1998.    Further, it was clearly your responsibility to clarify and understand any ambiguity you felt existed in these documents before you decided to work at home on February 24, 1998.

- You stated that other employees (you did not identify to whom you were referring) have missed meetings on their "flex" day; you could not get into Russell Calendar Manager from home on February 24, 1998; other staff members had not checked their E-mails to see that you had checked in by computer for duty on February 24, 1998, and no one offered to include you in the meeting by teleconference; and that the FWAP agreement was signed by all parties before you began to work.

These arguments are not persuasive to me, and you must accept responsibility for what you failed to do.  Your failure to follow your supervisor's instructions which were clearly stated, that you were not to begin to work flexiplace until all signatures for approval were appropriately obtained, is the reason for this disciplinary action.  You had not secured these required signatures before you left work on February 23, 1998, and your securing a signature by facsimile minutes before you decided to begin to work at home on February 24, 1998, did not, despite your argument to the contrary, constitute concurrence by your supervisor as authorization for you to work at home that day.  You clearly failed to comply with your supervisor's instructions and expectations.

Decision on Proposed Suspension -- Michael T. Benson -- Page 5

Your failure to chair the meeting, or even to participate in the meeting, is actually secondary to your failure to comply with your supervisor's instructions.     Further, your arguments appear to suggest that others are accountable for your misconduct.     The fact that others did not see your E-mail (when they did not expect it) or offer to include you in the meeting by telephone (which was not their responsibility) is clearly an attempt on your part to hold others accountable for what you failed to do.

- You have filed a discrimination complaint alleging that the Rehabilitation Act has been violated by the failure of your supervisors to grant your request to work flexiplace for some workdays each week. As a result, you stated that you have suffered a significant exacerbation of your pre-existing cardiovascular condition.     You have been advised that you can go to court and have a jury trial.     You stated that your right to accommodation has been violated.     You also objected that citing the Official Reprimand you received in 1996 as past record is inappropriate because that action is still being adjudicated through your discrimination complaint.

I disagree with your assertion that you have been discriminated against and that your rights under the Rehabilitation Act have been compromised or violated.     The evidence and documentation that you have provided to FDA have been personally reviewed by appropriate, impartial FDA medical consultants and they have determined the value of the evidence you have provided to support your assertions in this regard.     Contrary to your contention, the Official Reprimand was in full force on February 24, 1998, and is appropriately cited as past record in proposing and deciding your suspension.     Because, as you stated, the Official Reprimand is being adjudicated at this time, I will not comment further on your assertions.

- You stated that you acted in good faith based on the information you had available to you.     You did not commit any violations with an intent to do so. You stated that you hoped that management would relieve you of this misconduct charge being held against you.     You also stated that you would like to have clearer directions in order to preclude similar misunderstandings in the future.

While I accept your statement that you did not commit an intentional act of insubordination, I also must hold you responsible for your own choices and actions in this matter. Because of your actions, others in the Division, including your supervisor and team members, were required to substitute for you

**Decision on Proposed Suspension -- Michael T. Benson -- Page 6**

without notice and to communicate with industry on important issues for which you were to have been the Divisional spokesperson. If you believe you need clearer guidance from your supervisors, peers, or co-workers, please take the initiative in the future to clarify any questions or misunderstandings you may have.

However, as a GS-14 professional employee who has worked in this Agency for 20 years, you need to accept responsibility for your own actions and failures.

- You requested that management absolve you of the offense charged, withdraw the proposed suspension, declare the Official Reprimand issued in 1996 as null and void, terminate the suspension of your flexiplace privileges, and reinstate your authorization to work two days of flexiplace per week.

Based on my consideration of your arguments as outlined above and on your refusal to accept responsibility for your misconduct, I will not overturn the offense that is cited in the proposal to suspend, I will not reinstate your flexiplace privileges, and I will not rescind the Official Reprimand that was issued to you in 1996.

- Your NTEU representative, Mr. Jim Timper, offered some information on behalf of the Union for my consideration during your oral reply. Mr. Timper stated that you have 20 years of Federal service, that you are a knowledgeable and dedicated employee. He conceded that you did not attend the meeting in question, and that you were unclear about your attendance at the meeting. Mr. Timper wanted to concentrate on enhancing your working relationship with other members of our Division. He said that you would commit to be careful to understand instructions and work toward closer teamwork in the Division. Mr. Timper proposed that I consider mitigating this action in view of the historical information and procedural aspects of the situation. He defended your intentions and your commitment to avoid future confusion.

I considered what Mr. Timper argued on your behalf and was persuaded by his plea on your behalf and accepted your written reply in which you expressed sincere regret for any inconvenience your absence on February 24, 1998, caused to others. In that reply, you offered to make specified efforts to work with Dr. Katz and the project management staff in the Division to assure that you are clearly aware of your supervisor's and team's expectations about your performance and of your responsibilities in the future.

**Decision on Proposed Suspension -- Michael T. Benson -- Page 7**

Based on these written responses from you and Mr. Timper, I proposed that we reach an alternative resolution of this matter that would not impose the hardship of a suspension on your permanent record. However, you rejected an alternative resolution.

Accordingly, I have now decided on the proposal to suspend you.

After careful review of the proposal and all the material which formed the basis for the proposal, which was provided for your review, and giving full consideration to your written reply dated August 13, 1998, and your oral reply of August 12, 1998, I find that the charge and specifications stated in the proposal are supported by a preponderance of evidence. I have, therefore, decided to sustain the charge of failure to follow instructions, and I have relied on the sustained charge and specifications in making my decision. Further, it is my conclusion that the sustained charge and specifications fully warrant your suspension for three days as proposed.

Accordingly, it is my decision that, in order to promote the efficiency of the service, you will be suspended from duty without pay for a period of three calendar days, November 18, 1998, November 19, 1998, and November 20, 1998. You will be returned to duty status beginning November 21, 1998, and to active duty status on November 23, 1998. You are expected to report to your Corporate Boulevard worksite for duty on November 23, 1998. You will be continued in an active duty status at your present grade and salary until the effective date of this suspension.

In accordance with the Interim Memoranda of Understanding (MOU) #1 and #3 (dated April 20, 1998, and July 9, 1998, respectively) between the FDA and the National Treasury Employees Union (NTEU), you may file a grievance to have your suspension reviewed through FDA's grievance procedures to which the final step of binding arbitration [which may be invoked on your behalf only by NTEU] has been added by MOU #1. FDA's grievance procedures are found in FDA Instruction 771-1, FDA Dispute Resolution System.

If you want to seek review of this decision, you may file a Stage 2, Track 2, grievance under FDA's Dispute Resolution System (DRS). Your grievance must be filed in writing within 15 calendar days from the effective date of your suspension, and should be presented to:

    Dr. Robert Delap
    Director, Office of Drug Evaluation V
    Center for Drug Evaluation and Research
    Food and Drug Administration
    9201 Corporate Boulevard, Room S-219
    Rockville, Maryland 20857

Decision on Proposed Suspension -- Michael T. Benson -- Page 8

Your grievance presentation must otherwise comply with the requirements of the DRS as supplemented by the MOU. Under MOU #3, a complaint concerning discrimination on the basis of race, color, religion, gender, national origin, handicapping condition, age, or sexual orientation may be raised under the DRS or the appropriate statutory procedure, but not both. Initiation of a grievance or the statutory procedures explained below will constitute an irrevocable election.

If you believe this suspension is based on discrimination because of your race, color, religion, sex, national origin, handicap, or age, you may file a discrimination complaint within the Department of Health and Human Services (DHHS) under the Equal Employment Opportunity Commission (EEOC) regulations. To do so, you must first consult an EEO Counselor within 45 calendar days after the effective date of the suspension.

Finally, if you believe this suspension is based on discrimination or harassment because of sexual orientation, you may elect to have that allegation addressed under either the Department's separate procedures for processing such allegations, or under any other procedure which covers you (i.e., the FDA Dispute Resolution System described above). Under the Department's separate procedures, you are entitled to present such concerns to an EEO Counselor within 45 calendar days of the effective date of this suspension. This entitlement derives from DHHS policy and not from EEOC regulations and cannot be pursued to EEOC.

You may contact Margaret Bell, CDER's EEO Manager, on 301-594-6645, or FDA's Office of Equal Employment and Civil Rights on 301-827-4840 for information about obtaining a counselor to initiate a discrimination complaint under the EEOC regulations or a complaint under the separate DHHS procedures (for sexual orientation harassment and/or discrimination).

This action is being processed in accordance with Subparts A and B of Part 752 of Title 5 of the Code of Federal Regulations, DHHS Instruction 752-1, and FDA Staff Manual Guide 1431.12.

You may contact Ms. Kathryn T. Vengazo, Director, Division of Ethics and Labor Management Relations, on 301-827-4180 regarding your rights and the procedures in this matter, to obtain a copy of FDA Instruction 771-1, Dispute Resolution System, or to review the applicable regulations cited above.

Debra Bowen, M. D.

cc:  Jim Timper
     NTEU Steward, Chapter 282

I acknowledge receipt of the original of this memorandum.

Michael T. Benson                          10/23/98
Michael T. Benson                          Date