EXHIBIT U

MEMORANDUM

Date:   February 17, 2000

From:   Michael T. Benson
        Regulatory Review Pharmacist (HFD-560)

To:     Gail Pierpoint
        Director, Division of Employee and Labor Management Relations (HFA-410)

Subject: Step 1 Grievance

This Step 1 grievance seeks a change in final rating of my 1999 performance evaluation plan (PEP) (Exhibit 1) from "fails to meet performance measures" to "meets performance measures" and also seeks reinstatement to working flexiplace from home 2 days a week. Dr. Linda Katz, my first line supervisor determined that elements #1 (individual work management) and #6 (monograph documents) were not met, therefore, she stopped my use of a flexiplace schedule.

<u>Preliminary Matters</u>:

On February 15, 2000, I asked Division Director, Dr. Charles Ganley what items of my work he reviewed before signing off as the Reviewing Official on my PEP rating. My recollection of what he said was "nothing specific" before saying he would have to have Theresa Foster present before discussing that matter further. That response leads me to believe that he did not review any of my work products before signing the PEP form as Reviewing Official to ratify Dr. Katz' final rating. If he didn't review any of my work products, and he signed the PEP on Dr. Katz' suggestion, his opinion is without independent basis, and should be treated as carrying no weight. It's as if his required signature is a nullity. As such, the final rating of "fails to meet performance measures" is invalid.

Dr. Ganley's 12/27/99 memorandum (Exhibit 2) states that my flexiplace agreement was being approved based on my performance over the past year (1999) and due to my underlying medical condition (Exhibit 3). The Flexiplace agreement in pertinent part (Exhibit 4) provides that the employee's performance must be at least "meets performance measures." In effect, Dr. Ganley's memo acknowledges that I have met performance measures for 1999, otherwise my flexiplace agreement would not have been permitted. Dr. Ganley's memo also acknowledges that my medical condition warrants the flexiplace schedule. I relied on those acknowledgments and take the change in position as a breach of those initial commitments. On this point alone, my PEP is warranted for a change to "meets performance measures" and I am entitled to return to my flexiplace schedule. However, other reasons below are presented in support of the same result.

Gail Pierpoint
Page 2

<u>The Material Elements</u>:

Element #1---Individual Work Management

Measure #1, Leadership: Dr. Katz wrote "Waits for others to devise effective solutions." On face value, that statement is vague. If I had something to offer, I said it, otherwise I didn't. Among other things, I have spoken in favor of including the "dry hair" and "kills lice" concepts in pediculicide labeling and was overridden. I also made an attempt to get Bayer Co. to withdraw its submission of data for a gel vehicle for Campho-Phenique. Dr. Katz noted "often meets management due dates with little time for secondary review." The Team Leader doesn't specify the earliest time she wants the work, just when it's due. As long as I meet my deadlines (and that has been acknowledged), it is unfair to hold the secondary review aspect against me. Dr. Katz wrote "does come well prepared to meetings but doesn't translate information into good reviews." I have no idea what she means there. She never said anything to me about that prior to the evaluation. Measure #1 merits more than a valuation of 1.

Measure #2, Manner of performance: Dr. Katz wrote "Work requires extensive rewrites/revisions," and "needs extensive supervisor (and team leader) help." The notations do not specify the items involved. For one item, I worked on preparing the proposed amendment to the OTC pediculicide monograph. At one point, the medical officer on my team, Dr. Linda Hu and I obtained various references to see if we could find something that would implicate pyrethrum extract being subject to lice resistance. We found none. Marina Chang, team leader told me to go ahead with the rest of the document and not to look for any more references. I did and turned in the draft to her. Approximately 2 months later, I learned that Dr. Hu had looked for other references, and found one discussing treatment failures with pyrethrum extract, although it didn't state that lice were resistant to that ingredient. From that article, it was logical to follow up that synthetic pyrethroids have met lice resistance and the most effective way to combat treatment failures is with fomite control and more thorough combing. Without that reference, such a writeup would have implicated pyrethrum extract without foundation. Dr. Katz blamed me for not getting into a discussion like that. Until that additional reference was found, former versions of the draft document were approved. When turned in, changes were made, but they were not so substantive. If other reviewers don't know what they want, it's not fair to blame me for not being able to read their minds. Other items on which I worked were labeling reviews. We've had numerous changes in style relating to this work aspect. The most recent were "Drug Facts" labeling, and use of a grid style chart. When I began working with each of these changes, I sought interpretation of how to handle them with team leader, Marina Chang who made suggestions and sometimes changed her position. These situations ought not count against me for rating of this measure which deserves to be valued at more than 1.

Gail Pierpoint
Page 3

Element #6---Monograph Documents

Measure #1: Document Development

Dr. Katz wrote "Documents require extensive rewrites" and "needs help with formatting and organization of documents." This measure refers to EPMS Element 2 which states that for a fully successful rating, some substantive revisions are required. A drafting history of a monograph document (Exhibit 5) by a GS-14 colleague in the 1999 rating period shows extensive revision and change. Most documents undergo numerous revisions and changes. For me to be singled out by Dr. Katz with her valuation of 1 treats me unequally with the drafter in Exhibit 4 whose document also underwent extensive revision and change, and he received a "meets performance measures" rating. When the Label Formatting final rule published, that format had to be adapted to the monograph section of the pediculicide document which is referred to in Element #1, Measure #2. Its discussion is also applicable to this measure. I sought help with that aspect of the document, because I had not been involved in that final rule, and there was no other example of a comparable monograph. Other than that, I am unaware of any specific format and organization of document to which Dr. Katz refers. I also isolated issues and put together summaries for the diphenhydramine warning final rule, and forwarded them to Dr. Katz who hasn't said anything to me about them. That preparation took quite a bit of work and I trust it was respectable. Team leader Marina Chang has not had a lot of experience in developing monograph documents. To my knowledge, she has not prepared a monograph document that cleared the Division. If she gave Dr. Katz negative feedback, it should be discounted for this measure. If Dr. Katz didn't take my work on diphenhydramine warnings into account for my evaluation, she should have, since it occurred during the 1999 rating period. Maybe that work would have caused her to give me a rating higher than the number 1. I deserve more than that.

Past Rating Events with Dr. Katz:

The following events indicate a propensity of Dr. Katz to rate me lower than I deserve.

Attached is a copy of an E-Mail message from former Director, Dr. Debra L. Bowen to our division (Exhibit 6) saying in effect that document review will be by Anne Mustafa and Gerald Rachanow. During that rating period, I worked on one document reviewed by Mr. Rachanow. Dr. Katz refused to ask Mr. Rachanow about my work on that document and only accepted input from Anne Mustafa. It was patently unfair for Dr. Katz not to ask Mr. Rachanow for his opinion of my work when it was applicable to my PEP rating. Was Dr. Katz afraid that Mr. Rachanow might have something positive to say about my work on the document under his review?

At a meeting on a previous PEP, I had asked Dr. Katz about some ratings of 3 on certain elements. She said maybe in the future I might get "a couple" of 3s. By saying "a couple" of 3s, she gave me the impression that she foreclosed for me the possibility in the future of ever getting a rating of 3 more than 2 times, if ever.

Gail Pierpoint
Page 4

In another rating period, I cast the sole dissenting vote for resolving a complex sunscreen issue. When I explained my reasons for the dissent, former Division Director, Dr. Debra Bowen agreed with me and incorporated my position into the sunscreen final monograph in the FEDERAL REGISTER. This action was brought to Dr. Katz' attention. She refused to rate me a 3 on the element relating to that aspect of work when it was fairly warranted.

Her course of conduct as described indicates prejudicial bias into lowering my PEP rating and is defamatory to me. In another defamation-related incident, Dr. Katz made a statement under oath in one proceeding that I agreed to chair a 2/24/98 meeting which I didn't attend, and I stated the contrary at another transcribed proceeding (Exhibit 7, underlined part of top and all of bottom). I was not aware her affidavit existed at the time I made my statement, and found out about it later. I find her statement defamatory to me because my reputation for keeping agreements is put in jeopardy by anyone reading her affidavit without my response. If I had agreed to chair the particular meeting as indicated in Dr. Katz' affidavit, that "agreement" surely would have been mentioned in her July 28, 1998 memo to me about why she felt I was wrong for missing that meeting. It wasn't. Her prejudicial bias could have been expected to carry over into this evaluation, and evidently was. I believe this bias to be an abuse of her discretion and of her authority as my supervisor.

<u>Other Related Items:</u>

At the midyear review, I was given the cover page to the 1999 PEP by Linda Fujiwara and no other pages, apparently as directed by Dr. Katz. Since the midyear review had checkmarks for areas that Dr. Katz indicated needed improvement, I should have been given a copy of those pages as a reminder of those areas.

Marina Chang did not distribute copies of the attached 2 memoranda (Exhibits 8 and 9) of telephone conversations, thus keeping information that would have been favorable to my evaluation away from Dr. Katz. One of them would have showed Dr. Katz that I found a basis to try to get Bayer to withdraw its submission of data in support of Campho-Phenique Gel and that I exercised initiative in talking to the company to try to save our resources in preparing a complex feedback letter. It would have merited a higher value for measures related to those telecons.

Marina Chang has extensive experience with labeling reviews, unlike the other team leaders. As a result, she can be expected to take a more critical evaluation of work on labeling reviews than other team leaders not so experienced. That tendency should be scaled in line with that of the other Team Leaders so that an evaluation of labeling reviews will be equivalent in strictness to all others in the Division. That was not the case with this evaluation. I have heard that she gave negative feedback about another of my team's interdisciplinary scientist labeling reviews, and that the 3rd such professional on my team had little or no direct work involving clearance by Marina Chang. She would be able to rate everybody on labeling reviews if she were classified at her current grade as a Special Assistant to the Director overseeing everybody's labeling reviews.

Gail Pierpoint
Page 5

I have heard that at a team leader/management meeting, Marina Chang said she was suspicious that figures entered on my time and attendance sheet in advance of my leaving would vary with my time to leave work on a day when I came to the office after my usual arrival time. If she talks behind my back in that manner, I can easily expect that she will emphasize the negative and omit the positive items in reporting to Dr. Katz about my evaluation. The withheld memos of telecon discussed above are examples of such treatment.

Dr. Katz once held me liable over a matter involving a Likert scale relating to a valerian study. I had never heard of a Likert scale. I asked several statisticians with doctorates about it and they also didn't know about it. I finally found one who knew about it. On that basis, I shouldn't have been held at fault for not being familiar with the Likert scale. Before Dr. Hu found a reference that was pivotal in an additional writeup to the pediculicide report, Marina Chang told me to discontinue looking for references and prepare the report with what I have. With regard to pediculicide directions, they were changed numerous times by medical officers. I do not have clinical experience in the matter of treating pediculosis. Also, it has been Division practice to put directions in the monograph without giving reasons in the directions. Otherwise monograph directions would be changed similar to that of a common sign from "No Parking" to "No Parking because it may block rush hour traffic." To my knowledge, the pediculicide monograph will likely be the first one to have reasons for some of the directions for a plausible reason of better compliance. Dr. Katz has apparently held me to the standard of a medical officer. She once said to me "play M.D." I can play it to a point but ask that when evaluating me on the PEP, she take into account that I am not an M.D., and that she scale my rating accordingly.

In prior performance evaluations, Dr. Katz has shown an ingrained bias to rate me lower regardless of what I do. I didn't grieve past performance evaluations before. This time, I feel compelled to grieve because of the final rating. There were flaws as discussed above in the evaluation of my PEP which provide grounds to readjust the PEP to "Meets Performance Measures" and to reinstate my flexiplace schedule.

Michael T. Benson

Attachments
Exhibit 1--1999 Michael Benson PEP
Exhibit 2--12/27/99 memo from Dr. Charles Ganley
Exhibit 3--9/28/98 letter from Dr. John Bach
Exhibit 4--excerpt of 2000 Flexiplace Agreement
Exhibit 5--drafting history of a document
Exhibit 6--8/11/97 E-Mail from Dr. Debra Bowen
Exhibit 7--excerpts of Dr. Katz' 6/22/98 affidavit and Michael Benson's transcript of an 8/12/99
     proceeding
Exhibit 8--memo of separate telecons between Michael Benson and Bayer reps.
Exhibit 9--memo of telecon between Michael Benson and Kentucky Medical Assn. president

# EXHIBIT V



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Food and Drug Administration

# Memorandum

Date:            MAR    9  2000

From:            Director
                 Division of Over-the-Counter Drug Products
                 Office of Drug Evaluation V

Subject:         Step 1 Grievance Decision

To:              Michael Benson
                 Regulatory Review Pharmacist
                 Division of Over-the-Counter Drug Products
                 Office of Drug Evaluation V
                 Center for Drug Evaluation and Research

This responds to your grievance dated February 17, 2000.  The issues
of your grievance are:  (1)  your final rating of "Fails to Meet
Performance Measures" on your Performance Evaluation Plan (PEP) for
1999; and (2) the withdrawal of your flexiplace privilege.  I am the
reviewing official for your PEP rating and have the authority to grant
your request for flexiplace.  As such, I have been assigned as the
appropriate Step 1 Deciding Official and my response to the material
issues raised in your grievance follows.

Preliminary Matters

You state your belief that I did not review any of your work products
before signing the PEP form and that my opinion should carry no
weight.  Your recollection of our conversation on February 15 is
inaccurate and misleading.  In fact, I am aware of your work products
and have discussed these extensively with Dr. Katz.  There is no
requirement that I personally review your work products in order to
sign your PEP form as the Reviewing Official.  I find no violation of
regulation, procedure, or the Collective Bargaining Agreement in this
instance.

You state that my memorandum approving your flexiplace agreement
"acknowledges that [you] have met performance measures for 1999."
This is not accurate.  I approved your flexiplace agreement on
December 27, 1999, because at that time your most recent rating of
record was "Meets Performance Expectations" (based on your 1998 PEP).
You have misconstrued my comment about your "underlying medical
condition."  My intent in my memorandum of December 27, 1999 was to

document that I had considered your most recent performance rating and had also considered your medical condition. My conclusion was that you were authorized two days of work at home, which is consistent with my approvals for other members of the Division. I did not determine that your medical condition warranted work at home above that approved for other Division members.

<u>Element #1-Individual Work Management</u>

<u>Measure #1 - Leadership</u>

You state that Dr. Katz's comment, "Waits for others to devise effective solutions" is vague. The intent of this comment is to describe your lack of exercise of, or inability to exercise, independent thought in completing your work. Unless Dr. Katz, or others assigned to peer review your work, specifically informs you as to what you should include in your report, you do not include the relevant and necessary information.

You state that it is unfair to hold you accountable for the time spent by the secondary reviewer. As you are well aware, we have PDUFA deadlines imposed upon us and divisional goal dates by which tasks must be completed. A reviewer clearly cannot wait to submit an assignment on the designated PDUFA due date or divisional goal date. Clearly, you must allow time for the secondary review. This has not been your practice. Additionally, there have been occasions when you have missed the divisional goal deadlines in submitting your reviews.

You state that you "have no idea what [Dr. Katz] means by her statement that you "come well prepared to meeting but doesn't translate information into good reviews." To clarify, Dr. Katz intended to convey to you that, although you may make clear presentations at a meeting, when you write your reviews, these are neither clear nor consistent with your verbal presentation. As an example, your presentation at the meeting on diphenhydramine was acceptable, but the written report did not adequately convey those thoughts.

<u>Measure #2 - Manner of Performance</u>

Dr. Katz noted in your PEP rating, "Work requires extensive rewrites/revisions," and "needs extensive supervisor (and team leader) help." Your grievance states that Dr. Katz did not specify the items involved and goes on to provide examples of items you worked on which you alleged "ought not count against [you]." I do not find your examples persuasive. The nature of these rewrites/revisions and supervisory help referred to in this measure include matters not only

substantive in nature (see specific items discussed in Measure #1 above), but also include matters related to the actual writing of reviews, such as ability to follow review templates, and labeling formatting and fonts (as stated in the OTC final labeling rule). As you know, I have had multiple meetings with the Division staff to discuss and stress the importance of consistency in formatting and font size, as well as content of labels. Dr. Katz and Marina Change have spent considerable time showing you how to prepare a document to comply with this requirement. Even so, you failed to adequately and consistently address these issues in your reviews.

Element #6 - Monograph Documents

In response to Dr. Katz's comments on this element, you provide a drafting history of a monograph document, which you allege shows extensive revisions, and you argue that some substantive revisions are permitted for a fully successful rating. Your example of ephedrine is not comparable to your work. The Agency policy on this drug has changed over the past few years, which has resulted in revisions to the document. These revisions were not the result of poor writing quality, as is the case with your documents. Additionally, many of the revisions in the ephedrine document were from sources outside the Division. In your case, substantial revisions are necessary before the document leaves the Division.

You argue that the publication of the Label Formatting final rule necessitated changes to the pediculicide document. I recognize the new rule is complicated. However, its publication affected the entire Division and it was the responsibility of each reviewer to become familiar with the rule and implement it.

I do not agree with your argument that Marina Chang is not fully qualified to evaluate your work on monograph documents. One could take your logic further and say that I am not qualified to evaluate your work on monograph documents because of my shorter tenure in HFD-560 than Marina Chang.

Past Rating Events with Dr. Katz

I do not find any of the examples provided relevant to the rating you were assigned in 1999. Dr. Katz is fully capable of evaluating your work in a fair and impartial manner.

Other Related Items

At the midyear review, Dr. Katz discussed the areas in which you were deficient and you signed the form in her presence. The cover page

references the items which are marked as needing improvement.  If you were given only the cover page, it was your responsibility to request a copy of the remainder of the document.  I do not find this argument sufficient to invalidate your rating.

The records of telephone conversations, which you allege Marina Chang did not distribute, are not persuasive evidence to change your rating.

Again, you argue that Marina Chang should not have input into your rating.  In this case, however, you state that she has "extensive experience" and "can be expected to take a more critical evaluation" of your work.  I repeat my previous response that Marina Chang is fully qualified to provide fair, unbiased input into your performance evaluation.  You should keep in mind that your labeling reviews have also been critiqued by Dr. Katz.  Your evaluation has been based on her impression of your work.

Finally, you raise an issue regarding a Likert scale.  This incident occurred prior to the 1999 rating period and was not considered in your current rating.

Based on the foregoing, I believe the rating assigned by Dr. Katz of "Fails to Meet Performance Measures" is fully warranted and I am denying your grievance and your requested relief.

If you are dissatisfied with this decision, you have the right to file a Step 2 grievance with Robert Delap, M. D., Director, Office of Drug Evaluation V.  This grievance must be filed within fourteen (14) calendar days of your receipt of this decision.

Charles Ganley, M. D.

# EXHIBIT W



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Food and Drug Administration

# Memorandum

Date:          **JUN - 8 2000**

From:          Director
               Office of Drug Evaluation V

Subject:       Step 2 Grievance Decision

To:            Michael Benson
               Regulatory Review Pharmacist
               Division of Over-the-Counter Drug Products
               Office of Drug Evaluation V
               Center for Drug Evaluation and Research

This responds to your grievance dated April 6, 2000. The issues of your grievance are: (1) your final rating of "Fails to Meet Performance Measures" on your 1999 Performance Evaluation Plan (PEP); and (2) the withdrawal of your flexiplace privilege (FWAP).

On May 2, 2000, we met for the purpose of allowing you an opportunity to explain your position on the issues of this grievance. At that meeting, I informed you that I was aware of and understood the procedural problem with your 1999 PEP rating. This issue will be addressed in more detail below. Your oral presentation focused primarily on the revocation of your FWAP Agreement. I asked you to provide examples of your work products, so that I could make an independent assessment of your performance. This assessment would help form the basis for my determination on whether to reinstate your flexiplace privilege.

With regard to your 1999 PEP rating, I have determined that the PEP, when initially established on February 8, 1999, included performance measures for a Team Leader. Since these measures did not apply to you, I find that your 1999 rating is invalid. Therefore, I am directing Dr. Katz to withdraw the rating from your records. Because you have no official rating, the formal Performance Improvement Plan (PIP) will also be withdrawn. You will receive a separate memorandum from Dr. Katz concerning this matter. However, I do believe that you may benefit from a period of closer supervision such as that which was described in the PIP memorandum. I will request that Dr. Katz continue to closely monitor your performance and provide you with appropriate guidance and assistance in improving your performance.

On the issue of your FWAP Agreement, I have concluded that: (1) Dr. Ganley's decision in December 1999 to approve your FWAP Agreement was based on your most recent rating of record, which was "Meets Performance Measures;" (2) Dr. Ganley's reference to your "underlying medical condition" referred only to his conclusion that your medical condition had not been established to warrant a special

flexiplace accomodation consistent with the provisions of Section 3.C of Article 26 of the Collective Bargaining Agreement; and (3) the current suspension of your flexiplace schedule is warranted. I base this last conclusion on my review of the documents you provided to me in support of your grievance and my conversations with Dr. Ganley.

I believe that you have the ability to make substantive contributions to the work of the agency. However, you need to demonstrate significant improvement in the specific and very important area of efficient independent completion of written technical documents. As noted above, I encourage you to take advantage of the opportunity for a period of closer monitoring, guidance, and assistance from Dr. Katz and/or her designees. I also note that we recently discussed your taking responsibility for finalizing the fever blister component of the skin protection monograph. Your efficient and successful independent completion of a well-written document could help substantially to increase confidence in your ability to work in an independent manner in preparing technical documents.

In summary, based on the foregoing, I am granting your requested relief in part (with respect to withdrawal of your PEP rating for 1999), but I am at this time denying your grievance and your requested relief on the issue of the suspension of your flexiplace privilege.

As provided by the negotiated grievance procedure in the FDA-NTEU Collective Bargaining Agreement (CBA), the Union has the right to file for arbitration of this grievance under the terms of applicable sections (including, but not limited to, Article 46) of the FDA-NTEU CBA, within 30 calendar days of the date of receipt of this Step 2 grievance decision. You may consult a Union representative regarding any questions you may have about arbitration.

Additional information about your grievance rights may be obtained by consulting the FDA-NTEU CBA at the following Intranet site: http://www.nteu282.org, or by contacting a Union representative, or Theresa Foster, Labor and Employee Relations Specialist in the Division of Employee and Labor Management Relations (DELMR) on 301-827-4180.

A copy of this Step 2 grievance decision will be provided to the Union in accordance with the FDA-NTEU CBA.

Robert J. DeLap, M. D.

# EXHIBIT X





DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

**PERFORMANCE MANAGEMENT PROGRAM (PMP)**

## Performance Evaluation Plan (PEP)

---

**PART I: IDENTIFYING INFORMATION**

EMPLOYEE'S NAME: Michael T. Benson

SSN: 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

POSITION TITLE: Regulatory Review Pharmacist

SERIES: GS-0660

GRADE: 14

ORGANIZATION: DHHS/FDA/CDER/ORM/ODEV/Division of OTC Drug Products, HFD-560

**PART II: PERFORMANCE PLAN**

SET AND APPROVED

FOR THE PERIOD: 1/1/02    TO: 12/31/02

RATING OFFICIAL SIGNATURE: _Linda M Katz_    DATE: 2/4/02

EMPLOYEE SIGNATURE: _Michael T. Benson_    DATE: 2/4/02

**MIDYEAR PROGRESS REVIEW**

DATE REVIEW CONDUCTED: 7/16/02    RATING OFFICIAL SIGNATURE: _Linda M Katz, M.D._    EMPLOYEE SIGNATURE: _Michael T Benson_

COMMENTS:

**MIDYEAR PROGRESS REVIEW**

**PART III: FINAL RATING**

FINAL RATING:

[✓] Meets Performance Measures     [ ] Fails to Meet Performance Measures

RATING OFFICIAL SIGNATURE: _Charles J Ganley_    DATE: 2/6/03

EMPLOYEE SIGNATURE: _Michael T Benson_    DATE: 2/10/03

REVIEWING OFFICIAL SIGNATURE: *(Required if Final Rating is "Fails to Meet Performance Measures.")*    DATE:

COMMENTS: *(Required if Final Rating is "Fails to Meet Performance Measures.")*

See Attached Comments.

---

FDA 3440 (8/96)

Page 1

## Performance Evaluation Plan (PEP)
## Directions

Column 1   The element, a brief description of the element's objective, and the final rating for that element. There is space provided in which the supervisor can add additional elements for specific tasks or goals.

Column 2   Measures for the element. Measures are written for the "Meets Performance Measures" level.

In planning employee goals, the supervisor and employee shall discuss elements for the year and those measures appropriate for the objective of the element and for the employee. Those measures for which the employee is to be appraised are checked in the boxes to the left of the measures. The supervisor and employee discuss what is expected in each of these measures based on the individual employee's work area. There is a space below the measures beginning with the phrase "As evidenced by" in which the supervisor can add definers for the measures above. There is space provided in which the supervisor can add additional individualized measures for that rating year.

Column 3   Midyear Progress Review notes. A "✓" is placed in this column for a specific performance measure which the supervisor perceives as an area of weakness or area he/she feels the employee needs to concentrate on for the remainder of the rating period. These "✓"s denote target areas for the rest of the year.

Column 4   The performance measure rating.

If the employee "Exceeds Performance Measures" for a specific measure, a "3" will be placed in this column at the end of the rating period.

If the employee "Meets Performance Measures" for a specific measure, a "2" will be placed in this column at the end of the rating period.

If the employee "Fails to Meet Performance Measures" for a specific measure, a "1" will be placed in this column at the end of the rating period.

## Rating Levels

**Deriving Element Ratings**    A "✓" is placed in the appropriate box in Part III: Final Rating." The average of the performance measures within the element, with Exceeds = "3," Meets ="2," and Fails = "1." An average of ".5" or better is rounded up to the next number. Ratings are whole numbers.

**Deriving Final Ratings**

Meets Performance Measures          If all elements are rated "Meets Performance Measures" or "Exceeds Performance Measures," the final rating level is "Meets Performance Measures."

Fails to Meet Performance Measures    If one or more elements is rated "Fails to Meet Performance Measures," the final rating is "Fails to Meet Performance Measures."

Performance Evaluation Plan (PEP)

| ELEMENTS | PERFORMANCE MEASURES | M I D Y E A R | FINAL MEASURES RATINGS |
|---|---|---|---|
| | Standards for "Meets Performance Measures"<br><br>1. Check all measures for which the employee will be rated.<br>2. Add additional measures after the bullets, if needed.<br>3. Define a measure further on the "As evidenced by" line, if needed. | | 3 - Exceeds<br><br>2 - Meets<br><br>1 - Fails to<br><br>Meet |

**1 Individual Work Management**

*Works to accomplish tasks or provide services effectively and efficiently in support of the Agency's mission.*
*Strives for excellence.*

**Final Element Rating**

Exceeds ☐

Meets ☑

Fails to meet ☐

---

☒ Leadership *(Examples may include):*
- Plans work toward set goals/results.
- Communicates clearly and effectively orally.
- Uses effective judgement and conduct in the performance of responsibilities.
- Devises effective solutions to problems and appropriate procedures for accomplishing objectives.

*At mid-yr - still unable to demonstrate effective solns to problems without*

- As evidenced by: See attached EPMS elements 1 and 2 *excessive input from the others working with you.*
- As evidenced by: _____

☒ Manner of performance *(Examples may include):*
- Work products are clear and well-organized.
- Communicates clearly and effectively in writing.
- Completes work within established deadlines.
- Works independently with little need for supervision or help.
- Follows management procedures, directives, regulations, or technical orders.

_____

- As evidenced by: See attached EPMS elements 1 and 2
- As evidenced by: _____

☒ Communication *(Examples may include):*
- Seeks other opinions, as appropriate, to produce balanced work product.
- Keeps supervisor apprised of changes, progress, and barriers to progress.
- Undertakes difficult assignments with a professional attitude.
- Adjusts positively to changes in workload and priorities.

*At mid-yr still requires more input + assistance than would be*

- As evidenced by: See attached EPMS element 4 *expected for perform*
- As evidenced by: _____ *at a GS-14 level.*

Mid-year ratings: **2**, **1**, **3**

---

**2 Teamwork**

*Works with others either in formal teams or ad hoc groups to accomplish tasks or provide services effectively and efficiently.*

**Final Element Rating**

Exceeds ☐

Meets ☑

Fails to Meet ☐

---

☒ Cooperation *(Examples may include):*
- Works well with other Agency groups and organizations for the success of the group or organization.
- Works with others in developing and implementing solutions to problems.
- Assists others to meet objectives.
- Maintains effective working relationships with team members.
- Actively participates in team efforts.

☒ Leadership *(Examples may include):*
- Leads or follows, as necessary, within the team.
- Takes initiative to arbitrate and resolve disagreements if they arise.

☒ Commitment to Team Effort *(Examples may include):*
- Shares information willingly.
- Shares credit, recognition, and visibility with others.
- Supports and promotes team decisions and initiatives.

_____

- As evidenced by: _____
- As evidenced by: _____

Mid-year ratings: **2**, **2**, **2**

---

FDA 3440 98/960

Performance Evaluation Plan (PEP)

| | | |
|---|---|---|
| **3 Technical Competency**<br><br>*Knowledge, skills, and abilities.*<br>**Final Element Rating**<br><br>Exceeds ☐<br><br>Meets ☑<br><br>Fails to meet ☐ | ☒ Technical Competency *(Examples may include)*:<br>• Demonstrates technical competency/expertise in area of responsibility.<br>• Demonstrates quality and accountability in the majority of work activities.<br>• Keeps abreast of current developments within area of responsibility.<br>• Requires minimal supervision.<br>• Displays understanding of how job relates to others within area.<br>• Demonstrates technical competency in effectively using Agency information systems and computers.<br><br>☒ Leadership/Mentoring *(Examples may include)*:<br>• Fosters teamwork, commitment, and quality service to customers.<br>• Coaches employees in problem solving and decision making.<br>• Provides encouragement, guidance, and direction to teams and individual employees.<br>• Provides information and encouragement to other employees that empowers them to think and act on their own.<br>• Helps other employees to improve work performance through effective coaching.<br>• Leads by example.<br>• Adjusts leadership style to fit situation.<br>• Resolves controversial or delicate matters skillfully.<br>• Encourages and supports new ideas to improve work processes and services.<br>• Communicates effectively with employees.<br>• Provides honest, and constructive feedback to other employees.<br>• Negotiates conflicts effectively.<br><br>_____<br>• As evidenced by: See attached EPMS elements 1 and 2<br>• As evidenced by: _____ | 1<br><br><br><br><br><br><br><br>Marginal<br>2 |
| **4 Creativity/ Problem Solving**<br><br>*Seeks creative approaches in completion of work. Influences others by ideas or example.*<br><br>**Final Element Rating**<br>Exceeds ☐<br>Meets ☑<br>Fails to Meet ☐ | ☒ Initiative and innovation *(Examples may include)*:<br>• Shows initiative in starting, carrying out, and completing tasks.<br>• Seeks alternative solutions and creative approaches to problem solving.<br>• Takes into consideration new ideas and differing professional opinions.<br>• Treats change as an opportunity for growth and mistakes as learning opportunities.<br><br>☒ Leadership *(Examples may include)*:<br>• Exhibits collegiality. Works well with other Agency groups and organizations for the success of the Agency's mission and goals.<br>• Supports division, center/office, and Agency goals.<br>• Demonstrates integrity and professionalism.<br>• Leads by example. Acts as a role model for providing quality service.<br><br>_____<br>• As evidenced by: See attached EPMS elements 1, 2, and 4<br>• As evidenced by: _____ | 1<br><br><br><br><br>2 |
| **5 Customer Service**<br>*(Customers as defined by the employee's supervisor)*<br><br>*Provides professional and responsive service within mutually agreed upon time frames.*<br><br>**Final Element Rating**<br>Exceeds ☐<br>Meets ☑<br>Fails to Meet ☐ | ☒ Customer Service *(Examples may include)*:<br>• Delivers high quality products/services to internal/external customers.<br>• Stays focused on customer needs through effective communication.<br>• Projects positive attitude.<br>• Treats everyone with courtesy and respect.<br>• Honors commitments and agreed upon deadlines.<br><br>_____<br>• As evidenced by: See attached EPMS, all elements<br>• As evidenced by: _____ | 2 |

**Addendum to Performance Evaluation Plan for Michael Benson**
February 5, 2003

Michael Benson is a Grade 14 Regulatory Review Pharmacist who works as an Interdisciplinary Scientist (IDS) within the Division of OTC Drug Products. As a Grade 14, he is expected to be able to work independently with little need for oversight, produce high quality reviews on NDA related projects and develop and write monograph related documents. In the course of assessing his overall performance this year, I have gathered information from IDS Team Leaders who have directed the work projects that he has worked on. I have also reviewed some of the written projects, both NDA and monograph related, that he has provided to the Team Leaders. Additionally, I have observed Michael's participation and preparation at meetings.

On his mid-year evaluation, Dr. Katz noted that he "required more input and assistance than would be expected from one at Grade 14 level" and "unable to demonstrate effective solutions to problems" under the Element of Individual Work Management.

My personal observations of Michael particularly in meetings are that he is professional, prepares for the meetings by generally reviewing the relevant regulatory history and generally has opinions, which he readily expresses.

The IDS Team Leaders who have worked with Michael this past year have continually expressed concerns about the quality of the written documents. The work projects have been characterized as not well thought out, in some instances incomplete, needs improvement in technical competency, needs improvement in creativity and problem solving, just puts something together without evaluating the issue, and often requires extensive revisions before being passed on to the next level of review. I have reviewed some of his initial drafts of written projects and note that he needs to pay more attention to detail (particularly for labeling reviews) and there needs to be improvement in organization of documents. After reviewing some of this material, I understand the comments of the Team Leaders. For someone who is a Grade 14, the quality of the written work projects is not acceptable and should be better. For these reasons, I have rated Michael as **fails to meet** on three Performance Measures that are relevant to the issues just outlined.

I will note that Michael does seek a lot of advice from Team Leaders and this should not necessary be construed as a negative. I gave a Performance Measure rating of 3 (exceeds) for Communication because this should be encouraged. In Michael's case, the communication with the Team Leaders and others has not translated into a better written project.

The overall performance for Michael is Meets Performance Measures. He was not rated as fails to meet on any of the individual elements. I do have concerns, however, about the quality of the written projects Michael is providing and believe he would benefit from a Performance Improvement Plan. I also believe that until there is improvement in the quality of his written work he should no longer be permitted to work at home (flexiplace).

Charles J. Ganley, M.D.

**Job Element No. 1**
**Critical Element**

Job Element:

Coordination of Team Work Products

Directs and oversees the quality of the technical work products of the team. Assigns and reviews work daily, weekly, or monthly as necessary. Assigns work to team members based on priorities, selective consideration of the difficulty and other requirements of assignments, and the capabilities of the team members. Gives advice, counsel, or instruction to team members on work matters. Assures that production and accuracy requirements are met for work products. Identifies and proposes solutions to problems with workflow and meeting deadlines for the team. Coordinating with the Team Project Manager, plans work to be accomplished by team members, sets and adjusts short-term priorities, and prepares schedules for completion of work. Reassigns team priorities or team members as necessary during the performance period. Uses the Division work goals set by the Planning Team to coordinate and monitor the teams progress in meeting the work goals. Finds ways to improve production or increase the quality of the team's work. Recommends informal input into the performance rating of team members to be used by the supervisor in rating employees under the Employee Performance Management System. Cooperates with the CDER management control review program in the conduct of FMFIA program areas within the team as required for FMFIA activities.

Excellent:  Meets with team members individually and as a whole team on a regular basis to discuss work assignments, progress, problems, solutions, and strategies for resolving OTC drug issues involving the team's work assignments. Willingly takes on work tasks and produces high quality work products when deadlines are tight and team member resources are inadequate to meet team, Division, Office, and/or Center deadlines/goals. Provides timely and complete reports that are of exceptional quality on the progress of team work assignments in both written and oral formats to the Division Director and other team leaders. Meets all of the Fully Successful standards and shows exceptional innovation and imagination in executing projects, plans, assignments, etc. The teams performance is highly regarded by the Division Director as being very professional and immediately responsive to meeting the Division, Office, and Center goals.

Fully Successful:  Meets with team members individually and as a whole team on a regular basis to discuss work assignments, progress, problems, solutions, and strategies for resolving OTC drug issues involving, the team's work assignments. Provides timely and complete reports on the progress of team work assignments in both written and oral format to the Division Director and other team leaders. Shows innovation and imagination in executing projects, plans, assignments, etc. The team's performance is regarded by the Division Director to be adequate in meeting the Division, Office, and Center goals.

**Job Element No. 2**
**Critical Element**

<u>Job Element:</u>

<u>Monograph document development:</u>

Ensures the development of tentative final and final monographs and other documents for FEDERAL REGISTER publication to meet goals agreed to during meetings of the Division's Planning Team at the beginning of the performance period and updated as necessary during the performance period. Note: Completion of documents is dependent upon timely review of data and draft documents by Office, CDER, and Office of General Counsel personnel.

<u>Excellent:</u> Eighty percent of the document development goals agreed to during the Planning Team  meetings are issued from the Division by September 30, 1996. Documents are of high quality as evidenced by the ability to recognize and resolve issues and problems in advance of final Division review. Few significant substantive revisions are required.

<u>Fully Successful:</u> Seventy percent of the document development goals agreed to during the Planning Team meetings are issued from the Division by September 30,1996. Documents are of average quality as evidenced by the ability to recognize and resolve issues and problems in advance of final Division review. Some substantive revisions are required.

**Job Element No. 3**
**Critical Element**

<u>Job Element:</u>

<u>Regulatory and IND/NDA issues:</u>

Ensures the preparation of background and issue memoranda for agenda items for OTC Drugs Advisory Committee, Division, Office, Center, and Agency meetings; feedback letters related to Division recommendations on scientific data; memoranda and/or letter requesting consultation on scientific protocols and data; reviews of IND/NDA issues, scientific protocols, data and labeling reviews; and other documents related to the resolution of legal, scientific, and technical OTC drug issues.

<u>Excellent:</u>  Demonstrates a good understanding of the issues/work assignments involved and an excellent ability to communicate that understanding to team members. Work products are of high quality with respect to completeness, clarity of organization and writing, and inclusion of all appropriate supporting documentation. When applicable, work products present complete lists of options, including applicable pros and cons of possible approaches to resolution of an issue. Work products do not require substantive revision. Demonstrates good judgement and ingenuity in recommended courses of action, and acts expediently to ensure timely completion of team assignments, including taking on work tasks and producing high quality work products when deadlines are tight and team member resources are inadequate to meet team, Division, Office, and/or Center deadlines/goals.

<u>Fully Successful:</u>  Demonstrates an understanding of the issues/work assignments involved and communicates that understanding to team members. Work products are of average quality with respect to completeness, clarity of organization and writing, and inclusion of most of the appropriate supporting documentation. When applicable, work products present lists of options, including applicable pros and cons of possible approaches to resolution of an issue. Work products require few substantive revisions. Demonstrates good judgment in recommended courses of action, and acts in a timely manner to complete team assignments.

**Job Element No. 4**
**Noncritical Element**

<u>Job Element:</u>

<u>Responding to correspondence:</u>

Ensures a quality and timely response in no more than 30 days for regular correspondence (consumer and professional inquiries), 10 days for FOI and special correspondence (correspondence referred by the Commissioner or the Office Director), and 3 days for Congressional or correspondence referred by the Secretary, DHHS.  Note: Response times are the number of calendar days elapsed between receipt of correspondence in the Division and the date of signature of the final copy or draft response by Division signatory official.

<u>Excellent:</u>  Responses are completed and signed by the signatory official within the appropriate timeframe for more than 90 percent of the correspondence referred to the team. Responses are judged to be complete, accurate, and of high quality (as related to the difficulty of the response). All issues raised by the correspondence have been addressed, some with ingenuity, in the opinion of the Division Director.

<u>Fully Successful:</u>  Responses are completed and signed within the timeframe for 75-90 percent of all correspondence referred to the team. Responses are judged to be complete, accurate, and of average quality (as related to the difficulty of the response).  All issues raised by the correspondence have been addressed in the opinion of the Division Director.